Allen Lichtenstein
3315 Russell Road #H222
Las Vegas, Nevada 89120
702-433-2666

Mark Lopez
American Civil Liberties Union
125 Broad St., 17th Floor
New York, NY 10004
212-549-2608

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

American Civil Liberties Union of )
Nevada, Gary Peck, Unitarian )
Universalist Social Justice Committee, )
Paul R. Brown, The Shundahai Network, )
and Greg Gable, )
)
    Plaintiffs, )
)
    vs. )    CV-S-97-01419-DWH (LRL)
)
The City of Las Vegas, Jan Laverty )
Jones, in her official capacity as the )
Mayor of Las Vegas, The Fremont Street )
Limited Liability Corp., and Mark Paris, )
in his official capacity as the )
Executive Director of The Fremont Street )
Limited Liability Corp. )
)
    Defendants. )
_____ )

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Come now the Plaintiffs, by and through the undersigned attorneys, and file this Motion for

Summary Judgment. This Motion is based on all pleadings and papers on file herein, and the

Memorandum of Points and Authorities attached hereto, and any further argument and evidence as

may be presented at hearing.

Dated this 1st day of November 2000.

Respectfully submitted by:

1

2

Allen Lichtenstein
3315 Russell Road, No. 222
Las Vegas, Nevada 89120
(702) 433-2666
Nevada Bar No. 3992

and

Mark Lopez
*American Civil Liberties Union Foundation*
125 Broad St., 17th Floor
New York, NY 10004
(212)549-2608

Attorneys for Plaintiffs

ii

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                                 iii

TABLE OF AUTHORITIES                                                               v

    cases                                                                         v

    statutes                                                                     vi

MEMORANDUM OF POINTS AND AUTHORITIES                                               1

I.     INTRODUCTION AND BACKGROUND                                              1

II.    FACTS                                                                     4

III.   STANDARD FOR GRANTING SUMMARY JUDGMENT                                      9

IV.   ARGUMENT

    A.    LVMC 11.68.100 (I) Prohibiting the In-hand                           9
          Distribution of Literature on Fremont Street
          Violates the Equal Protection Clause of the
          Fourteenth Amendment.

        1.  Equal Protection as Grounds for Enjoining                       10
            Enforcement of LVMC 11.68.

        2.  The First Amendment as Grounds for Enjoining                    12
            Enforcement of LVMC 11.68.100 (I).

            a.  The Ordinance is Not Reasonable in Light of                 12
                The Purposes of the Forum.

            b.  LVMC 11.68.100 (I) is a Viewpoint-Based                     15
                 Regulations of Speech.

        3. Any Injunction Barring the Enforcement of the LVMC             17
            11.68.100 (I) Should be Written Broadly Enough to
            Prevent the Defendants from Circumventing it
            Through the Enforcement of other Ordinances.

    B.    LVMC 11.68.100 (B) and LVMC 11.68.100 (H)                          19
          Regulating Mall Vending and the Placement of
          Tables on Fremont Street Should be Permanently
          Enjoined Because the Permit System Places No
          Limits on the Discretion of FSELLC officials

        1.  LVMC 11.68.100 (B)                                             19

        2.  LVMC 11.68. 100 (H)                                            21

C.    The Restrictions Placed on Assembly, Proselytizing,          23
Carrying Signs, Collecting Signatures and
Informational Tabling Violate the First Amendment.

V.    CONCLUSION          29

# TABLE OF AUTHORITIES

## cases

Adickes v.  S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)  …  9

Baker v. Centennial Ins. Co., 970 F.2d 660 (9ᵗʰ Cir. 1992)  …  9

Board of Airport Comm'rs of Los Angeles, v. Jews For Jesus, Inc., 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987),  …  12,13,27

Boos v. Barry, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1998)  …  27

Chicago Acorn v. Metropolitan Pier and Exposition Authority, 150 F3d 695 (7ᵗʰ Cir. 1998)  …  14,28

City of Cincinnati v. Discovery Network, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)  …  10

Cornelius v. NAACP Legal Defense & Educ. Fund, Inc. 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)  …  13

East High Gay/Straight Alliance v. Bd. Of Educ., 81 F. Supp.2d 1166, (D. Utah 1999)  …  15

Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.420 (1988)  …  27

Gaudiya Vaishnava Soc. V. City and County of San Francisco, 952 F2d 1059 (9ᵗʰ Cir. 1990)  …  20,23

Gentala v. City of Tucson, 213 F3d 1055 (9ᵗʰ Cir. 2000)  …  12,15,17

ISCKON v. Lee, 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992)  …  13,14,28

Jews for Jesus v. MBTA, 984 F.2d 1319 (1ˢᵗ Cir. 1993)  …  14,28

Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)  …  15,26,17

One World Family Now, Inc., v. State of Nevada, 860 F.Supp. 1457 (D. Nev. 1994)  …  23

Perry Educ. Ass'n v. Perry Local Educator's Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)  …  12,13

Police Dept. of Chicago v. Mosely, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d. 212 (1972)  …  12

Postal Service v. Council of Greenberg Civic Assis., 453 U.S. 114, 69 L.Ed. 2d 517, 101 S.Ct. 2676 (1981)  …  13

Rosenberger v. University of Virginia, 515 U.S. 815, 115 S.Ct 2510, 132 L.Ed.2d 700 (1995) ... 16,17

Roulette v. City of Seattle, 97 F3d 300 (9th Cir. 1996) ... 21

San Diego Building and Trades Council v. Garmon, 359 U.S. 236 (1959) ... 11,15,16

Schenk v. Pro-Choice Network of Western New York, 519 U.S. 357, 117 S.Ct 855, 137 L.Ed.2d 1 (1997) ... 27

S.E.C. v. Seaboard Corp., 677 F.2d, 1301 (9th Cir. 1982) ... 9

Sentinel Communications Co. v. Watts, 936 F2d 1189 (11th Cir. 1991) ... 19

United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed. 2d 736 (1983) ... 27

United States v. Kokinda, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) ... 12,13

Zoslow v. MCA Distri. Corp., 693 F.2d 870, (9th Cir. 1982), cert. denied, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983) ... 9

**statutes**

Fed. R. Civ. P. 56 (c) ... 9

18 U.S.C. § 157 ... 15,16

18 U.S.C. § 158 ... 15,16

N.R.S. 268.810 et. seq. ... 4

L.V.M.C. 10.44 ... 2,3,18,19

L.V.M.C. 11.68.100 ... 1,2,3,4,6,7,8 10,12,15,17 19,21,23,26

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION AND BACKGROUND

In October 1997, Plaintiffs brought this action to enjoin the Defendants, City of Las Vegas and the then Mayor, Jan Laverty Jones, from enforcing Las Vegas Municipal Code Section 11.68.100 (I) and Section 10.44 which prohibit, respectively, the distribution of literature and the solicitation of funds on the Fremont Street Pedestrian Mall ("Fremont Street") located in downtown Las Vegas. The plaintiffs further sought to enjoin the defendants from prohibiting any other peaceful First Amendment activity on Fremont Street, including: 1) peaceful assembly, 2) carrying banners, signs, placards or pickets, 3) proselytizing, 4) circulating petitions, 5) collecting signatures, 6) selling message-bearing merchandise such as books, T-shirts, bumper stickers or buttons, and 7) placing tables, stands, or displays on Fremont Street in connection with the forgoing activities. Unlike the city ordinances which expressly prohibit the distribution of literature and solicitation, Las Vegas municipal code does not specifically prohibit the other activities plaintiffs seek to conduct. Nevertheless, under threat of arrest and prosecution, the plaintiffs have been prevented by the local authorities from assembling on Fremont Street and engaging in First Amendment activities. The plaintiffs sought an injunction barring local authorities from interfering with this peaceful and lawful conduct.

Named as additional defendants are the Fremont Street Limited Liability Corporation (FSELLC) and its executive director, Mark Paris. The FSELLC has been granted broad regulatory authority to control all activities on Fremont Street, L.V.M.C. 11.68 et. seq. Although FSELLC officials deny any authority to restrict plaintiffs activities, they clearly have acted in concert with local officials to prohibit First Amendment activity on Fremont Street. Accordingly, plaintiffs also sought an injunction enjoining FSELLC officials from interfering in any way with the exercise of First Amendment rights.

Shortly after the case was filed, the defendants moved to dismiss or alternatively, for entry of summary judgment. In support of the motion, the defendants argued that Fremont Street was not a public forum under First Amendment doctrine and that they were free to prohibit all manner of speech. The plaintiffs opposed the motion, but did not file a cross-motion for a summary judgment.

Instead, plaintiffs sought entry of a preliminary injunction enjoining any and all restrictions on their First Amendment activities. On April 24, 1998, the court issued its decision in the case, granting the motion for a preliminary injunction in part and denying it in part; and granting the defendants' motion for summary judgment in part, and denying it in part.

Specifically, the court held that Fremont Street was not a public forum and that the defendants could enforce L.V.M.C. 10.44, prohibiting the solicitation of funds. The court also held that the plaintiffs could not assert a facial challenge to the discretionary authority delegated to FSELLC officials to regulate the placement of tables, stands or displays on Fremont Street, L.V.M.C. 11.68.100 (H). Summary judgment was granted to the defendants on these issues and denied as to all others.

Upon consideration of the plaintiffs' motion for a preliminary injunction, the court enjoined the hand billing ordinance 11.68.100 (I) and the licensing scheme which vested in FSELLC officials authority to regulate mall vending as applied to the sale of message-bearing merchandise L.V.M.C. 11.68.100 (B). The hand billing ordinance was struck down on Equal Protection grounds because of the irrational distinction it drew between the activities of labor unions exempted from the ordinance's coverage and all other leafleting. Having relied on the Equal Protection Clause, the court found it unnecessary to reach the First Amendment question. Treating plaintiffs' challenge to the restriction on the sale of message-bearing merchandise as a facial challenge only, the court held that the licensing scheme violated the First Amendment because it granted FSELLC officials unbridled discretion to grant or withhold permission to sell political T-shirts and the like.

The court did not reach the merits of the plaintiffs' remaining allegations that the defendants prohibited all additional First Amendment activities on Fremont Street, including assembly, proselytizing, picketing and canvassing for signatures. The court construed plaintiffs' pleadings as abandoning those issues for the purposes of the preliminary injunction. For purposes of the defendants motion for summary judgment, the court similarly did not reach the merits as to those activities because of the unresolved factual dispute over whether the forgoing activities were in fact prohibited by ordinance, policy or practice.

The ACLU appealed the partial denial of preliminary relief, and the defendants cross-appealed.

Both appeals were dismissed and the case is now back in the district court for final disposition of the relief granted in the preliminary injunction and the remaining claims not yet decided. On the strength of the court's previous Order granting relief, plaintiffs seek entry of a permanent injunction barring enforcement of the handbilling ordinance and prohibiting the defendants from obstructing or otherwise interfering with persons distributing literature under the pretext of enforcing L.V.M.C. 10.44, which prohibits solicitation. The defendants have taken an unreasonable and narrow view of the court's Order enjoining the handbilling ordinance and have consistently prevented persons from freely distributing literature on Fremont Street.

For the reasons stated in that same Order, the plaintiffs also seek entry of a permanent injunction barring the defendants from enforcing L.V.M.C. 11.68.100 (B), as applied to the sale of ideologically oriented products such as books or T-shirts sold incident to the political or public education activity that plaintiffs seek to conduct generally. In evaluating L.V.M.C. 11.68.100 (B), the plaintiffs emphasize that the ordinance is unconstitutional on its face and as applied. The Court's previous Order only addressed the facial claim -- which the defendants have argued was erroneous. To avoid the thorny problems which sometimes arise when bringing a facial challenge to an ordinance, the plaintiffs submit that L.V.M.C. 11.68.100 (B), in addition to violating the First Amendment on its face, has been applied unconstitutionally to prohibit their activities.

Plaintiffs also seek an injunction against the enforcement of L.V.M.C. 11.68.100 (H), governing the regulation of tables or displays on Fremont Street. The provision was previously upheld on the grounds that the plaintiffs could not properly assert a facial claim. While plaintiffs believe that the existing record was sufficient to bring an "as applied" challenge to the ordinance, new evidence makes the basis of plaintiffs claim more certain. On the basis of this new evidence, and in view of the fact that final judgment has yet to be entered in this case, plaintiffs seek a ruling that L.V.M.C. 11.68.100 (H) is unconstitutional as applied to the plaintiffs because of the unchecked discretion it vests in FSELLC officials.

Finally, plaintiffs seek entry of a permanent injunction enjoining the defendants from interfering in any way with their First Amendment right to assemble, proselytize, gather signatures, or carry a placard or banner on Fremont Street. FSELLC officials have steadfastly denied any

1   authority to prohibit such activity, but the plaintiffs have consistently been denied the right to conduct

2   these activities by city and FSELLC officials under one pretext or another.  Thus, while there may

3   be no official policy, ordinance or statute that specifically prohibits these activities, the plaintiffs seek

4   an injunction enjoining the defendants from interfering with the exercise of their First Amendment

5   rights.

6           At a status conference held before Magistrate Judge Leavitt on September 14, 2000, the

7   plaintiffs agreed to submit the case by motion for a summary judgment.

8   **II.    FACTS**

9           The facts relevant to the disposition of this case are largely set forth in the Court's written

10  opinion granting, in part, and denying, in part, the plaintiffs' motion for a preliminary injunction and

11  the defendants motion for summary judgment.  On the strength of those findings, plaintiffs' previous

12  submissions and additional evidence tendered herewith, plaintiffs seek entry of a permanent injunction

13  barring the defendants from enforcing those provisions of L.V.M.C.. Section 11.68.100 which the

14  court previously enjoined.   On the strength of this evidence, plaintiffs also seek an Order enjoining

15  the defendants from interfering with the other First Amendment activities alleged on the Complaint.

16

17          Plaintiffs submit that the following facts are undisputed :  (1)Fremont Street  is public

18  property located in the heart of downtown; (2) Fremont Street is a pedestrian mall as defined by the

19  Pedestrian Mall Act N.R.S. 268.810 et. seq. (3) Pedestrian malls are defined by the enabling and

20  enacting legislation as being comprised of public streets; (4) The area is a public thoroughfare that

21  is contiguous on all sides to public streets; (5) there are no barriers to pedestrian entry or movement;

22  (6) public streets run right through the middle of the area; (7) the Fremont Street Experience was

23  built by and is maintained utilizing public funds; (8) prior to renovation of Fremont Street, that section

24  of downtown was an undisputed public forum; (9) Mayor Jones stated in a letter to the editor of the

25  *Las Vegas Review Board* that the property is the modern version of the "Town Square" and (10) both

26  Mayor Jones and FSELLC Executive Director Mark Paris have described the property as a public

27

28

1  park. [1]  *See affidavit of Gary Peck, (Exhibit 1, ¶ 7-9, 22).*

2        The undisputed facts also establish that Fremont Street covers an area that is five blocks long

3  from Main Street on the west to Las Vegas Boulevard on the east and anchors the downtown gaming

4  and commercial district.  The streets and sidewalks were demolished and one large promenade was

5  created by paving the area with a smooth surface.  The sidewalks on Main Street and Las Vegas

6  Boulevard are incorporated into the Fremont Street Mall where they intersect with Fremont Street

7

8  _____

9  [1]Plaintiffs recognize that the Court has previously excluded as hearsay the statements of
10  Mayor Jones and Mark Paris as reported in the Las Vegas Review Journal. The Court granted partial
    summary judgment, on the issue of whether the Fremont Street Experience is a public forum, without
11  affording an opportunity for an evidentiary hearing. Nevertheless, the plaintiffs allege that the
    statements made by those individuals are undisputed -- without regard to admissibility of those
12  articles. If the defendants want to deny making those statements or the Mayor wants to deny she
    wrote the letter to the Editor which was printed in the Review Journal,   this is their opportunity to
13  do so by sworn affidavit. Gary Peck *(Exhibit 1)* the Executive Director of the ACLU of Nevada and
    one of the plaintiffs in this case, has submitted a sworn affidavit stating that he read those statements
14  in the Review Journal and his statement has not been controverted. *See Peck affidavit, (Exhibit 1,*
15  *¶22).*

16        Additionally, the plaintiffs request that the court reconsider its ruling on the admissibility of
17  the articles and Mayor Jones' letter to the editor. The plaintiffs submit that they do not constitute
18  hearsay because they (1) are not admissions, and (2) are not offered for the truth of the matter
    asserted therein. If the reporter testified directly as to the statement made to him, there could be no
19  objection because the statement constitutes admissions by both party opponents. The objection arises
    because the reporter has not been tendered and the statement purportedly constitutes hearsay within
20  hearsay. If the initial statement does not constitute hearsay, however, it does not become hearsay
    merely because it is contained in a second out-of-court statement. This is not a situation where the
21  first statement constitutes hearsay and is allowable under one of the exceptions. In that situation, the
22  hearsay within hearsay rule would come into play. More importantly, even if the court disagrees with
    this assessment, the statements contained in the articles and the letter to the editor are not being
23  offered for the truth of the matter asserted therein. First, it is irrelevant whether Mayor Jones or
24  Mark Paris were asserting the truth with their statements. Those statements constitute their
    characterization of Fremont Street -- without regard to the truthfulness or accuracy of their
25  description. Their description is relevant to the issues in this case. Second, plaintiffs are not offering
    the articles and letter as an accurate or truthful recording of the statements made by the party-
26  opponents. At this juncture, the letter and the articles are offered as evidence that the statements
27  attributed to the defendants were reported to the public in the local press. This is relevant because
    if the local press misrepresented the statements of the defendants, especially the Mayor's letter, the
28  defendants could have sought to repudiate, withdraw, or clarify those statements.

1  and extend for some distance in each direction. Fremont Street extends one block to the north and
2  south of each of the intersecting streets.  First and Third streets bisect Fremont Street and have been
3  converted to cul-de-sacs to enlarge the plaza.  Vehicles can no longer use these streets which are
4  dedicated to pedestrian use only.  Casino Center Boulevard and Fourth Street also bisect Fremont
5  Street, but allow vehicle traffic to pass as part of the downtown traffic grid. The sidewalks adjacent
6  to these traffic-bearing streets are incorporated into the Fremont Street Mall.  *See Peck affidavit,*
7  *(Exhibit 1, ¶10-12).*

8        Although Fremont Street is located in the heart of downtown, the surrounding area is not
9  particularly visitor-friendly, especially after dark.  For developers, Fremont Street was conceived as
10  a gaming attraction to compete with the "Strip".  Undoubtedly, this is one of its principal functions.
11  For visitors, however, Fremont Street is more than a gaming attraction.  It provides a respite from
12  casino action, where they can stretch their legs, get some fresh air and enjoy the street scene.  In this
13  sense, the function of Fremont Street is very similar to the "Strip".  For Las Vegans and people who
14  work downtown or have business there, Fremont Street serves a much more basic function -- it is a
15  centrally located section of town that may have to be regularly traversed.  Fremont Street is
16  sometimes crowded, but more often it is uncrowded.  The crowds gather for the seven minute light
17  show which runs on the hour after dark and for other special events.  Even these activities do not
18  always draw large crowds.  Even at its busiest, Fremont Street is no more crowded than sections of
19  the "Strip" where similar "extravaganzas" are regularly scheduled for the public's enjoyment.  On the
20  "Strip", individual's are permitted to distribute literature and other First Amendment activity.  *See*
21  *affidavit of Gary Peck, (Exhibit 1, ¶13-18).*

22        L.V.M.C. 11.68.100 (I) prohibits the distribution of literature on Fremont Street and the
23  intersecting streets and sidewalks incorporated into its  boundaries.  It is also prohibited on the
24  sidewalk adjacent to Las Vegas Boulevard and Main Street to the extent they have been incorporated
25  into Fremont Street.  Despite the restriction, evidence previously submitted and supplemented
26  herewith establishes that casinos and other businesses on Fremont Street freely distribute thousands
27  of handbills daily from the entrance ways of their establishments.  These entrance ways open onto
28  Fremont Street under the overhang.  They are approximately the width of the old sidewalk that was

6

1    demolished and are indistinguishable from the smooth pavement which anchors Fremont Street. A

2    thin line carved or painted into the pavement marks the property line. FSELLC-sponsored events and

3    promotions also occur regularly to attract visitors and gambling dollars. During the events, tables

4    and displays are placed on the street, signs and banners appear, there are promotional give-aways

5    where literature or souvenirs are distributed or sold, individuals are invited to sign up for things, and

6    of course there are performances. Kiosk sales of Las Vegas souvenirs are also set up on several

7    locations on Fremont Street. *See Peck affidavit, (Exhibit 1, ¶23-25).*

8         In addition to the submissions describing Fremont Street, plaintiffs' affidavits establish that

9    leafleting and other activities can be conducted without interfering with the multipurpose function of

10   Fremont Street. *See Peck affidavit,*(Exhibit 6, ¶ *26 ) and photographs attached to affidavit of*

11   *Harold Langert[2] (Exhibit 4).* They also establish that the defendants have failed to adhere to the

12   injunction barring enforcement of L.V.M.C. 11.68.100 (I) through the subterfuge of prohibiting the

13   distribution of material that merely seeks the reader to contact the organization for information about

14   membership or simply for more information. *See declaration of Allen Lichtenstein (Exhibit 3), and*

15   *attached exchange of correspondence between T. Bice and A. Lichtenstein (attachments 'a' and 'b'*

16   *to Exhibit 3),* and *affidavits of Marcus Patrick Blaise Page (Exhibit 7), Graham Sullivan (Exhibit*

17   *8), Heather A, Burmeister (Exhibit 9) and Christiane M. Meier (Exhibit 10).* As explained more fully

18   below in Section IV A.3., plaintiffs have repeatedly been prohibited from distributing such material.

19   Indeed, all political literature contains such an invitation. By adopting such an unreasonable

20   construction of the court's injunction, the defendants have barred virtually all leafleting.

21        Plaintiffs' affidavits also clarify that this lawsuit is not limited to a facial attack on the

22   ordinances and policies of the defendants. The evidence shows that the defendants, by their actions,

23   have prohibited the plaintiffs from participating in any First Amendment activity on Fremont Street.

24   _____

25        [2]Attached as Exhibit 4 is the affidavit of Harold Langert. Mr. Langert was hired as a
     photographer to photograph Fremont Street during different times of the week and hours of the day.
26   He also photographed a small group of ACLU of Nevada supporters on October 24, 2000, when they
     went to Fremont Street to distribute literature. His photographs show that Fremont Street is
27   uncrowded during different hours of the day and that the plaintiffs activities are not obstructive. The
28   photos show the layout of Fremont Street and the pedestrian and vehicular traffic patterns.

1    *See affidavit of G. Peck (Exhibit 1) & declaration of Greg Gable (Exhibit 5).*   The court has thus

2    far treated the plaintiffs' challenge purely as a facial challenge, but plaintiffs have alleged that the

3    defendants have interfered with their rights from the outset. Id. New evidence shows that the

4    defendants have not altered their practices and continue to prohibit the plaintiffs from participating

5    in any First Amendment activity on Fremont Street. *See affidavit of Gary Peck, (Exhibit 1).*  Without

6    abandoning their facial attack on the L.V.M.C. provisions at issue in this case, at this juncture of the

7    litigation, the case is more appropriately cast as a challenge to the defendants' conduct rather than

8    any specific ordinance specifically and primarily directed at expressive activity.  For the purposes of

9    the challenge to the handbill ordinance (and the solicitation ordinance), the distinction is not especially

10   important because those ordinances are exclusively addressed to First Amendment activity.  With

11   respect to the other restrictions alleged by the plaintiffs, the distinction has come into play, specifically

12   with respect to the court's consideration of L.V.M.C. 11.68.100 (B) and (H), which regulate,

13   respectively, sales of merchandise and the placement of tables and displays on Fremont Street.  In

14   analyzing the plaintiffs' claim that these restrictions violated the First Amendment, the court treated

15   the claim as a facial challenge only.  This proved fatal to the plaintiffs' attack on the tabling restriction

16   because the ordinance is not aimed directly at expressive activity. While the plaintiffs prevailed on

17   their challenge to the licensing scheme regulating sales, the defendants argued that a facial challenge

18   to that ordinance is inappropriate.  The exhibits submitted herewith make absolutely certain that

19   plaintiffs have repeatedly sought to engage in the forgoing activities, but have been denied the right

20   to do so. *See affidavit of M. Lopez  (Exhibit 2)* and attached correspondence to K. McMillan,

21   requesting permission and application to set up tables and sell T-shirts *(Exhibit 2, attachments 'd'*

22   *and 'e'). See also affidavits of Alina Shell (Exhibit 15), Joseph Cohn (Exhibit 16) and Gary. Peck*

23   *(Exhibit 1),  ¶ ¶  56–61),* stating that they were required to remove a table on October 24, 2000.

24   The challenges to L.V.M.C. 11.68.100 Sections (B) and (H) should both be treated as "an applied

25   challenge".

26          Finally, with respect to the plaintiffs' remaining claims in this case, the defendants -- at least

27   the FSELLC defendants -- have maintained all along that they have no policy or authority to prohibit

28   a person from lawfully assembling on Fremont Street for the purpose of gathering signatures,

8

1    picketing, carrying a banner, or standing on a soapbox and proselytizing.  Yet, as discussed below,

2    their actions contradict this position.  *See affidavit of G. Peck (Exhibit 1)  and declaration of G.*

3    *Gable (Exhibit 5)*.  In view of the fact that there are no written policies prohibiting such conduct or

4    any municipal ordinance or state statute specifically addressed, for instance,  to the conduct of a

5    single person gathering signatures or small peaceful assembly of people urging citizens to vote --

6    short of a parade or demonstration for which a permit may be required -- plaintiffs seek an injunction

7    barring the defendants from interfering with those activities.  As explained more fully in Section IV,

8    C., and as set forth in attached affidavits, the defendants have prevented the plaintiffs from engaging

9    in the forgoing activities in the past and continue to do so. *See affidavit of G. Peck (Exhibit 1)*.  Only

10   last week, the ACLU was told these activities were prohibited and asked to leave Fremont Street

11   when they assembled there to protest the restrictions placed on First Amendment activity. *Id*.

12   Through the intercession of Gary Peck, the director of the ACLU of Nevada, they were able to work

13   out a compromise, but only because Peck refused to leave when told to do so by FSELLC security.

14   *See Peck affidavit (Exhibit 1)*.

15   **III.    STANDARD FOR GRANTING SUMMARY JUDGMENT**

16          As recited by this court in its written Order, summary judgment "shall be rendered forthright

17   if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

18   affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is

19   entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The burden of demonstrating the

20   absence of a genuine issue of material fact lies with the moving party, *Zoslow v. MCA Distr. Corp.,*

21   693 F.2d 870, 883 (9th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349

22   (1983), and for this purpose, the material lodged by the moving party must be viewed in the light

23   most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct.

24   1598, 26 L.Ed.2d 142 (1970); *Baker v. Centennial Ins. Co.,* 970 F.2d 660, 662 (9th Cir.1992).  A

25   material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve

26   the differing versions of the truth. *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982).

27   Applying this standard, there are no material disputed facts that would preclude summary judgment.

28   **IV.    ARGUMENT**

**A.     L.V.M.C. 11.68.100 (I) PROHIBITING THE IN-HAND DISTRIBUTION OF LITERATURE ON FREMONT STREET VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND THE FIRST AMENDMENT.**

      **1.     Equal Protection as Grounds for Enjoining Enforcement of L.V.M.C. 11.68.100 (I).**

The plaintiffs rely on the analysis and conclusion reached by the court in entering the preliminary injunction. Applying Equal Protection analysis, the ordinance draws an irrational distinction between handbills "arguably protected by the National Labor Relations Act" (NLRA) and all other handbills. While content-based distinctions are sometimes permitted in non-public forums, the distinction must be rational under equal protection analysis. As the court correctly held the exception for NLRA literature does not rationally advance the city's objectives in otherwise prohibiting the distribution of literature. None of the interests purportedly served by the ordinance are furthered by carving out an exception for NLRA protected literature . This is particularly true since the ordinance exempts all literature "arguably protected" by the NLRA "until or unless such conduct is determined to be unprotected pursuant to a decision of the National Labor Relations Board" 11.68.100. Thus, the exception broadly extends to all literature involving labor issues or a labor dispute -- until the NLRB decides otherwise.

As the court explained in its opinion, whatever interests the city has in prohibiting the in-hand distribution of literature, the justification is undermined by the exception for NLRA protected materials. This is true whether the justification for the law is preventing litter, ensuring pedestrian traffic flow, preventing annoyance of pedestrians, or preserving the commercial atmosphere of Fremont Street. Those interests are not rationally advanced by allowing labor organizations, or even a group of employees seeking recognition, to distribute literature under circumstances that will be more harmful to the city's purported interests than the activities of a handful of political activists. Activities incident to a union organizing drive or a collective bargaining dispute operate on a much larger scale and are specifically designed to interfere with business as usual. These groups are at their most effective when they can bring large numbers of their members and supporters together to pressure the employer. Discrimination in favor of organized labor and against other groups serves

1    no rational purpose in relation to the interests the ordinance purports to advance.  *See e.g. City of*

2    *Cincinnati v. Discovery Network*, 507 U.S. 410, 418-19 (1993) (applying First Amendment

3    commercial speech analysis and rejecting distinction between news racks distributing commercial

4    handbills because discrimination against commercial handbills did not "reasonably fit" government's

5    legitimate interests in safety and aesthetics).[3]

6           By carving out an exception for labor organizations, moreover, the ordinance conveniently

7    allows city officials to avoid any argument or showdown with the unions.  By its terms, the ordinance

8    protects the activities of labor organizations until an employer initiates an action in state court to

9    enjoin the conduct against the union. This is unlikely for several reasons.  First, the action would be

10   preempted by the NLRA and the court would be precluded from entering an injunction or awarding

11   damages.  *See, San Diego Bldg. And Trade Council v. Garmon*, 359 U.S. 236 (1959).  Second, the

12   action would be futile since picket line activities, including the distribution of literature, are protected

13   activities within the meaning of the NLRA.  Moreover, it is doubtful that employer could even assert

14   a state law claim against the organizers since the activity is occurring on public property -- not private

15   or casino property.  Even FSELLC officials are powerless to bring a state law claim because the

16   ordinance allows the activity of the labor organizers.

17          By crafting the ordinance in such a way that it creates an exception for organizations in a labor

18   dispute or groups seeking recognition, city officials abandoned their  responsibility to enforce the

19   ordinance evenhandedly and shifted the burden to the casino owners to take on the unions in a private

20   dispute.  That dispute could take years to resolve and almost certainly will be resolved in favor of the

21   picket-line activities of the unions if litigated in the context of the NLRA.  The NLRA proscribes

22   unfair practices like secondary boycotts, not peaceful picket line activities in public spaces that are

23

24          [3]The additional fact that the businesses located on Fremont Street routinely distribute handbills

25   soliciting patronage and gambling dollars refutes any suggestion that the ordinance furthers those
     governmental interests.  *See affidavit of Gary Peck (Exhibit 1)*, attesting to the in-hand distribution

26   of literature by businesses on Fremont Street.  The ACLUN offered evidence that the casinos and
     other businesses on Fremont Street routinely distribute commercial handbills to passers by.  Indeed

27   this court brushed aside the Defendants' attempt to contest this fact with the observation that he had

28   visited Fremont Street and is aware of the practice. (Transcript of February 20, 1998 Hearing, at 21).

specifically permitted under city ordinances. The course city officials should have taken -- and one that would not have offended the Equal Protection Clause --would have been to ban the distribution of literature by any organization. That way, the unions would have to proceed against city officials on the same First Amendment grounds and under the same constraints that plaintiffs and other organizations must act under. Instead, the ordinance confers upon the union not only a statutory right to distribute literature, but a litigation advantage over other organizations engaged in First Amendment activity. The drafters of L.V.M.C. 11.68.100 (I) could not possibly have overlooked this inequality when they decided to protect the activities of the local union. The fact that the ordinance actually protects unions puts to rest any argument that the exception merely recognizes the preemptive effect of the NLRA. *See Police Dept. of Chicago v. Mosely*, 408 U.S. 92 182 (1972). As argued in Section A.2 (b) below, moreover, this type of speaker-based discrimination is a form of viewpoint discrimination that is forbidden even in non-public fora. It is as if city officials carved out an exception for religious groups because they feared a lawsuit based on free exercise or Establishment Clause of the First Amendment. *See, e.g. Gentala v. City of Tucson*, 213 F3d 1055 (9th Cir. 2000).

> **2.    The First Amendment as Grounds for Enjoining Enforcement of L.V.M.C. 11.68.100(I).**
>
> > **a.    The Ordinance is Not Reasonable in Light of the Purposes of the Forum.**

As the defendants correctly observe in their memorandum, those fora that have not been traditionally open to expression and debate and have not been specifically designated by government as a place where expressive activity may take place, are non-public fora. *Perry Educ. Ass'n. v. Perry Local Educator's Ass'n.*, 460 U.S. 37 45 (1983). In these fora, the government may, as the owner of private property, prohibit any and all speech so long as the regulation is not based on viewpoint and is reasonable in light of the purposes of the forum. *Id.* At 45.

That the Fremont Street promenade may not be a public forum, however, does not mean that the city can restrict speech in whatever way it likes. "The government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints." *United*

1   *States v. Kokinda*, 497 U.S. 720, 725 (1990) (plurality opinion).  For example, in *Board of Airport*

2   *Comm'rs of Los Angeles, v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987), the Court unanimously struck

3   down a regulation that prohibited "all First Amendment activities" in the Los Angeles International

4   airport (LAX) without reaching the question whether airports were public fora.  *Id.*, at 574-75.  The

5   Court found it "obvious that such a ban cannot be justified even if LAX were a non-public forum

6   because no conceivable government interest would justify such an absolute prohibition of speech".

7   *Id* at 575.

8          Subsequently, in *ISCKON v. Lee*, 505 U.S. 672 (1992), the Court held that an airport terminal

9   was not a public forum.  Applying the reasonableness standard argued by the defendants in this case,

10   five members of the Court held that airport officials could not ban the distribution of literature inside

11   the terminal.  O'Connor, S., (concurring), *Id.* at 685; Kennedy, J., (concurring), *Id.*, at 693.  Justice

12   O'Connor, who provided the crucial fifth vote invalidating the ordinance, summarized the relevant

13   inquiry determining the reasonableness of a restriction:

14          "The reasonableness of the Government's restriction [on speech in a
        non-public forum] must be assessed in light of the purpose of the

15      forum and all the surrounding circumstances." *Cornelius [*v. NAACP
        Legal Defense & Educ. Fund, Inc.* 473 U.S. 788, 809 (1985)],

16      "'Consideration of a forum's special attributes is relevant to the
        constitutionality of a regulation since the significance of the

17      governmental interest must be assessed in light of the characteristic
        nature and function of the particular involved.'" *Kokinda, supra*, at

18      732, quoting *Heffron v. International Soc. For Krishna
        Consciousness, Inc.*, 452 U.S. 640, 650-651. 2d. 298, 101 S.Ct. 2559

19      (1981).

20                              ****

21          We have said that a restriction on speech in a non-public forum is
        "reasonable" when it is "consistent with the [government's] legitimate

22      interest in 'preserving the property. . . for the use to which  it is
        lawfully dedicated.'" *Perry ,supra, at 50-51*, quoting *Postal Service

23      v. Council of Greenberg Civic Assis.*, 453 U.S. 114, 129-130, 69
        L.Ed. 2d 517, 101 S.Ct. 2676 (1981) (internal quotation marks

24      omitted).

25                              ****

        In my view, the Port Authority is operating a shopping mall  as well as

26      an airport.  The reasonableness inquiry, therefore, is not whether the
        restrictions on speech are "consistent with ...preserving the property"

27      for air travel, *Perry, supra*, at 50-51 (internal quotation marks and
        citation omitted) but whether they are reasonable related to

28      maintaining the multipurpose environment that the Port Authority has

                                     13

1    deliberately created.

2
     *ISCKON*, 505 U.S. at 687.
3
4          Applying that standard, it would seem that as a matter of law there are no "problems intrinsic
5    to the act of leafleting that would make it naturally incompatible with a large, multipurpose forum"
6    such as the one at issue here. *Id.*, at 690-92 (invalidating ban on leafleting in terminal, while upholding
7    ban on solicitation).  Indeed, this is an even stronger case than the airport terminal, because there is
8    little doubt that airports are among those publicly owned facilities that could be closed to all except
9    those who have legitimate business there. *Id.*, at 689.  By contrast, access to Fremont Street, like
10   public parks, sidewalks, and streets "is inherent in the open nature of [those ] locations," rather than
11   a "matter of grace by government officials."

12         The Seventh Circuit in *Chicago Acorn v. Metropolitan Pier and Exposition Authority*, 150
13   F3d 695 (7th Cir. 1998) cited Justice O'Connor's opinion in *ISKCON v. Lee, supra,* as requiring the
14   MPEA to permit the in-hand distribution of leaflets on the sidewalks and in the open areas of the
15   Chicago Navy Pier, which the Court deemed to be a non-public forum.  Thus, regardless of whether
16   the Fremont Street Experience is determined to be a public forum or not, the ban on leafleting cannot
17   withstand constitutional scrutiny.  See also *Jews for Jesus v. MBTA*, 984 F.2d 1319 (1st Cir. 1993)
18   (invalidating ban on leafleting and collection of signatures in train station under reasonableness
19   standard since conduct was consistent with purposes of the premises).

20         This case fits easily  within the facts presented in the authorities cited above.  The activities
21   of  a handful of leafletters do not unreasonably interfere with the multipurpose function of Fremont
22   Street.  The area anchors downtown Las Vegas and is indisputably part of the city's transportation
23   grid.  Fremont Street bustles with activity and pedestrians like any other downtown plaza.  Access
24   is unrestricted and visitors can come and go as they like.  For Las Vegans with business downtown,
25   Fremont Street may simply be an area that must be traversed.  Although special events are sometimes
26   planned, Fremont Street is spacious and often uncrowded.  Even during the night hours when the area
27   attracts crowds for the light show, Fremont Street functions more like the "Strip" or "Times Square"
28   rather than some special enclave where persons distributing leaflets would detract from the

14

1  freewheeling atmosphere that exists.  *See Peck affidavit (Exhibit 1)*.

2       City officials cannot have it both ways by purporting to restore downtown on one hand, and

3  complaining, on the other, that leafleting is incompatible with the function of the "modern"

4  downtown.  Their position is particularly dubious given the protection offered to labor organizations

5  by the ordinance and the pervasiveness of leaflets distributed by the casinos from the entrance ways

6  and sidewalks in front of their properties.  For the defendants to assert that the plaintiffs' activities

7  are incompatible when these other activities are allowed undermines the justification for enforcing the

8  ordinance against the plaintiffs.[4]

9                    **b.    L.V.M.C. 11.68.100(I) is a Viewpoint-Based Regulation of Speech**

10       The leafleting ban also violates the First Amendment because it discriminates on the basis of

11  viewpoint.  As noted above, while the government may restrict discussion in a nonpublic forum to

12  certain subject matters, even in a nonpublic forum the government may not "regulate speech in ways

13  that favor some viewpoints . . . at the expense of others."  *Lamb's Chapel v. Center Moriches Union*

14  *Free Sch. Dist.*, 508 U.S. 384, 394 (1993).  *Accord Gentala v. City of Tucson*, 213 F.3d 1055, 1063

15  (9th Cir. 2000); *East High Gay/Straight Alliance v. Bd. of Educ.*, F. Supp. 2d 1166, 1172 (D. Utah

16  1999).  In this case, the distinction that Las Vegas chose to draw in its ordinance is not one based on

17  subject-matter.  It might validly have decided to permit all or no leafleting on all subjects generally,

18  or on the subject of labor issues specifically.  This, however, is not what Las Vegas has done.

19       Under the Las Vegas ordinance, leafleting on the subject of labor relations is permitted on the

20  promenade only by a very restricted class of speakers -- those speakers whose actions are "arguably

21  protect[ed]" by the NLRA.  Sections 7 and 8 of the NLRA, which delineate the conduct that is

22  "arguably protect[ed]" for purposes of the ordinance, *see* L.V.M.C. 11.68.100; *San Diego Building*

23  *and Trades Council v. Garmon*, 359 U.S. 236 (1959), are concerned with preserving the right of

24

25       [4]To the extent the defendants are correct that there are no municipal ordinances or FSELLC
policies which specifically prohibit peaceful assembly on Fremont Street and other First Amendment
26  activity -- such as gathering signatures, proselytizing or holding a sign or banner -- the justification
for prohibiting the distribution of literature is seriously undermined by the fact that these arguably
27  more intrusive activities are allowed.  In their role of gatekeeper, of course, FSELLC officials may
28  prohibit these activities under other pretexts.  See Section C., infra.

                                                  15

*employees* to organize, bargain collectively, and engage in other "concerted activities." *See* 29

U.S.C. §§ 157, 158.[5] By expressly adopting the NLRA's protections, which focus on employees, the

Las Vegas ordinance effectively permits only employees, and no one else, to leaflet on the subject of

their employment relationship. Of course, the existence of an employment relationship provides "a

specific premise, a perspective, a standpoint from which" one will approach the subject of labor

relations. *Rosenberger v. University of Virginia*, 515 U.S. 815, 831 (1995). In other words,

employees will naturally have a different perspective on their employment relationship than will an

employer, the Chamber of Commerce, the gaming lobby, a political party, or some other group. These

other groups, however, are prohibited from leafleting on the promenade. Under the ordinance, for

example, a labor union would be permitted to distribute literature urging citizens to oppose legislation

that would prohibit unions from spending union dues on political campaigns -- especially if the

Casinos were lobbying for the adoption of such legislation. Nevertheless, no one else, including the

---

[5]     The Las Vegas ordinance exempts leafleting that is "arguably protected by the NLRA," as that term is defined in *San Diego Blding and Trades Council v. Garmon*, 359 U.S. 236 (1959)." In *Garmon*, the Court is concerned with two types of activities: activities that are "protected by § 7" of the NLRA, and actions that are "prohibited by § 8" of the NLRA. 359 U.S. at 245; *see also Id.* (holding that "when it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield"). Therefore, by describing the permitted set of leafleting activities as those defined as "protected" under *Garmon* (as opposed to those activities that are defined as "protected" or "prohibited" under *Garmon*), the Las Vegas ordinance exempts from regulation activities that are arguably "protected by § 7" of the NLRA. *Garmon*, 359 U.S. at 245. Looking to § 7 to determine the scope of leafleting activity permitted by the ordinance, we see, as noted above, that § 7 protects the following:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157.

1    Casinos, could distribute literature on the issue.

2    In excluding certain perspectives on labor issues, Las Vegas engaged in the same type of

3    illegitimate viewpoint discrimination that was struck down in *Rosenberger*, 515 U.S. at 837, *Lamb's*

4    *Chapel*, 508 U.S. at 392-93, and *Gentala*, 213 F.3d at 1062-66.   In each of those cases, the

5    government, concerned about violating the Establishment Clause, prohibited speech from a religious

6    viewpoint in a nonpublic or limited public forum.   And in each case, the restriction was invalidated

7    as impermissible viewpoint discrimination.   *See Rosenberger*, 515 U.S. at 831; *Gentala*, 213 F.3d at

8    1065; *Lamb's Chapel*, 508 U.S. at 393.   Here, Las Vegas excluded all viewpoints on labor issues

9    except the viewpoint of employees, ostensibly out of a concern about federal preemption.   But if a

10   substantial concern about violating the Establishment Clause cannot countenance viewpoint

11   discrimination, neither can a concern about federal preemption.   Moreover, the city cannot distinguish

12   these recent viewpoint discrimination cases on the ground that they involved discrimination against

13   only one viewpoint, while the present controversy involves discrimination by the city against an entire

14   class of viewpoints.   For as the Supreme Court has made clear, "the exclusion of several views on [a]

15   problem is just as offensive to the First Amendment as exclusion of only one."   *Rosenberger*, 515

16   U.S. at 831.

17   **3.     Any Injunction Barring the Enforcement of the L.V.M.C. 11.68.100 (I) Should
           be Written Broadly Enough to Prevent the Defendants from Circumventing it
18         Through the Enforcement of other Ordinances.**

19   Upon plaintiffs' motion for a preliminary injunction, this court enjoined enforcement of

20   L.V.M.C. 11.68.100 (I), prohibiting the in-hand distribution of literature.   Simultaneously, the Court

21   denied the plaintiffs' motion to preliminarily enjoin L.V.M.C. 10.44, prohibiting solicitation on

22   Fremont Street.   Following entry of the Order, the parties have skirmished over the meaning and

23   implementation of the Order.   One area of contention concerns the scope of the injunction barring

24   the enforcement of the hand billing ordinance.   The defendants have adopted an unreasonable

25   construction of the injunction and prohibited the distribution of "virtually all literature" under the

26   pretext that the material falls within the solicitation ordinances coverage and is not protected by the

27   court's injunction. If this Court enters a permanent injunction barring enforcement of L.V.M.C.

28   11.68.100 (I), plaintiffs' request that any Order be written broadly enough to prohibit the defendants

1  from interfering with the plaintiffs' right to distribute literature through the expedient described above

2  or any other pretext.

3        The defendants' intent to prohibit the distribution of literature protected by the Court's Order

4  is established through a series of incidents since the injunction was issued. An incident occurred on

5  February 3, 2000, when individuals from the Shundahai Network were prevented from distributing

6  a flyer by FSELLC security on the grounds that the material contained unlawful solicitation. The

7  leaflet contained no appeal for money, goods, or any other material support. Nevertheless, security

8  personnel determined that the phrase "join us" along with a phone number violated L.V.M.C. 10.44.

9  *See Lichtenstein affidavit (Exhibit 3) and attached March 3, 2000 correspondence from A.*

10  *Lichtenstein to T. Bice (attachment 'b' to Exhibit 3) and May 1, 1998 correspondence from Bice to*

11  *Lichtenstein (attachment 'a' to Exhibit 3).* The 'objectionable' handbills are appended thereto.

12        An earlier incident occurred on November 9, 1999. The events of that night demonstrate the

13  defendants' intransigence. Several anti-nuclear activists, including members of the Shundahai

14  Network, a peace organization that is a named plaintiff in this case, went to Fremont Street

15  Experience for purposes of distributing literature. *See affidavits of: Marcus Patrick Blaise Page*

16  *(Exhibit 7), Graham Sullivan (Exhibit 8), Heather Aelfgifu Burmeister (Exhibit 9) and Christiane*

17  *M. Meier (Exhibit 10).* The literature was critical of nuclear testing. At the bottom, the leaflet stated

18  "join us, call (702)647-3095." No request for donations or money appeared. The flyer did not name

19  any organization. The leafletters were approached by security staff and told that they could not

20  continue distributing the pamphlet because it invited the reader to "join us". The leafletters were

21  only allowed to continue after they scribbled out the "j" and the "o" in the word "join" so that the

22  flyer read "in us call (702)647-3095."[6] Id. A copy of the flyer is attached to the forgoing *witness*

23

24      [6]Two weeks prior to this incident, on October 22, 1999, a group of leafletters were told by

25  FSELLC security personnel that the distribution of literature was not allowed. Security pulled out
   a laminated card-sized copy of the ordinance and pointed to posted municipal signs which stated that

26  it was illegal to distribute literature. The police were called and they also informed the group that
   leafleting was prohibited by city ordinance. Only through the intercession of Gary Peck, the director

27  of the ACLU of Nevada, who explained the injunction, were the leafletters allowed to continue.

28  *See Peck affidavit (Exhibit 1, ¶43-51) and affidavits of Sarah Anderson (Exhibit 11), Paul Tompkins*

1  *statements.*

2      Attempts to resolve this dispute with the defendants' counsel have been unsuccessful.  (*See*

3  *Affidavits of M. Lopez (Exhibit 2) and A. Lichtenstein (Exhibit 3) and attached correspondence from*

4  *Lopez to Bice and Lichtenstein to Bice (attachments 'a' and 'b' to Exhibit 3)).*The defendants'

5  position is that the solicitation ordinance prohibits any requests for charity, support or patronage, not

6  just requests for money. *See May 1, 1998 T. Bice correspondence to A. Lichtenstein, attachment*

7  *'a' to Lichtenstein affidavit.*  The defendants' actions and pinched reading of the court's <u>Order</u> are

8  a naked attempt to circumvent the injunction by the simple expedient of invoking the solicitation

9  ordinance.  If the solicitation ordinance can be used to prohibit the most general and rhetorical

10  expressions of solicitation, such as "join us", "support us", "vote for" or even invitations to learn

11  more about the organization, the defendants will have largely accomplished their objective of

12  preventing the in-hand distribution of literature.  It is the rare political pamphlet or religious tract that

13  does not contain some form of general request for support.  The defendants know this and their

14  pinched construction of L.V.M.C. 10.44 is a flagrant attempt to avoid their obligations under this

15  injunction. The Court should issue an Order clarifying that the injunction is broad enough to protect

16  written materials that contain general or rhetorical requests for support.  Leaving the matter to the

17  discretion of the defendants has resulted in flagrant abuse.

18      **B.**    **L.V.M.C. 11.68.100 (B) & L.V.M.C. 11.68.100 (H) Regulating Mall Vending
19          and the Placement of Tables on Fremont Street Should be Permanently
        Enjoined  Because the Permit System Places No Limits on the Discretion of
        FSELLC Officials.**

20

21      **1.**    **L.V.M.C. 11.68.100 (B)**

22      In its April 24, 1998 Order, the Court enjoined enforcement of L.V.M.C. 11.68.100 (B)

23  against the plaintiffs with respect to the sale of merchandise constituting a statement carrying a

24  religious, political, philosophical, or ideological message relevant to the purpose of the plaintiffs'

25  organization.  As grounds for enjoining this provision of the ordinance, the Court held that the

26

27  *(Exhibit 12), Misty Nash (Exhibit 13)* and *Lauren Varner (Exhibit 14)* (prohibited from distributing
literature or carrying a banner on Fremont Street).  Plaintiffs moved for contempt in January, 2000,
28  based on this conduct.  The defendants agreed to remove the signs.

1   licensing scheme established by the ordinance for the regulation of this activity vested too much

2   discretion in the defendants to withstand First Amendment scrutiny under the lesser standard

3   governing non-public fora.  See *Sentinel Communications Co. v. Watts*, 936 F2d 1189 (11th Circuit

4   1991)(enjoining permit system regulating the placement of newspaper racks in a non-public forum

5   airport because of unfettered discretion vested in government officials).  See e.g. *Gaudiya Vaishnava*

6   *Soc. v. City and County of San Francisco*, 952 F2d 1059 (9th Circuit 1990) (enjoining permit system

7   for street sales of merchandise that is inextricably intertwined with a statement carrying a religious,

8   political, philosophical, or ideological message).   Since the issuance of the injunction barring

9   enforcement of 11.68.100 (B), the ordinance has not been amended to circumscribe the defendants'

10  discretion.   Accordingly, the plaintiffs submit that an injunction should be entered to permanently

11  prohibit the enforcement of 11.68.100 (B).

12       As additional grounds for entry of a permanent injunction, the plaintiffs submit the provision

13  that governs vending on Fremont Street is unconstitutional, not only on its face, but as applied to

14  their conduct.  The court has thus far treated the plaintiffs' claim as a facial challenge only.  In the

15  Court of Appeals, the defendants challenged the soundness of that analysis.  While the plaintiffs

16  believe that this Court's analysis was correct, the record in this case fully supports enjoining

17  enforcement of the statutory provision as applied to the plaintiffs' conduct.

18       Initially, the ACLUN brought this lawsuit as both a facial and an "as applied" challenge.  *See,*

19  *Complaint, ¶ 4 and 42, and Peck Affidavit (Exhibit 1, ¶ 28-30)*, where he states that prior to the

20  commencement of this lawsuit he contacted city officials to learn the scope of the restrictions in the

21  anticipation of the filing of the lawsuit and was informed that the municipal ordinances prohibited

22  leafleting and soliciting, but that other activities were at the discretion of Mark Paris.  Mr. Peck is the

23  Executive Director of the ACLUN, and is the principal person who coordinated this litigation.  On

24  a separate occasion, he and the other plaintiffs in this case were warned by the local police to leave

25  Fremont Street in connection with the pre-filing rally to protest the restrictions on First Amendment

26  activities.  *See Peck affidavit, (Exhibit 1, ¶ 27), and declaration of G. Gable (Exhibit 5)*.  To

27  emphasize the point, when the ACLUN was informed that solicitation was banned by the ordinance,

28  there was no question that raising funds through the street sales of T-shirts or books was prohibited.

1   The defendants have never suggested otherwise. Indeed, in answers to interrogatories, the defendants

2   refused to state whether this conduct was allowed or prohibited on Fremont Street.  *See Lopez*

3   *affidavit (Exhibit 2) and accompanying interrogatory responses (attachment 'a' to Exhibit 2); See*

4   *note 9, infra.*

5          On at least two separate occasions since the entry of the injunction, the plaintiffs have

6   contacted opposing counsel seeking permission to assemble on Fremont Street to conduct various

7   First Amendment activities, including the sale of merchandise constituting a statement relevant to the

8   purpose of their organizations.  Thus far, the defendants have failed to grant permission.  *(See*

9   *affidavit of M. Lopez (Exhibit 2)* and *correspondence to K. McMillan and T. Bice (attachments 'a'*

10  *through 'd' to Exhibit 2)*. Based on these developments, L.V.M.C. 11.68.100 (B) should be enjoined

11  as applied to the plaintiffs.[7] *Gaudiya Vaishnava Soc., supra.*

12                    **2. L.V.M.C. 11.68.100 (H)**

13         L.V.M.C. 11.68.100 (H) regulates the placement of tables and displays on Fremont Street.

14  Complete and unbridled discretion has been granted to FSELLC officials to regulate that activity.

15  FSELLC officials have exercised that authority to prohibit informational tabling the plaintiffs have

16  sought to conduct in connection with distributing literature or collecting signatures on a petition.  In

17  contrast, FSELLC sponsored or approved parties are routinely allowed to engage in the very same

18  activity in connection with promotional or other events. *See Peck affidavit (Exhibit 1)*.  In previously

19  evaluating this claim, the Court only considered the plaintiffs' facial challenge to this restriction.

20  Relying on *Roulette v. City of Seattle*, 97 F3d 300 (9th Circuit 1996), the Court rejected the

21  plaintiffs' claim on the grounds that the challenged provision was not directed at conduct exclusively

22  or commonly associated with expression.

23         The plaintiffs believe that they properly alleged and established the facts to challenge

24

25

26         [7]The plaintiffs submit that this provision of the ordinance can also be enjoined on the strength
    of the court's equal protection analysis because of union's conduct in selling T-shirts, hats or buttons
27  may be arguably protected by the NARA as part of their picket-line activities. L.V.M.C. 11.68.100
    carves out an exception for unions for activities otherwise prohibited under 11.68.100. Plaintiffs
28  specifically alleged this claim in their Complaint. (Complaint, Paragraph 42).

                                              21

1  L.V.M.C. 11.68.100 (H) as applied to their conduct from the outset.[8]  Regardless of the events

2  preceding the Court's Order, the events following the entry of the Order in this case granting

3  summary judgment to the defendants on this issue fully support the plaintiffs' right to challenge the

4  ordinance as applied to them.  On October 24, 2000, three individuals associated with the ACLU of

5  Nevada went to Fremont Street to distribute literature and collect signatures.  They set-up a small

6  display table with an ACLU banner affixed to the front and commenced to distribute literature and

7  gather signatures.  FSELLC officials descended immediately and stated that the conduct was

8  prohibited and the group had to leave.  Only after Gary Peck, Director of the ACLUN, interceded

9  and asserted his right to be there did security back off to consult their supervisor.  When security

10  returned, the ACLU was permitted to stay, but only on the condition that the table be removed.  *See*

11  *Peck affidavit (Exhibit 1).*

12          What is particularly objectionable about the defendants' conduct is that the plaintiffs have

13  repeatedly sought permission from FSELLC officials to conduct informational tabling prior to the

14  forgoing incident.  The defendants never responded to the plaintiffs' requests.  *See Lopez affidavit*

15  *(Exhibit 2)*.  The defendants' position contemplates instead that the plaintiffs proceed at their own

16  risk of arrest.  The plaintiffs need not risk arrest and prosecution to properly assert an as applied

17  challenge.

18

19          [8]Plaintiffs emphasize that they asserted both a "facial" and an "as applied" challenge to the
20  restrictions barring protest activities.  *See, Complaint* , ¶ 4 & 42.  Although the plaintiffs did not
    distinguish between the different restrictions in casting their challenge, in his affidavit, Gary Peck
21  stated: (1) that he was informed by FSELLC officials and Las Vegas Police immediately prior to the
22  commencement of this case that the protest activities were not permitted on the Fremont Street
    Experience; and (2) that he and the other plaintiffs in this case were ordered to disperse by the police
23  when they engaged in a small protest there several months prior to the filing of the lawsuit.  *Affidavit*
    *of Gary Peck, (Exhibit 1,¶27)*.  As relates specifically to informational tabling and the placement of
24  displays and exhibits in connection with that protest or any similar activities, Mr. Peck specifically
25  sought permission from the defendant's counsel to do this prior to the commencement of this
    litigation.  *See Peck affidavit ¶29*.  Moreover, the defendants have never disputed that this conduct
26  is prohibited.  In answer to interrogatories, the defendants refused to state whether informational
27  tabling is allowed on Fremont Street.   *See note 9, infra and M. Lopez affidavit (Exhibit 2)*.  The
    restrictions have been in place and the plaintiffs have understood the actions and statements of both
28  FSELLC officials and the police to mean that informational tabling is prohibited.

1    Based on these developments, plaintiffs submit that L.V.M.C. 11.68.100 (H) be permanently

2    enjoined as applied to the plaintiffs.  Applied to the plaintiff's conduct, L.V.M.C. 11.68.100 (H)

3    suffers from the same constitutional defect as the vending ordinance previously enjoined by the Court.

4    The permit system established by the ordinance places no limit on the discretion of FSELLC officials

5    to allow or disallow informational tabling.  This type of scheme is unconstitutional for the reasons

6    relied upon by the Court in enjoining the vending ordinance as applied to the sale of merchandise

7    inextricably intertwined with the a religious or political organization's message. See e.g., *One World*

8    *Family Now, Inc. v. State of Nevada*, 860 F.Supp. 1457 (D.Nev. 1994)(enjoining licensing scheme

9    governing the placement of informational tables on the Las Vegas "Strip" because of unlimited

10    discretion granted licensing officials).  Indeed, the District Court distinguished that case on the

11    grounds that it involved an as applied -- rather than a facial attack.  Statutory schemes that vest

12    government officials with unlimited discretion to grant or withhold First Amendment principles are

13    unconstitutional. *See Gaudiya Vaishnava Soc.*, 952 F.2d at 1065-66.

14        **C.    The Restrictions Placed on Assembly, Proselytizing, Carrying Signs, Collecting
              Signatures and Informational Tabling Violate the First Amendment.**

15        The  FSELLC defendants' position throughout this litigation is that they have no authority

16    to prohibit individuals from assembling and conducting peaceful First Amendment activities on

17    Fremont Street. In defending this case, they have hidden behind the city's skirts and sought to avoid

18    any claim that they have any statutory authority to interfere with the plaintiffs' activities.  Even with

19    respect to mall vending and the placement of tables or displays on Fremont Street, FSELLC officials

20    have sought to avoid any responsibility for the discretion they exercise over this conduct. The Court,

21    however, has already found that the Las Vegas Municipal Code vests broad discretion in FSELLC

22    officials to regulate at least those activities. The issue at this juncture is under what authority are the

23    defendants acting to prohibit peaceful assembly on Fremont Street and can they do so without

24    violating the plaintiffs' rights.  Short of a parade or large demonstration, there are no city ordinances

25    specifically addressed to peaceful assembly on Fremont Street or any other street or sidewalk.  Nor

26    are there any provisions which prohibit an individual from proselytizing, gathering signatures on a

27    petition, carrying a sign identifying his or her organization, or even placing a table on Fremont Street

28

in connection with any of the forgoing activities. Yet the defendants continue to prohibit these activities under one pretext or another.

Throughout this litigation, the plaintiffs have been threatened with arrest for engaging in these activities. The first such incident occurred immediately prior to the filing of this lawsuit and was the catalyst for the litigation. *See Peck affidavit, (Exhibit 1, ¶27) and declaration of G. Gable (Exhibit 5)*. Thereafter, the plaintiffs repeatedly sought to ascertain from the defendants whether they could safely proceed with these activities without risking arrest. FSELLC officials refer these injuries to city officials under the pretext that they have no authority to prohibit the activities. City officials who in turn refuse to disclose whether the plaintiffs would be arrested and prosecuted for their conduct. *See City's Answers to Interrogatories, Note 9, infra.* The attitude of the defendants is that the plaintiffs must proceed at their own risk.

FSELLC officials assert that nothing in their policies or practices, apart from the city ordinances prohibiting the distribution of literature or solicitation, prohibits peaceful and orderly demonstrating, carrying of banners, placards or pickets, proselytizing, or circulating petitions and collecting signatures. See defendants' *Reply Brief in Support of Motion to Dismiss or Alternatively for Summary Judgment,* at pp. 17-18.

> As for plaintiffs' other activities, those activities may very well be allowed depending on how they are conducted. It is unknown what plaintiffs really plan to do by picketing, carrying banners collecting signatures or plaintiffs other activities. The point is that there are no policies restricting any activities by these plaintiffs other than state statutes or city ordinances.

The FSELLC defendants then vaguely suggest that these activities may be proscribed by other state statutes. *See Mark Lopez affidavit (Exhibit 2) and exchange of correspondence between M. Lopez and T. Bice(attachments 'a' and 'b' to Exhibit 2).* The City defendants have also refused to provide any clarification on the scope of the restrictions. In their *Answer to Plaintiffs' Interrogatories to the City Defendants*, the City refused to answer whether the plaintiffs could lawfully proceed with the activities alleged in the Complaint. [9] Subsequent attempts to learn the

---

[9]   **INTERROGATORY NO. 16:**

Prior to the development of the FSE, which of the following activities were permitted on the downtown streets and sidewalks now within the borders of the FSE:

(1)    In-hand distribution of literature?
(2)    Circulating petitions and collecting signatures?
(3)    Carrying of signs, banners, and placards?
(4)    Proselytizing or speaking to a gathering of listeners?
(5)    Street sales or distribution of message bearing merchandise (T-shirts, bumper stickers, hats, books) in exchange for either director payment or a contribution?
(6)    Street solicitation of donations?
(7)    The placement of stands, tables, exhibits or displays?

**OBJECTION TO INTERROGATORY NO. 16:**
Defendants object to this interrogatory on the grounds that it seeks legal opinions and conclusions and that it seeks the mental impressions, conclusions, opinions, and legal theories of Defendant's attorneys.

**INTERROGATORY NO. 17:**
Since the opening of the FSE, which of the activities described in interrogatory number 16 are prohibited by city ordinance and which are prohibited by regulation or practice of the FSE?

**OBJECTION TO INTERROGATORY NO. 17:**
Defendants object to this interrogatory on the grounds that it seeks legal opinions and conclusions and that it seeks the mental impressions, conclusions, opinions, and legal theories of Defendant's attorneys.

**INTERROGATORY NO. 21:**
What authority do FSELLC security personnel have to detain, arrest or remove, or threaten to detain, arrest or remove, persons from the FSE for violating its regulations or city ordinances or for any reason? Cite all statutory, municipal, other lawful authority for that power.

**OBJECTIONS TO INTERROGATORY NO. 21:**
Defendants object to this interrogatory on the grounds that it seeks legal opinions and conclusions and that it seeks the mental impressions, conclusions, opinions, and legal theories of Defendant's attorneys.

25

1   city's position have also been unsuccessful.

2          Events came to head recently when a small group of individuals risked arrest by assembling

3   on Fremont Street to distribute literature and collect signatures on a petition which called upon the

4   FSELLC and city officials to allow First Amendment activity on Fremont Street. The group also set

5   up a small table and affixed a banner to it identifying the organization. Shortly after their arrival, they

6   were told they had to leave by FSELLC security personnel. Only through the intercession of Gary

7   Peck, the Director of the ACLU of Nevada, did the security staff back off. Mr. Peck had to inform

8   security staff of the Court's Order and that local ordinances did not prohibit them from being there.

9   When the security supervisors came onto the scene, Mr. Peck had to argue further for the right to

10  stay and had to submit the leaflet and petition for review. Eventually, the supervisors contacted their

11  superiors and after a long delay, the three protesters were allowed to continue distributing literature

12  and collecting signatures. They were specifically warned, moreover, to avoid obstructing any

13  pedestrians pursuant to city ordinances that prohibit obstruction. Additionally, the group had to

14  remove the table and the banner affixed to it on the authority contained in L.V.M.C. 11.68.100.

15  Security personnel actually pulled the ordinance out and showed it to Peck. *See Shell (Exhibit 15),*

16  *Cohn (Exhibit 16) and Peck (Exhibit 1) affidavits.*

17         It is clear that but for Mr. Peck's intercession, the group would have been run off. That was

18  the security staff's first intention. Only because Peck knew his rights was he able to work out a

19  compromise allowing the group to stay and distribute literature and collet signatures. Fortunately,

20  local police were not called to intercede. They have intervened in the past on the side of FSELLC

21  officials and their presence would have raised the stakes considerably for someone arguing with them

22  and trying to assert their rights. *See Peck affidavit (Exhibit 1) & Gable declaration (Exhibit 5).* In

23  view of the defendants' conduct in this incident and earlier incidents, and the defendants'

24  intransigence in responding to our repeated requests for clarification on the scope of activities that

25  are permitted on Fremont Street, plaintiffs seek entry of an injunction barring the defendants from

26  _____

27         *See, Defendants' Answer to Plaintiffs' First Set of Interrogatories to
       the City Defendants, (attachment 'a' to M. Lopez affidavit (Exhibit 2)).*

28

1   interfering with their rights.

2        The defendants are exercising  their authority to prohibit plaintiffs from assembling on

3   Fremont Street and distributing literature, collecting signatures, carrying a sign or banner or setting

4   up a small table in connection with these activities.    There is little question that these peaceful

5   activities are classic forms of protest that fit easily within the Supreme Court cases upholding protest

6   activities.  See, *United States v. Grace*, 461 US 171, 176-177, 103 S.Ct.1702, 1706-1707, 75

7   L.Ed.2d 736 (1983)(complete ban on protest activities on sidewalks in front of United States

8   Supreme Court building); *Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct 1157, 1162, 99 L.Ed.2d 333

9   (1988)(carrying banners within 500 feet of foreign embassies); *Frisby v. Schultz*, 487 U.S. 474, 485,

10  108 S.Ct. 2495, 2503, 101 L.Ed.2d.420 (1988)(protests in residential neighborhoods); *Schenk v. Pro-*

11  *Choice Network of Western New York*, 519 U.S. 357, 117 S.Ct.855, 865 137 L.Ed.2d 1

12  (1997)(protests in front of abortion clinics).  While these cases admittedly apply to public fora, even

13  in a non-public forum, city officials do not have carte blanche to suppress First Amendment activities.

14   *See Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.* 482 U.S. 569 (1987)

15  (enjoining total ban on First Amendment activity in an airport).

16       The conduct at issue here, moreover, is even more insidious than a blanket ban.  FSELLC

17  security is acting as a gatekeeper through their conduct in intimidating groups and individuals who

18  want to engage in First Amendment activity and by demanding to review their literature and petitions.

19  As argued in Section A.3., they already give an unreasonable interpretation of the Order enjoining

20  the leafleting Ordinance and have used their authority to threaten or remove individuals distributing

21  literature under the protection of the court's injunction.  Until recently, the defendants actually

22  prohibited leafleting altogether and posted city signs on Fremont Street that explicitly prohibit the

23  distribution of literature in defiance of the court's Order.  *See Section N. 6 supra, Peck affidavit*

24  *(Exhibit 1, ¶43-51)*.    Through the ACLU of Nevada's intervention, the signs have been removed,

25  but the defendants continue to interfere with groups and individuals lawfully exercising their First

26  Amendment rights.   The willingness of FSELLC security to threaten protestors with enforcement

27  of ordinances directed at obstructing pedestrian traffic enlarges their role as gatekeeper and gives

28  security staff even more power to stifle speech.  *See affidavit of Reinard Knutson (Exhibit 6),*

1     testifying that when he contacted Kristen McMillan for permission to assemble on Fremont Street,
2     she faxed him a local ordinance prohibiting obstruction. The threat of calling the police and being
3     arrested is sufficient to scare off many would-be protestors.  What is particularly offensive about the
4     power vested in FSELLC officials is that FSELLC approved speakers, performers, and special events
5     attracting large crowds are routinely permitted on the Fremont Street Experience, and are
6     unquestionably more obstructive.   Similarly, FSELLC-sponsored or approved displays are visible
7     everywhere, as are sponsors giving away promotional materials or selling message-bearing
8     merchandise celebrating Las Vegas from stands or booths.

9           The limitations placed on the plaintiffs' activities here are unreasonable under the less exacting
10    standard applicable to non-public fora because they constitute a complete ban without regard to their
11    compatibility with the function of Fremont Street.  Under this standard, conduct that is disruptive to
12    the forum's primary purpose may be restricted.  If this case involved a train station, airport, or even
13    fairgrounds, the question might be closer.  However, Fremont Street anchors downtown Las Vegas
14    and it is one of the city's premier public gathering places.  The plaintiffs are not seeking to stage a
15    parade or even conduct a demonstration. They want the right to assemble on Fremont Street, interact
16    with the public, distribute literature, gather signatures, hold or carry a banner, and set up a small
17    folding table in connection with those other activities.  These less intrusive activities clearly comport
18    with the multipurpose function of the types of areas that Fremont Street closely resembles. *See Jews*
19    *for Jesus v. M.B.T.A.*, 984 F2d 1319 (1st Circuit 1993)(invalidating the ban on leafleting and
20    collection of signatures in train stations under the  reasonableness standard since conduct was not
21    inconsistent with the purpose of the forum); *Chicago Acorn v. M.P.E.A.* 150 F3d 695 (7th Circuit,
22    1998); *ISCKON v. Lee, supra.*  In defense of the broader range of activities the plaintiffs seek to
23    conduct, it must be emphasized that if Fremont Street is not a public forum, it nearly is.  The more
24    a non-public forum resembles a public forum, the less the justification there is for suppressing speech.

25          In recreating Fremont Street, the defendants purport to have reestablished downtown as the
26    premier gathering place in Las Vegas.  In doing so, however, the defendants neglect to point out that
27    Fremont Street was always the premier gathering place in downtown Las Vegas, and an undisputed
28    public forum.  Functionally, nothing significant has changed  its character as a bustling urban center.

Fremont Street remains today what it was only a few years ago before it was modernized, except that free speech has been banished.

The fact that FSELLC-approved speech occurs without causing problems undermines the defendants' argument that other speech would disrupt the primary function of Fremont Street. This case does not involve the construction of a baseball stadium, government center, or even the typical shopping mall. Even in cases involving non-public fora, governmental efforts to totally ban speech are rarely upheld. Those cases, moreover, do not involve a forum whose very purpose is to serve as the heart of the city's commercial and cultural district. Nor were those cases decided under circumstances where some speech -- in this case FSELLC speech -- is permitted to be expressed without restraint.

## V.    CONCLUSION

For the reasons discussed above, summary judgment should be entered in this case. There are no disputed material facts and the plaintiffs are entitled to such a judgment providing declaratory and permanent injunctive relief as a matter of law.

Dated this 1st day of November 2000

Respectively submitted by :


Allen Lichtenstein
3315 Russell Road, No. 222
Las Vegas, Nevada 89120
(702) 433-2666
Nevada Bar No. 3992

and

Mark Lopez
*American Civil liberties Union Foundation*
125 Broad St., 17th Floor
New York, NY 10004
(212)549-2608

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I Allen Lichtenstein hereby certify that on the 1st day of November 2000, I caused to be deposited for mailing postage prepaid, at Las Vegas, Nevada copies of the Plaintiffs Motion for Summary Judgment addressed to the following:

William P. Henry, Esq.
Office of the City Attorney
City of Las Vegas
400 East Stewart Avenue, 9th Floor
Las Vegas, NV 89101

Todd L Bice, Esq.
Schreck Morris
1200 Bank of America Plaza
300 South Fourth Street
Las Vegas, NV 89101

Kristen B. McMillan, Esq.
Hale, Lane, Peek, Dennison,
Howard, Anderson & Pearl
2300 West Sahara Avenue
Eighth Floor, Box 8
Las Vegas, Nevada 89102

# TABLE OF EXHIBITS

Exhibit 1      Gary Peck Affidavit
          Exhibits to Peck Affidavit
            a.  April 16, 1997 letter to editor from Mayor Jan Laverty Jones to Editor of *Las Vegas Review* article
            b.  March 29, 1997 *Las Vegas Review* article
            c.  May 29, 1997 *Las Vegas Review* article
            d.  June 2, 1997 *Las Vegas Review* article
            e.  October 24, 2000 petition
            f.  October 24, 2000 flyer

Exhibit 2      Mark Lopez Declaration
          Exhibits to Lopez Declaration
            a.  *Defendant's Answers to Interrogatories*
            b.  May 19, 1999 letter to T. Bice from M. Lopez
            c.  June 11, 1999 letter from T. Bice to M. Lopez
            d.  October 10, 2000 letter from M. Lopez to K. McMillan
            e.  October 25, 2000 letter from M. Lopez to K. McMillan
            f.  October 26, 2000 letter from T. Bice to M. Lopez

Exhibit 3      Allen Lichtenstein Declaration
          Exhibits to Lichtenstein Declaration
             a.  May 1, 1998 letter from T. Bice to A. Lichtenstein
            b.  March 3, 2000 letter from A. Lichtenstein to T. Bice

Exhibit 4      Harold Langert Affidavit
          Exhibits to Langert Affidavit
             a.  Photographs

Exhibit 5      G. Gable Declaration

Exhibit 6      Reinard Knutson Affidavit
          Exhibit to Knutsen Affidavit
          a.  Copies of ordinances sent by Kristen McMillen on October 2, 2000

Exhibit 7      Marcus Patrick Blaise Page Affidavit
          Exhibit to Page Affidavit
          a.  November 9, 1999 Flyer

Exhibit 8      Graham Sullivan Affidavit
          Exhibit to Sullivan Affidavit
          a.  November 9, 1999 Flyer

Exhibit 9        Heather Burmeister Affidavit
                 Exhibit to Burmeister Affidavit
                 a.   November 9, 1999 Flyer

Exhibit 10       Christiane Meier Affidavit
                 Exhibit to Meier Affidavit
                 a.   November 9, 1999 Flyer

Exhibit 11       Sarah Anderson Affidavit

Exhibit 12       Paul Tompkins Affidavit

Exhibit 13       Misty Nash Affidavit

Exhibit 14       Lauren Varner Affidavit

Exhibit 15       Alina Shell Affidavit
                 Exhibits to Shell Affidavit
                 a. October 24, 2000 Petition
                 b. October 24, 2000 Flyer

Exhibit 16       Joseph Cohn Affidavit
                 Exhibits to Cohn Affidavit
                 a. October 24, 2000 Petition
                 b. October 24, 2000 Flyer

# Exhibit 1

# Gary Peck Affidavit

Attachments  to Peck Affidavit
a.  April 16, 1997 letter to editor from Mayor Jan Laverty Jones to
    Editor of *Las Vegas Review* article
b.  March 29, 1997 *Las Vegas Review* article
c.  May 29, 1997 *Las Vegas Review* article
d.  June 2, 1997 *Las Vegas Review* article
e.  October 24, 2000 petition
f.  October 24, 2000 flyer

# AFFIDAVIT OF GARY PECK

State of Nevada          }
                         } ss:
County of Clark          }

Gary Peck, having been duly sworn, hereby states and declares as follows:

1.  I reside at 5050 Tamarus St., No. 202, Las Vegas, Nevada and am a resident of Nevada.

2.  I am Executive Director of the American Civil Liberties Union of Nevada. The American Civil Liberties Union of Nevada is a non-profit advocacy membership organization dedicated to the preservation of individual liberties and rights.  The effectiveness of the ACLU depends on its ability to persuade people to its point of view through its public education and legal advocacy programs.  A critical and strategic component of the organization's efforts is its work with and support of other community-based organizations.  Acting alone, and in its capacity as a member organization in a broader coalition, the ACLUN and its members often participate in traditional First Amendment activities on the streets, sidewalks and other public places in Las Vegas.

3.  The ACLUN frequently participates in assemblies where they speak out on a public issue, distribute literature, gather signatures, circulate petitions, solicit membership, carry a sign or banner, distribute or sell politically-oriented T-shirts, buttons, bumper stickers, etc., or to set up a small table in connection with these activities. One such occasion occurred on August 1997 when I participated in a small rally on Fremont Street with approximately 15 other local activists.  After a short while, we were approached by local police and told that our conduct was illegal and ordered to disperse.   4  Immediately thereafter, I contacted FSELLC officials and the Las Vegas Metropolitan Police to determine under what authority the protestors' activities were prohibited and whether we would be at risk of arrest if we came onto Fremont Street again.  Despite repeated phone calls to these officials, I was

never able to determine for certain whether we could proceed without risking arrest or prosecution.

5. The ACLU of Nevada, together with other groups seeking access to Fremont Street initiated this litigation shortly after these events.

6. I have previously submitted a number of sworn statements in this case, pursuant to 28 USC §1746, describing myself, the American Civil Liberties Union of Nevada, the importance of Fremont Street as a forum for free expression, the restrictions imposed by city and FSELLC officials on my right to engage in public education and protest activities at the forum, and the impact of those restrictions on my rights. For purposes of this declaration, I reallege the statements made in those sworn declarations and offer the following additional statements in support of plaintiffs' *Summary Judgement*.

### A. A Description of Fremont Street

7. Fremont Street is an outdoor or open-air mall dedicated to pedestrian use and enjoyment. It is public property and anchors the downtown commercial and casino district.

8. Fremont Street is a public thoroughfare that is contiguous on all sides to public streets. There are no barriers to pedestrian entry or movement. Public streets run right through the middle of the area

9. The Fremont Street Experience was built by and is maintained utilizing public funds. Fremont Street is part of the city's transportation grid for both pedestrian and vehicle traffic.

10. Fremont Street covers an area six blocks long from Main Street on the east to Las Vegas Boulevard on the west and anchors the downtown gaming and commercial district.

11. The streets and sidewalks were demolished and one large promenade was created by paving the area with a smooth surface. The sidewalks on Main Street and Las Vegas Boulevard are incorporated into the Fremont Street Mall where they intersect with Fremont Street and extend for some distance in each direction. Fremont Street extends one block to the north and south on each of the intersecting streets.

12.   First and Third streets bisect Fremont Street and have been converted to cul-de-sacs to enlarge the plaza. Vehicles can no longer use these streets which are dedicated to pedestrian use only. Casino Center Boulevard and Fourth Street also bisect Fremont Street, but allow vehicle traffic to pass as part of the downtown traffic grid. The sidewalks adjacent to these traffic-bearing streets are incorporated into the Fremont Street Mall.

13.   Although Fremont Street is located in the heart of downtown, the surrounding area is not particularly visitor-friendly, especially after dark.

14.   Based on my familiarity with the development of Fremont Street it was conceived as a gaming attraction to compete with the "Strip". This is one of it's principal functions.

15.   For visitors to downtown, Fremont Street is more than a gaming attraction. It provides a respite from casino action, where they can stretch their legs, get some fresh air, and enjoy the street scene. In this sense, the function of Fremont Street is very similar to the "Strip".

16.   For Las Vegans and people who work downtown or have other business there, Fremont Street serves a much more basic function -- it is a centrally located section of the city that may have to be regularly traversed.

17.   Fremont Street is sometimes crowded, but more often it is uncrowded. On the overwhelming majority of the occasions that I have visited Fremont Street, the promenade is not crowded or congested. The crowds gather for the seven minute light show which runs on the hour after dark and for other special events. Even these activities do not always draw large crowds. At it's busiest, Fremont Street is no more crowded than sections of the "Strip" where similar "extravaganzas" are regularly scheduled for the public's enjoyment.

18.   On the "Strip", individual's are permitted to distribute literature and conduct other First Amendment activity.

3

19.    The Fremont Street Experience is a unique and essential forum for engaging in protest activities because of its location and function as a central gathering place for both Nevada and out-of-state residents.  The ACLU and other organizations to which I and the ACLU are allied can reach the largest single audience in the state on Fremont Street on a day-to-day basis.

20.    There are few alternative locations in Las Vegas where the ACLU can reach so large an audience .

21.    The effectiveness of conducting the ACLU's activities on the perimeter of the Fremont Street Experience is greatly diminished by the fact that the overwhelming majority of visitors enter Fremont Street directly from hotels and casinos that border it.

22.    I have reviewed a letter written by then Mayor Jones sent to the editor of the *Las Vegas Review Journal* in which Mayor Jones states that Fremont Street is the modern version of the "Town Square."  I have also reviewed articles in that publication in which both Mayor Jones and FSELLC Executive Director Mark Paris have described Fremont Street as a public park.  These materials are attachments 'a' through 'd' to my affidavit.

23.    LVMC 11.68.100 (I) prohibits the distribution of literature on Fremont Street and the intersecting streets and sidewalks incorporated into it's boundaries.  It is also prohibited on the sidewalk adjacent to  Las Vegas Boulevard and Main Street to the extent they have been incorporated into Fremont Street.

24.    Despite the restriction, casinos and other businesses on Fremont Street freely distribute thousands of handbills daily from the entrance ways or patios  of their establishments. I have observed casino employees distribute literature soliciting business in front of the casinos which anchor Fremont Street.  On a typical night thousands of handbills are distributed by the casinos.  These entrance ways open onto Fremont Street and are situated under building overhangs.  They are approximately the width

4

of the old sidewalk that was demolished and are indistinguishable from the smooth pavement which anchors Fremont Street. A thin line carved or painted into the pavement marks the property line.

25.    FSELLC-sponsored events and promotions also occur regularly to attract visitors and gambling dollars. I have attended free concerts and other entertainment on Fremont Street Experience promenade. During the events, tables and displays are placed on the street, signs and banners appear, there are promotional give-aways where literature or souvenirs are distributed or sold, individuals are invited to sign up for things, and of course there are performances. I have observed the placement of displays, tables and advertisements on the Fremont Street Experience promenade. Kiosk sales of Las Vegas souvenirs are also set up on several locations on Fremont Street. I have observed the sale of message-bearing merchandise, (i.e. T-shirts, from kiosks and stands, located on the Fremont Street Experience promenade).

### b.  Interference With the ACLU of Nevada's Right to Exercise Their First Amendment Rights on Fremont Street.

26.  The public education and protest activities the ACLU of Nevada is prohibited from engaging in on Fremont Street promenade are peaceful and orderly. As can be seen from the photographs and exhibits submitted, plaintiffs conduct in no way is disruptive or obstructive.

27.  In the summer of 1997 I participated in a small peaceful rally on Fremont Street. FSELLC security contacted the local police and the group was told that our conduct was illegal and ordered to disperse. On or about September of 1997, I contacted the offices of the Las Vegas City Attorney to find out whether ACLU members or members of the Unitarian Social Justice Committee, the Shundahai Network, and other organizations could solicit funds, leaflet, demonstrate, set up informational tables, or protest on the Fremont Street Experience. I was informed that the City Attorney could not answer that question for me, but that I should contact the offices of Mark Paris because he was responsible for

such decisions.

28. On or about September of 1997, I contacted the offices of Mark Paris to inquire about the permissibility of the aforementioned activities on the Fremont Street Experience. The Secretary to Mr. Paris informed me that I should contact Kristen McMillen, who I was told was the attorney for the Fremont Street Experience Liability Corporation. I therefore made that call and had a lengthy conversation with Ms. McMillen.

29. Ms. McMillen informed me that leafleting and solicitation were strictly prohibited and that demonstrating, informational tabling, speech making, and protesting were at the discretion of Mr. Paris. I was further informed that the ban on leafleting and solicitation was no problem because I and the others who wished to engage in such activities could enter a lottery for newspaper rack space provided by the Fremont Street Experience on adjacent streets.

30. I asked Ms. McMillen whether there was a written policy regarding these matters that I could share with individuals and organizations wishing to engage in the aforementioned activities. Ms. McMillen informed me there was no such policy and the decision was at the discretion of Mr. Paris.

31. Based on the forgoing events, the ACLU of Nevada, together with other local organizations, filed a lawsuit seeking to enjoin any further interference with their First Amendment rights.

32. Following the entry of the Court's April 24, 1998 Order, I repeatedly have had to intercede in situations with FSELLC officials and the local police to protect the rights of political organizations to distribute literature on Fremont Street.

33. On or about July 17, 1999 I was contacted by Pastor Mike Robinson who told me he and other members of his church had been stopped by Fremont Street Experience security guards while attempting to distribute religious leaflets to passerby. He stated that he and his group were informed by the security guards that in accordance with the Las Vegas Pedestrian Mall ordinance there was a blanket

6

ban on leafleting.

34.   Pastor Robinson asked me if such leafleting was permitted and whether I could come to the Fremont Street Experience to help him explain the Federal Court <u>Order</u> prohibiting enforcement of the anti-leafleting provisions of the ordinance.

35.   I immediately went to the Fremont Street Experience and asked Pastor Robinson what the situation was.  I was again told that the security guards were asserting that no leafleting of any type was allowed on the pedestrian mall, and that the security guards had shown him and his group hand cards stating that the passing of printed materials in a repetitive fashion was prohibited at the Fremont Street Experience.

36.   ACLU of Nevada General Counsel, Allen Lichtenstein, arrived.  He and I approached the security guards and informed them they were in violation of a Federal Court <u>Order</u> enjoining the anti-leafleting provision of the Pedestrian Mall ordinance.

37.   The security guards said they knew nothing about the court <u>Order</u> and said they would call their supervisor to get clarification as to the matter of leafleting.

38.   Mr. Lichtenstein and I asked the security guards to show us the cards stating the prohibition against leafleting.  They did so, but refused to give us a copy of the card.  The security guards also pointed out that there were signs also stating that leafleting was prohibited.  Both the signs and the cards contained a list of enumerated prohibitions including those enjoined by the Court.  Both the cards and the signs stated that violators of any of the listed prohibitions were subject to citation and arrest.

39.   Mr. Lichtenstein and I informed the security guards that their actions, as well as the signs and cards, were in violation of the court <u>Order</u>.  We insisted that Pastor Robinson and his group be permitted to continue leafleting.

40.   The security guards' supervisor arrived.  He also expressed a lack of knowledge concerning

7

the court Order. Mr. Lichtenstein and I informed him that the court had enjoined the anti-leafleting prohibition.

41.    After a period of discussion the supervisor stated to us that repetitive or obstructive leafleting was still prohibited. Mr. Lichtenstein and I informed him that he was wrong about repetitive leafleting. We also stated that while obstruction was clearly prohibited, Pastor Robinson's group was not engaged in and was not accused of engaging in any obstructive behavior. We further stated that claims of obstruction could not be used as a pretext to ban lawful, non-obstructive leafleting and that the misleading signs and cards should be removed.

42.    At this point Pastor Robinson and his group were allowed to continue passing out their religious material.

43.    On or about October 20, 1999 a group wanting to distribute material regarding National Anti-Police Brutality Day contacted the ACLU of Nevada to ask about the rules concerning leafleting at the Fremont Street Experience. I told them non-obstructive leafleting was permitted pursuant to a Federal Court Order and that they should call me if anyone attempted to stop such activity.

44.    On October 22, 1999 I was contacted by this group. They informed me they were at the Fremont Street Experience and were being prohibited from passing out material at the pedestrian mall by security guards and Metro police officers. They informed me that they had told security and police officers about the court Order, but both guards and police professed ignorance about the Order.

45.    I arrived to find the group still being prevented from distributing their leaflets. They told me the security guards had shown them the hand cards that stated leafleting was prohibited. They also told me the guards pointed them to the signs stating the same prohibition. They further told me the security guards and police officers repeatedly asked them for a copy of the court Order.    4 6 .       I identified myself to the police officers, J. Harrison (#5312), J. Hendricks and R. Wood (#5266), and

8

informed them about the court <u>Order</u> and the right of the group to distribute their material. The police told me they knew nothing about any court <u>Order</u> and asked me to produce a copy. I responded that it was their responsibility to know the law and that I had worked with Undersheriff Richard Winget to draft a Department Directive that would insure that they would be properly informed regarding such matters.

47. I was informed by police officers that the Fremont Street Experience Chief of Security, Bill Brennan, was on his way and was asked if I would stop the group from leafleting until he arrived. I responded that I would not do so, especially since this was not the first time I was called to Fremont Street to defend the rights of lawful leafleters.

48. When Mr. Brennan arrived I informed him about the Federal Court <u>Order</u>. He, too, professed complete ignorance about it and told me there should be no leafleting until the Fremont Street Experience attorney, Todd Bice, arrived. I told him he was wrong and that I was advising the group that they could legally continue to leaflet.

49. After some time, Mr. Brennan informed me that Mr. Bice would not be coming to the pedestrian mall. Mr. Brennan proceeded to read a copy of the leaflet being distributed, telling me he was checking to determine whether the materials constituted unlawful solicitation. He informed me as well that obstruction was prohibited and that I was personally responsible for any unlawful behavior on the part of the leafleters.

50. I told Mr. Brennan I was in no way responsible for the activities of the group and that no claim of solicitation or obstruction had been made. I further informed him that any such pretextual claims made after the fact did not justify the Fremont Street Experience's repeated violations of the court <u>Order</u>. I told him as well that the cards stating a prohibition on leafleting must be removed.

51. I then informed the group that they could continue leafleting and instructed them to call me

9

if they were again prevented from doing so.

52.   On or about November 9, 1999 I was contacted by the Shundahai Organization notifying me that they wanted to distribute literature on Fremont Street.  At this juncture, a representative of the organization routinely contacted me in advance of the activities to seek assurance their conduct were legal and that they would not be run-off or arrested.  I told them that they could distribute literature under the court's Order, provided they did not solicit donations.  I told them that I would stand by and intercede if there was any trouble.

53.   On November 9, 1999, several members of the group proceeded to Fremont Street and commenced to distribute literature.  They were stopped by FSELLC security and prohibited from distributing the leaflet unless they deleted the solicitation inviting the reader to "join us, call (702) 647-3045".  They were also prohibited from carrying a sign.  When the organizers of the group decided to delete the words "Join us", they were permitted to distribute the leaflets.  I was immediately informed of these developments.

54.  On yet another occasion on February 3, 2000, I was contacted by the Shundahai organization about distributing literature on Fremont Street.  I again assured them that they would be acting within their rights and told them I would stand by and intervene if any trouble arose.

55.   Once again, FSELLC security told the member of the group that the leaflet could not be distributed because it invited the reader to "Join us (702) 697-3094."

56.   On October 24, 2000, at approximately 2:25 p.m., Alina Shell, Joseph Cohn, and I went to the Fremont Street Experience. We set up a table on the west side of Casino Center Boulevard on the Experience mall.  We hung an ACLU banner on the front of the table.  We had petitions with us that asked simply for support in our fight to preserve the First Amendment on the Experience.  We placed the petitions on the table (see attachment 'e').  We had flyers with us that also called on the public

10

to support our fight to protect free speech (see attachment 'f'). We intended to hand out the flyers and ask people to sign our petition.

57.    As soon as we set up the table and hung the banner on it, Fremont Street security guards wearing name tags approached us. The tags said "Bruce" and "Richard." Bruce told us that we were not allowed to engage in the type activities we were involved in on the Experience. We told him he was wrong and he informed us he would contact his supervisor to find out who was right. He began using his radio, I presume to call his supervisor.

58.    We began handing out flyers and asking people to sign the petition. While we were doing this, a pedestrian began talking to Bruce. Bruce informed him that people could not engage in the activities we were involved in. I intervened and said that was wrong.

59.    At about 2:45PM, two more security guards arrived. One wore a name tag saying "Heidi Arnell, Assistant Supervisor." The other guard did not have a name tag, but he told us his name was John Ruffner. They asked what we were doing and I told them we were handing out flyers and gathering signatures in support of our organization's efforts.

60.    She told us we would have to remove the table. I said we would remove it, but asked why it had to be taken away. John showed me a copy of the Pedestrian Mall Ordinance, which banned tabling and other First Amendment activities. I asked if he knew about the Federal court Order relating to the ordinance. John did not answer.

61.    I then asked about signature gathering, flyers, and the sign. Heidi said she was uncomfortable with the sign, but she would check. At some point, she asked my name. I informed her I believed that was irrelevant. She asked if she could read the petition and the flyer. I told her she could. After a brief delay of several minutes, she informed us that we could continue with our

11

activities as long as we did not obstruct passers by.  She also told me she knew who I was, because she had seen me several times on television and in the newspapers.

Dated this 31st day of October 2000

Gary Peck

Subscribed and sworn before me this 31st day of October 2000.

Allen Lichtenstein
Notary Public for said county and state.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

12

# SATURDAY

Las Vegas, Nevada

---

# PARK PAY A PERK

 *There are no swings or fields, but it is a great venue to enjoy the Las Vegas climate, special events, and one another's company.*

**Mark Paris**
President, Fremont Street Experience Limited Liability Corp.


### The Fremont Street Experience is labeled a park so it can receive public recreation funds.

**By Mike Zapler**
Review-Journal

Is the Fremont Street Experience a park?

The Las Vegas Convention and Visitors Authority thinks it is — so strongly that it is giving the city of Las Vegas $1 million a year in recreation money to help pay for the $70 million lighted canopy that connects downtown hotels.

In a little-noticed vote four years ago, the authority agreed to designate the attraction as a recreational facility. The move, made at the behest of downtown casino owners and Las Vegas Mayor Jan Jones, an authority board member, allowed the tourism agency to grant the city a special allocation of $8 million over eight years.

So far, half of that amount has been allocated to help pay for the downtown redevelopment project.

Nevada law says grants from the authority to incorporated cities are supposed to be used for public recreational facilities. The authority agreed such a label was appropriate for the Experience, which includes casinos, gift shops and a topless bar.

In its unique way, the Experience is a park, said Mark Paris, president of the Fremont Street Experience Limited Liability Corp., which represents major downtown casinos.

"It's a great gathering place," he said. "There are no swings or fields, but it is a great venue to enjoy the Las Vegas climate, special events, and one another's company. It's parochial thinking to think of a park as a field or a baseball diamond."

But others questioned the recreational merits of Fremont Street.

"I hardly see it as a park," said Chuck Musser, a member of the Las Vegas Parks and Recreation advisory board. "For me, a park is for kids to walk around and play in, not a commercial function. I guess they played games with semantics to get the money."

**Please see PARK/2A**



Exhibit 1, Attachment b
"Park Pay A Perk"

Article (Mike Zapler)
March 29, 1997
Las Vegas Review-Journal

Memorandum p. 3

**Mike Salsbury/Review-Journal**

Illinois tourists Davena Morse, left, and her mother, Doris Gist, enjoy the antics Thursday of Fremont Street Experience entertainer Perry Genovese. The downtown Las Vegas attraction gets $1 million a year in tax funds because it is considered a park.

6B

Indiana University. The find was announced Friday at a meeting in Rohnert Park, Calif., of the Society for California Archaeology.

Becker and several colleagues traveled to the site by helicopter just week to investigate the area around a cenote, or natural well, that the Indiana archaeologist has been studying for several

## Park

From 1A

Nevada law says the tourism board is allowed to give money to cities in Clark County for public ... grounds, exposition building, convention halls, auditoriums, field houses, amusement halls, public parks, playgrounds, swimming pools, golf courses, recreation centers, museums, zoos, historical sites and other recreational facilities and buildings....

Does the Experience fit that definition?

Former County Commissioner Paul Christensen does not think so. The chairman of the authority board at the time of the designation, he was the only member of the 11-person panel to vote against it.

Although he could not be reached for comment, Christensen said at the time that the Fremont Street Experience should not qualify for recreation money.

"If you can make a finding that revitalizing a street downtown fits recreation, you can make a finding that almost anything fits recreation," he said, according to transcripts of the May 1993 meeting.

There is also a question of whether the facility is owned by the city, which is required for the authority to authorize money.

According to Paris, the Experience is owned partly by casinos, and partly by the city.

"Under our agreement, the city owns that which it is paid for, and

the Spanish upon their arrival in the New World.

At the site, known as La Aleta, the archaeologists found three plazas lined by 5-foot-tall limestone blocks. The plazas were 75 yards long and 15 yards wide, and would have been used for ceremonies and the playing of a soccer-like game that was

the Fremont Street Limited Liability Corporation owns that which it paid for," he said.

Paris said the light show belongs to the casinos, and the structure that supports it is city property. Of the $70 million spent on the Experience, $42.4 million came from casinos, and $27.6 million from the city and its Downtown Redevelopment Agency, he said.

Paris counts the authority money as a casino contribution because the authority is funded by hotel room taxes. He said that funding — which is being used to pay back a bond for the attraction — was spent only on the city-owned frame.

The authority acts as Las Vegas' public relations firm. With

... at a Taino site ...

Very little is known about the Taino Indians because they were nearly annihilated by 1515. The ... one of the first conflicts between the Spanish and the Taino, may have happened at La Aleta, according to Wilson.

According to the missionary's account, it all began when the Taino were loading bread onto a

his handler and soon disembarked the chief.

The Indians retaliated a few months later by killing a few Spaniards. That led the colony of Santo Domingo to lead an expedition against the city.

One of the officers sent on the mission was Ponce de Leon, who would later roam Florida in search of the Fountain of Youth.

few exceptions, it does not provide money for private construction.

Jones and casino owners argued that the allocation was appropriate because the Experience would be partly city-owned, adding that it would help revitalize and bring tourists downtown.

Whether Fremont Street itself is public or private is also a source of confusion. City Manager Larry Barton said the city owns the right of way under the canopy. But in 1995, the Las Vegas City Council authorized casinos to restrict access to the Experience for special events, such as New Year's Eve.

The authority's fifth $1 million payment for the Experience will be made July 1.



FOSSIL ® SUNGLASSES FOR MEN

Fossil® sunglasses feature everything from classic designs from the '50s to modern.



Sansa

"Park Pay A Perk"

Article (Mike Zapler)
March 29, 1997
Las Vegas Review-Journal

Dillard's on Sun... so that c... enjoy th... with... We send... hopes... Dillard' Monday, ...



points on a bill that used the fluoridation of water in Clark and Washoe counties. Opponents called fluoride a cumulative poison, and supporters touted it as a fighter of tooth decay.

**Page 4B**

used fang out a challenging new era in the history of the area's water quality, which one federal biologist

A daily average of 124 million gallons of treated waste from three sewage treatment plants has

# IN BRIEF

## Josh Jenkins jury continues deliberating

VISTA, Calif. — The jury that will decide whether a Las Vegas teenager was sane when he killed five relatives in 1996 deliberated for a full day Wednesday without reaching a verdict.

Josh Jenkins, who turns 17 today, pleaded guilty on April 16 to bludgeoning and stabbing to death his parents, his grandparents and his 10-year-old sister during a Jenkins family visit to the grandparents' Vista condominium on Feb. 3, 1996.

The jury asked a question about the definition of legal insanity.

The jury sent a note just before 2 p.m. asking for a definition of the word "quality" in the law.

After conferring with attorneys from both sides, Vista Superior Court Judge John Einhorn sent a note telling the jury California law does not further define the term.

## Police arrest 42 over weekend in Laughlin

Metropolitan Police Department officers in Laughlin over the three-day Memorial Day weekend made 42 arrests and issued 33 citations for misdemeanors and another 99 citations for traffic violations.

Police arrested four suspected of driving under the influence of alcohol; two fugitives from other states; six on battery and domestic violence charges; three on bench warrants; six on drug charges; and one for impersonating an officer.

Of the 33 misdemeanor citations, 10 were for juveniles in possession of false identification. Two personal watercrafts, one vehicle, and one boat and trailer were stolen. Three accidents occurred, one that resulted in an injury.

## Man tries to run over NLV police officer

Police late Wednesday were using a helicopter to hunt a man who attempted to run over a North Las Vegas police officer during a traffic stop. A police spokesman said the officer fired his weapon at the man, but the man escaped.

Police were unsure whether the

# Legislator says bill polling violated open meeting law

☐ A move

Lamb Sta

and a Las

objects to

**By Ed Vogel**
Donrey Capital B

CARSON

semblywoma

chairwoman

the open me

secret poll on

of Floyd Lam

Exhibit 1, Attachment c

"Park Protestors Planning Picnic"

Article (Mike Zapler)

May 29, 1997

Las Vegas Review-Journal

Memorandum p. 3

**Please see PARK/5B**

Tobel, R-Las Vegas, l Resources Chairwomraga with illegally polln Von Tobel's bill that he park's name back to e of Tule Springs.

# Park protesters planning picnic

☐ The use of public funds to help pay for the Fremont Street Experience is fueling an event slated for Sunday.

**By Mike Zapler**
Review-Journal

In what's being billed as a "picnic in the park," Las Vegas residents are planning a demonstration Sunday at the Fremont Street Experience downtown to protest using public funds to

pay for the project.

"Come frolic in Las Vegas' newest park," said a flier announcing the event, which is scheduled for noon in front of Binion's Horseshoe.

Organizers said the demonstration is meant to protest the use of taxpayer dollars for the neon-lighted canopy connecting downtown casinos.

The Las Vegas Convention and Visitors Authority in 1993 agreed to allocate $8 million over eight years to the

**Please see PICNIC/3B**

# Sherrice wasn't the only unsup

As Metro homicide detectives studied video surveillance tapes of the minutes leading up to the murder of 7-year-old Sherrice Iverson on Sunday morning at the Primm Valley hotel, they naturally focused on the images of the suspects and the victim.

While poring over scene after scene, they noticed something else that disturbed them.

It was the commotion inside the video arcade where Iverson played a short time before she was raped and asphyxiated in a restroom stall.

In the middle of the night, the arcade was teeming with children.

We're not talking about a few kids up past dark or even curfew. Some of the video footage was recorded after 3 a.m. Some of the kids were in their teens. Others appeared to be as young as the Iverson girl. All were milling around the arcade in the middle of the graveyard shift while their parents played in the casino.



John L. Smith

brothers and sisters."

That's the reality. When she should have been sleeping, Sherrice was chaperoned by her 14-year-old brother, Harold, and the glowing images inside the video arcade.

That there was a crowd in the arcade doesn't excuse the behavior of the victim's father, LeRoy Iverson, who was notified repeatedly by hotel security that his children were wandering through the casinos without adult supervision. It just puts it in perspective. The Iverson children were far from the

Thursday, May 29, 1997/**Las Vegas Review-Journal/3B**

# ada girl out of National Spelling Bee

ch for competing.
raveled with her
rcobatus Flat, a
Beatty, said she
whether she'll

was among 245
ions in the con-
rounds are sched-

allroom crowd of
and media, spell-
turn to a micro-
their words. Stu-
owed to ask the
ition of the word,

whether there was more than one pronunciation, and could ask to hear a sentence with the word in it.

Caligiuri and other stud sat for hours to spell just a words. To pass time, Calig paid attention to the others.

"I just try and like spell words in my head that he g to other people while I wait my turn," she said.

To prepare for the nati spelling bee, Caligiuri said studied spelling whenever had time.

"I read a lot so I came across words in books and stuff," she said.

Her mother described he expe-

## "Park Protestors Planning Picnic"

Article (Mike Zapler)
May 29, 1997
Las Vegas Review-Journal
Memorandum p. 3

Review-Journal.

On Tuesday, spellers and their families were treated to tours around Washington and Mary-l. Sollinger said they were t busy with trips to the Viet-i and Korean War memorials, Lincoln Memorial and other shington highlights.

ational contestants this year ed in age from 9 to 15. ety-four competitors are age Prizes awarded to the bee mpion include $5,000, a lap-00 U.S. Savings Bond, a lap-computer and a speaking ionary/thesaurus.

---

cks

cipants will learn
ct breast self-
about the im-
g healthy foods.
e fee is $25, but
for cancer survi-
or younger and
enior citizens,

s will be directed
and guest speak-
ared on both days,

r. I. Jean Jones,
rofessor at Drew
ool of Medicine
Los Angeles, will
the western re-
of the National
ip Initiative on

treeter Jr., who
Angeles branch of
initiative, will
y. Streeter is a
University of
ornia School of

# Picnic

**From 1B**

city of Las Vegas to help pay for the Experience. The authority's funding was considered crucial to completing the $70 million project.

Nevada law says authority money given to cities must be used for public parks and recreational facilities. The authority decided the Experience fit that definition, even though it includes casinos, gift shops and a topless club.

Joseph Cartino, the vice president of Laservida Arts Cooperative, who is organizing the event, said he doubts the Experience is a park but wants to see.

"Everybody knows it's really a big tourist trap," he said. "They're passing it off as a park, so we're just testing the whole idea."

City and casino officials have said the project is a recreational facility because people gather

there to enjoy the outdoors. The city occasionally holds special events there, such as ice skating.

"It's a great gathering place," Mark Paris, president of Fremont Street Experience Limited Liability Corp., said in a previous interview. "There are no swings or fields, but it is a great venue to enjoy the Las Vegas climate, special events and one another's company. It's parochial thinking to think of a park as a field or a baseball diamond."

The corporation, made up of major downtown casinos, has a private security force that monitors the mall beneath the canopy.

Corporation officials could not be reached for comment, but a spokesman for the Metropolitan Police Department said the Experience likely will handle the demonstration.

The protesters, Sgt. Will Minor said, "would probably have to go through the administration of the

Fremont Street Experience to see if something like this is allowed. It may not be illegal."

It's unclear whether the mall beneath the canopy is public or private. According to Las Vegas officials, the city owns the right of way along Fremont Street. But in 1995, the City Council voted to allow the Experience to hire its own security force, and to restrict access for special events, such as New Year's Eve.

Cartino said he expects 50 to 100 people to join the demonstration, possibly more.

The idea was originally a joke, he said, but "it just snowballed. If everybody shows up, I could see hundreds and hundreds (of people)."

Cartino said the demonstration will be peaceful.

"We're encouraging people to take a real playful attitude," he said. "We'll make our point and move on."

---

n home

and gagged him
him near the top
imit. Jordan was
ith any crime.
he actions by his
itions Response
squad, was justi-
departmental



Wade Cook Seminars Inc. Presents...
New, Innovative and Powerful Ways to Make Your Money Work Wonders!
STOCK MARKET
STOCK MARKET MIRACLES

Las Vegas Review-Journal

Section B

CITY EDITOR: Steve Papinchak, 383-0289. E-mail: Steve_Papinchak@lvrj.com

Page 1B

# Funding for Fremont Experience protested

People picnic downtown to make their point that the city is misusing money set aside for public parks.

**By Mike Zapler**
*Review-Journal*

Sitting on blankets, tossing softballs and munching fried chicken, about 50 people picnicked under the Fremont Street Experience Sunday to protest the attraction's designation as a public park.

The demonstrators said park money should not be spent on the project, which includes casinos, gift shops and a topless club.

About 10 Las Vegas police officers watched the protesters but did not ) them leave. One woman who

tried to bring her dog to the demonstration, however, was stopped by the officers, and people were asked not to distribute fliers unless passers-by asked for them.

The protest was a Woodstock-meets-Glitter Gulch spectacle. Most of the demonstrators were long-haired, barefooted artistic types who origin- / planned the gathering as a prank.

One middle-aged woman wearing a red headband danced to Steve Winwood's "Bring Me a Higher Love," which played over the Experience's sound system. Others spent most of the 1½-hour demonstration meditating and doing yoga.

Despite the antics, though, several gatherers said their message was serious.

"They are using public parks money

for what is obviously not a park, and that's wrong," said Heather Brandes.

In 1993, the Las Vegas Convention and Visitors Authority agreed to allocate $8 million over eight years to help complete the $70 million, neon-lighted canopy connecting downtown casinos. Nevada law says that authority grants to cities can be made only for public parks and recreational facilities, a designation the board found appropriate for the Experience.

The fifth $1 million allotment will be made July 1.

Mark Paris, president of the Fremont Street Experience Limited Liability Corp., took the demonstration in stride.

"When you have 20,000 to 30,000 people coming here every day, another

15 or 20 don't have much of an impact," he said, understating the number of protesters. "As long as they aren't infringing on the rights of others or violating city ordinances, we have no reason to step in."

Paris added that tax revenue generated by downtown casinos helps pay for parks.

"The success of it (the Experience) has a direct benefit to the people of Las Vegas," he said.

A few American Civil Liberties Union lawyers, a former city councilman and a resident whose business was displaced by the Experience's parking garage also attended the protest. The ACLU attorneys said the city ordinance that allows

**Please see PROTEST/3B**

## Longtime resort icon Saiger dies

□ Southern Nevadans say 'Mr. Frontier,' a legend in the gaming community,



xhibit 1, Attachment d

runding for Fremont
Experience protested"

ticle (Mike Zapler)
e 2, 1997
s Vegas Review-Journal
Memorandum p. 3



chair since being shot by a bank robber at a Lake Tahoe beach in December.

Deputy Bill Doyle, 49, was shot five times when he was confronted by the assailant on Dec. 15 at Kings Beach State Park on the lake's north shore. He credits a bulletproof vest with saving his life.

"He hit me right in the plate, and I was on the ground looking at the stars," he said. "I'm from L.A. You are not allowed to hit the streets without a vest."

Nearly six months later, Doyle still ponders how one 45-second event could so profoundly change a life.

"One minute I'm in control of my life; the next minute everyone else is in control of it," he said.

Authorities said Christopher Ray Dennison, 34, confessed to the shooting after he was arrested Jan. 21 in Phoenix in connection with several bank robberies

> **looking at the stars.
> I'm from L.A. You
> are not allowed to
> hit the streets
> without a vest.** 〞
>
> Bill Doyle
> *Deputy shot five times*

across the West.

Dennison currently is awaiting trial in Portland, Ore., on a federal bank robbery charge.

Doyle said he went to the beach to check on a woman who had a fight that night with her boyfriend. The woman wasn't there, but a man charged at him in the dark, yelling "I'm going to shoot you."

"When I saw the flash from the barrel, that's the first time I knew he had a weapon," he said.

ing at the stars. He was 15 feet away a e kept firing. He was trying to nit me in the head."

Doyle said other officers have asked him if there was anything he could have done differently, but he doesn't think so.

"How do you know the person is a danger to society until he does something?" he asked. "I could've shot the guy and killed him and then what if he doesn't have a weapon? The least of the evils is waiting."

The three-year department employee, who has undergone extensive physical therapy as well as the seven operations, said he hopes to know by December whether he'll be able to return as a deputy.

"(I won't return) if I can't hold a weapon or put someone in an arrest lock ... Everyone will wait until December to see if I can get into shape."

spokesman Wayn pects the average ly trains through 25.

"Historically tra been double wha do," he said.

In the 1940s, trains a day ran town Reno. By the ly train count was in the final years Pacific Railroad, t ed to six or eight.

The Southern P in Reno for gener last year with the The railroad, ho for 18 months im increased train sch

Washoe County already are getti the increased nun They have come u million proposal by 50-foot trench mile section of dov

Once the trench the trains would ginia Street and n of pedestrians and casinos.

To pay for part some community the Legislature t sembly Bill 291. county commissi quarter-cent sales The Assembly has bill, which the reviewing.

The tax would r million a year eventually pay for flood-control mitiga along the Truckee million police-fire emergency dispat for lowering the ra

# Arizonans more likely to litter than rest of nation

**Associated Press**

PHOENIX — Arizonans litter their glass, metal and plastic beverage containers at more than twice the rate of other Americans.

And they don't show much re

to a place that's trashy."

The national forest service already bans glass from its land but Lewis said the amount of glass found there indicates a public education drive may be in order.

e annual survey, conducted e Center for Marine Conser- n, was released last week. It based on 1996 information was the first study in which na participated, Lewis said. e numbers were based on nount of trash picked up by olunteers in the Lower Lake Recreation Area Cleanup ll.

ional averages are based on 460 tons of trash volunteers ected in Marine

Conservation's International Coastal Cleanup.

The survey also found that Arizonans left more metal bottle caps, foam cups and plates, metal pull tabs and plastic utensils than in other places nationwide.

Meanwhile, city officials say cigarette butts, illegal dumping of landscape trimmings and construction debris are top city litter sources.

"People waiting for lights to change flick their cigarette butts right out the window," said Tempe street maintenance supervisor Randy Bologna. "If you don't get them in time and cars run over them, they get stuck to the asphalt."

"Funding for Fremont
Experience protested"

Article (Mike Zapler)
June 2, 1997
Las Vegas Review-Journal
            Memorandum p. 3

# Protest

**From 1B**

the Experience to restrict public protests and demonstrations, as well as access to events such as New Year's Eve celebrations.

"In this city there seems to be an attitude that it's OK to give away public space," said Gary Peck, executive director of the ACLU's Nevada chapter. "The casinos treat the space as a private province where people's constitutional rights don't need to be respected."

Along those lines, demonstrators distributed a flier that said, "Hendrix was an Experience. Fremont is a Street."

They also criticized Las Vegas' mayor, handing out sheets that read, "The Jan Jones Experience ... made possible by a grant from Steve Wynn." Jones and Mirage Resorts Inc. Chairman Steve Wynn both strongly backed the Experience, which they said would help revitalize downtown.



NEED SOME EXTRA C

Loans From
$75-$750
GIVE US A CALL!
We Want To Make You A Loan T

30 Minute Service

Flamingo Finance
2825 E. Tropicana
458-2506

Base Finance
4725 E. Craig Rd. #2
643-8088

Central Fina
4425 E. Tropic
435-4743

Mid-Town Credit
2411 So. Eastern
432-0080

Your Credit
1000 N. Nellis
452-1909



See-Vu Awning Co.
Patios · Sunrooms
• Awnings • Carports
• Screenrooms • Gardenrooms

Doctor Duct
The Indoor Duct
Cleaning Professionals

## Cabs banned from slum

To the editor:
Great article by reporter Mike Zapler, in the Review-Journal of April 5, "Rough ride for some taxi drivers."

I support 100 percent the state Taxicab Authority's memorandum and the Las Vegas Metropolitan Police Department's action in forcing cab drivers to stay out of the crime-ridden Meadows Village area.

The memorandum wisely states, "If you have no legal business in that area, for your safety, stay away. Do not use the area for shortcuts or anything else!"

I praise and commend Taxicab Authority Administrator Robert Anselmo for issuing the memorandum. It took courage, and he deserves our support. Likewise, Sheriff Jerry Keller and Desert Cab Company President George Balaban are to be commended for enforcing the memorandum.

Some cab drivers complain, saying it's a shortcut that saves time. I suggest your life, wife, children and loved ones' concern for your safety are more important than saving a little time.

Also, let's be honest. A few drivers go to Meadows Village to buy drugs for themselves. Others knowingly transport people there to buy and deal drugs. This is documented by Taxicab Authority's chief investigator, Robert Flaven. Who can deny drugs are the ruin of our children and destructive to America?

Our Las Vegas taxicab drivers are among the best in the country. They're hard-working, dedicated men and women. I have faith they will accept the need for this policy for their safety, their family's benefit and the public good.

**CLYDE DINKINS**
Las Vegas

■ To the editor:
The fact that Metro has noticed an unusual number of cabs in the Meadows Village area has nothing to do with drugs, as it would like you to believe. The fact is that it is the fastest, most economical way for cabs to get to and from the Stratosphere.

For Robert Flaven of the Taxicab Authority to say drivers are buying drugs or bringing customers for that reason is irresponsible. How many cab drivers have been arrested for buying drugs in Meadows Village?

To say we are bringing people there to buy drugs shows you the mentality of the Taxicab Authority. Our job is to drive people to their destination. If it's to the Meadows Village are we automatically to conclude it is for a drug sale? The Taxicab Authority has never told us to refuse fares to that destination, just that we are responsible for what that fare does. Sounds like the

The Review-Journal welcomes letters to the editor. Only letters that include a legible signature, return address and phone number will be considered. Shorter, concise letters will be given preference and names will not be withheld for any reason. All letters are subject to editing. Fax letters to 383-4676, e-mail to letters@lvrj.com, or mail to:

**Letters to the editor
P.O. Box 70
Las Vegas, NV 89125**

work of the police, not the cab driver.

Exhibit 1, Attachment a

## "Our Town Square"

Letter to the Editor
April 16, 1997
Las Vegas Review-Journal
**Mayor Jan Laverty Jones**
Memorandum p. 3

## Our Town Square

To the editor:
It seems that the local news media have recently decided to stir up controversy over a 1993 decision by the Las Vegas Convention and Visitors Authority. The authority voted to grant $1 million a year for eight years to the city for the development of the Fremont Street Experience pedestrian mall. The media issue is that the Fremont Street Experience, by lacking grass, can't possible be considered a "park." I beg to differ.

To make a point, I would ask the following questions: How many people (both tourists and residents) visit the Experience every night? How many of these are families? How many of those families come to enjoy the atmosphere and entertainment? How much do they pay? And who do they pay? Do adjacent businesses profit from their proximity to waterfront parks in Seattle, San Diego or Cincinnati?

The American Heritage Dictionary defines a park as a tract of land set aside for public use as a landscaped city square. The Fremont Street Experience is a tract of land four blocks long set aside for public use. The city uses it as its Town Square. It was the venue for our Olympic Torch Ceremony. The community tree light ceremony is there. In fact, this year, the en-

tire month of December will be called a "Country Holiday Festival," with daily activities and entertainment including an ice skating rink that is used by our children.

Before the Fremont Street Experience existed, we didn't have a Town Square. I'll bet if you surveyed the thousands of people who go there every night, many of them are our own residents. The entertainment is free.

The Fremont Street Experience will be the home of our Neon Museum. Surely, many of the old signs to be resurrected are from hotels. Many of them, however, are icons of old Las Vegas near and dear to the hearts of our own residents.

Do adjacent businesses benefit from the Experience? You bet! Does the public receive any benefit from this park venue? You bet!

In conclusion, though the Experience may not fit in the narrow paradigm established by the Review-Journal, in every other regard it is perfectly suited to the definition of a "park." Perhaps the local media would be well served by counting the bodies before they launch their most recent crusade against a 1993 decision. The editorial, as well as the article that appeared on this subject, were poorly researched and just another good opportunity for government bashing.
**JAN LAVERTY JONES**
Mayor
City of Las Vegas

## Spending priorities

To the editor:
Regarding "Educators told: Don't expect to get extra cash": Why are we not surprised at the irony, considering the shabby state of education in Nevada?

Yesterday I read the Las Vegas Convention and Visitors Authority spent nearly $500,000 on an ice skating TV show promoting Las Vegas. Now, I read that state lawmakers told UNLV officials that the $11.7 million they had wanted for projects, including $700,000 to establish a law school at UNLV, is "unlikely forthcoming."

There is money for convention authority ice shows and ad campaigns, new megaresort expansions in our neighborhoods, new airport additions (which never seem to be completed), new offices for lawmakers, and merit pay raises for 20 top UNLV administrators, but no funds for a law school?

How about casino and construction companies asking their highly paid bosses to dip into their pockets for the extra $700,000? That's pocket change to them because they are making tons of money as a result of Nevada's growth.
**C. VARTAN**
Las Vegas

| **Name** | **Address** | **Telephone** |
|---|---|---|
| Thomas Paerr | 611 S. 6TH St LV NV 89101 | |
| James Williams Jr. | 2636 Sonna St. | |
| Orlo mitchell Brooks | P.O. Box 96482 L.V. NV. 89193-6482 | (702)-252-1968: |

**If you support the ACLU's efforts to defend the First Amendment on Fremont Street, please sign this petition calling on our elected officials to side with us.**

Exhibit 1, Attachment f

# Do you support Free Speech guaranteed by the 1st Amendment?

XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX

## Then you should support the Nevada ACLU as it continues to fight the Fremont Street Experience's policy of censorship!

## Call the Nevada ACLU at 366-1536 to find out how you can protect your civil liberties.

# Exhibit 2

# Mark Lopez Declaration

Attachments to Lopez Declaration
a.  *Defendant's Answers to Interrogatories*
b.  May 19, 1999 letter to T. Bice from M. Lopez
c.  June 11, 1999 letter from T. Bice to M. Lopez
d.  October 10, 2000 letter from M. Lopez to K. McMillan
e.  October 25, 2000 letter from M. Lopez to K. McMillan
f.   October 26, 2000 letter from T. Bice to M. Lopez

ALLEN LICHTENSTEIN
3315 Russell Road #H222
Las Vegas, Nevada 89120
702-433-2666

MARK LOPEZ
American Civil Liberties Union
125 Broad St., 17th Floor
New York, NY 10004
212-549-2608

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| American Civil Liberties Union of Nevada, Gary Peck, Unitarian Universalist Social Justice Committee, Paul R. Brown, The Shundahai Network, and Greg Gable, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CV-S-97-01419-LDG (RJJ) |
| The City of Las Vegas, Jan Laverty Jones, in her official capacity as the Mayor of Las Vegas, The Fremont Street Limited Liability Corp., and Mark Paris, in his official capacity as the Executive Director of The Fremont Street Limited Liability Corp. | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

DECLARATION UNDER PENALTY OF PERJURY

State of New York:

    Mark Lopez, pursuant to 28USC §1746, hereby makes the following declaration:

    1.  I am counsel of the record in the above referenced case and have been since it's

inception;

2.   In that capacity, I have contacted counsel for the Fremont Street Experience Liability Corporation and for the City of Las Vegas to determine whether my clients could freely assemble on Fremont Street and engage in peaceful First Amendment activities and under what circumstances;

3.   From the start of this litigation there has been some confusion about the defendant's authority to prohibit First Amendment activity on Fremont Street except as provided by LVMC 11.68.100 (I) (leafleting) and 11.44 (solicitation).   In their answers to interrogatories, the defendants refused to state what other activities were allowed or not allowed.   *See City Defendant's Answer to Interrogatories*, attached as Exhibit A to this declaration.

4.   Following the dismissal of the appeal and cross-appeal in this case, I sent Todd Bice, attorney for the FSELLC, a letter formerly seeking immediate permission to erect a table and display on Fremont Street for purposes of conducting informational tabling.   In that correspondence, plaintiffs also sought immediate permission to sell message-bearing merchandise, such as T-shirts, baseball hats, and buttons on Fremont Street. *See May 19, 1999 correspondence from M. Lopez to T. Bice*, attached as exhibit B. Mr. Bice did not respond to my request until June 11, 1999, when he advised me that my clients would have to submit an application. Despite the delay in responding to my correspondence, Mr. Bice did not include an application in his response. Instead he offered to provide an application if I again requested one. *See June 11, 1999 correspondence from T. Bice to M. Lopez*, attached as Exhibit C. By the time I received Mr. Bice's response, however, the event my clients had planned had already passed .

5.   I did not contact FSELLC officials or counsel again about the tabling and vending regulations until October 10, 2000. Most of the plaintiffs efforts in the interim period were

directed at securing their right to distribute literature under the protection of the court's <u>Order</u>. This odyssey is explained elsewhere.  On October 10, 2000. I wrote Kristen McMillan, counsel for FSELLC, a letter specifically requesting permission on behalf of my clients to set up a small table from which to distribute literature, gather signatures. and sell T-shirts bearing political messages.  I explicitly asked if there was an application that I needed to file. *See October 10, 2000 correspondence from M. Lopez to K. McMillan*, (By overnight mail) attached as Exhibit D. I also sought clarification from Ms. McMillan whether my clients could proceed with their plans to distribute literature, gather signatures, and carry a sign or banner without threat of interference by  FSELLC security.   I asked Ms. McMillan for an immediate response because my clients wanted to schedule an activity prior to the November elections.  As of this writing, I have not received a response.  What is particularly objectionable about counsel's failure to respond to my correspondence is that the reason that I wrote Ms. McMillan in the first place is because my clients had directly contacted Mark Paris' office seeking permission to assemble on Fremont Street and conduct various First Amendment activities and they were referred to her.  Her response failed to clarify whether my clients could proceed without risking arrest and necessitated my letter to her.

5.  Not having received a response to my correspondence to Ms. McMillan. I advised my clients that they were free to go to Fremont Street, set up a small table, affix a banner to it, distribute literature, and gather signatures.  On October 24, 2000, my clients assembled on Fremont Street to proceed with their activities, only to be stopped by FSELLC security and told that their conduct was prohibited. Through the intercession of Gary Peck, the Executive Director of the ACLU of Nevada and the lead plaintiff in this case, my clients were permitted to continue with their activities, but only on the condition that they remove the table.  When I learned of this,

3

I immediately wrote Ms. McMillan a second letter objecting to the requirement that the table be removed and asking her once again to clarify the FSELLC position governing the placement of tables and the sale of message-bearing merchandise. I once again asked for an application, if that was the procedure required to be followed. *See October 24, 2000 correspondence from M. Lopez to K. McMillan* (by facsimile), attached as Exhibit E to this declaration. I never received a response from Ms. McMillan

6. On October 26, 2000, I did receive a response from Todd Bice. My letters to Ms. McMillan were apparently forwarded to him. Mr. Bice raises a number of objections to the substance of my correspondence but he fails to respond to my repeated requests for permission or an application to go forward with informational tabling on Fremont Street or to sell message-bearing merchandise. As of this writing, I have never received an application. *See October 26, 2000 correspondence from T. Bice to M. Lopez,* attached as Exhibit F to this declaration.

I declare under penalty of perjury that the forgoing is true and correct.

_____

Mark Lopez

Executed October 30, 2000

BRADFORD R. JERBIC
City Attorney
By: WILLIAM P. HENRY
Senior Litigation Counsel
Nevada Bar No. 101
400 East Stewart Avenue, Ninth Floor
Las Vegas, NV 89101
Attorneys for CITY DEFENDANTS

Exhibit 2, Attachment a

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

\* \* \*

AMERICAN CIVIL LIBERTIES UNION
OF NEVADA, GARY PECK, UNITARIAN
UNIVERSALIST SOCIAL JUSTICE COM-
MITTEE, PAUL R. BROWN, THE
SHUNDAHAI NETWORK and GREG
GABLE,

        Plaintiffs,

    vs.

THE CITY OF LAS VEGAS, JAN
LAVERTY JONES, in her official capacity
as the Mayor of Las Vegas, THE
FREMONT STREET LIMITED LIABIL-
ITY CORP., and MARK PARIS, in his offi-
cial capacity as the Executive Director of the
Fremont Street Limited Liability Corp.,

        Defendants.

CASE NO. CV-S-97-1419-DWH(LRL)

## ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO THE CITY DEFENDANTS

TO:   AMERICAN CIVIL LIBERTIES UNION OF NEVADA, GARY PECK, UNITARIAN
UNIVERSALIST SOCIAL JUSTICE COMMITTEE, PAUL R. BROWN. THE
SHUNDAHAI NETWORK and GREG GABLE, Plaintiffs, and

TO:   ALLEN K. LICHTENSTEIN, ESQ., and MARK LOPEZ, ESQ., their attorneys:

    Pursuant to FED. R. CIV. P. 33(b), Defendants CITY OF LAS VEGAS, and JAN
LAVERTY JONES, in her official capacity as the Mayor of Las Vegas, through their

1 | ANSWER TO INTE   OGATORY NO. 15:

2 |     Yes. The portions of the Fremont Street Experience extending north on First and

3 | Third Streets are to be extended towards Ogden Avenue.

4 | INTERROGATORY NO. 16:

5 |     Prior to the development of the FSE, which of the following activities were permitted

6 | on the downtown streets and sidewalks now within the borders of the FSE:

7 |     (1)    In-hand distribution of literature?

8 |     (2)    Circulating petitions and collecting signatures?

9 |     (3)    Carrying of signs, banners, and placards?

10 |     (4)    Proselytizing or speaking to a gathering of listeners?

11 |     (5)    Street sales or distribution of message bearing merchandise (T-shirts, bumper

12 | stickers, hats, books) in exchange for either direct payment or a contribution?

13 |     (6)    Street solicitation of donations?

14 |     (7)    The placement of stands, tables, exhibits or displays?

15 | OBJECTION TO INTERROGATORY NO. 16:

16 |     Defendants object to this interrogatory on the grounds that it seeks legal opinions and

17 | conclusions and that it seeks the mental impressions, conclusions, opinions, and legal theories

18 | of Defendants' attorneys.

19 | INTERROGATORY NO. 17:

20 |     Since the opening of the FSE, which of the activities described in interrogatory number

21 | 16 are prohibited by city ordinance and which are prohibited by regulation or practice of the

22 | FSE?

23 | OBJECTION TO INTERROGATORY NO. 17:

24 |     Defendants object to this interrogatory on the grounds that it seeks legal opinions and

25 | conclusions and that it seeks the mental impressions, conclusions, opinions, and legal theories

26 | of Defendants' attorneys.

27 | . . . .

28 | . . . .

1 | **INTERROGATORY NO. 18:**

2 | In the two years prior to the opening of the FSE, is there any record of disturbances,

3 | citations or arrests in connection with the activities listed in interrogatory number 16? If so,

4 | describe the records and the circumstances of each incident.

5 | **ANSWER TO INTERROGATORY NO. 18:**

6 | Any such records would be in the custody of the Las Vegas Metropolitan Police

7 | Department.

8 | **INTERROGATORY NO. 19:**

9 | Is there any record of disturbances, citations or arrests on the FSE since its opening?

10 | This question is limited to incidents related to the activities described in interrogatory number

11 | 16. If so, describe the records and the circumstances of each incident.

12 | **ANSWER TO INTERROGATORY NO. 19:**

13 | *See* answer to Interrogatory No. 18.

14 | **INTERROGATORY NO. 20:**

15 | Have city, county, or consolidated metropolitan officials issued any oral or written

16 | instructions or rendered any advice to FSELLC or city officers or employees [sic] for regulating

17 | First Amendment activity on the FSE, including any guidelines or suggestions for

18 | accommodating the activities described in the complaint and in interrogatory number 16?

19 | **OBJECTION TO INTERROGATORY NO. 20:**

20 | Defendants object to this interrogatory on the grounds that it is vague, ambiguous, over

21 | broad, unduly burdensome and seeks, in part, information protected by the attorney-client

22 | privilege.

23 | **INTERROGATORY NO. 21:**

24 | What authority do FSELLC security personnel have to detain, arrest or remove, or

25 | threaten to detain, arrest, or remove, persons from the FSE for violating its regulations or city

26 | ordinances or for any reason? Cite all statutory, municipal, or other lawful authority for that

27 | power.

28 | . . . .

OBJECTION TO INTERROGATORY NO. 21:

Defendants object to this interrogatory on the grounds that it seeks legal opinions and conclusions and that it seeks the mental impressions, conclusions, opinions, and legal theories of Defendants' attorneys.

INTERROGATORY NO. 22:

Does the exception for NLRB protected activities contained in LVMC 11.68.100 apply to all NLRB activities (i.e., picketing, circulating petitions, soliciting donations, holding rallies, giving speeches) or just the in-hand distribution of literature?

ANSWER AND OBJECTION TO INTERROGATORY NO. 22:

Defendants object to this interrogatory on the grounds that it seeks legal opinions and conclusions. Without waiving said objection, Las Vegas Municipal Code § 68.100 does not create an exception for NLRB-protected activities. The ordinance recognizes the general federal preemption of all state and local laws for any matters arguably within the purview of the National Labor Relations Act as held by the United States Supreme Court in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959).

INTERROGATORY NO. 23:

Is solicitation or in-hand distribution of literature exempted from LVMC 10.44 or 11.68.100 if conducted by a business or agent of a member of the FSELLC or a business located in or about the FSE? If so, what is the scope of the permissible activities and source of the exemption?

ANSWER TO INTERROGATORY NO. 23:

No.

INTERROGATORY NO. 24:

List all the governmental interests purportedly served by LVMC 11.68.100 and LVMC 11.44, and by the grant of authority to FSELLC agents to regulate or prohibit Plaintiffs' activities as described in the complaint and in interrogatory number 16. Identify all studies, reports, or other documents which support or refute those interests.

. . . .

1    I have read th      egoing CITY OF LAS VEGAS' AN      ERS TO PLAINTIFF'S

2    INTERROGATORIES and know the contents thereof and that the same are true except as to

3    those matters therein stated on information and belief, and as to such matters, I believe them to

4    be true.  Further, I have been advised of my duty to supplement these responses to include

5    information acquired hereafter and agree to that.

6

7                                                          _____
                                                          LARRY K. BARTON
8

9    SUBSCRIBED AND SWORN to before

10   me this __9th__ day of February, 1998.

11   _____
     NOTARY PUBLIC
12

13       OBJECTIONS.

14       DATED this __9th__ day of February, 1998.

15                                      BRADFORD R. JERBIC
                                        City Attorney
16

17                        By:  _____
                                        WILLIAM P. HENRY
18                                      Senior Litigation Counsel
                                        Nevada Bar No. 101
19                                      400 East Stewart Avenue, Ninth Floor
                                        Las Vegas, NV 89101
20                                      Attorneys for CITY DEFENDANTS

21

22

23

24

25

26

27

28

LEGAL DEPARTMENT

Mark J. Lopez
Senior Staff
Attorney

**ACLU**

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Exhibit 2, Attachment b

National Headquarters 125 Broad Street, New York, NY 10004-2400                   Tel (212) 549-2608  Fax (212) 549-2651

May 19, 1999

Todd L. Bice
Schreck Morris
300 South Fourth St., Ste 1200
Las Vegas, NV 89101

Dear Todd:

Judge Hagen has entered a preliminary injunction enjoining the enforcement of LVMC 11.68.100(I) and LVMC 68.100(B). He has also granted the defendants motion for summary judgment as it pertains to solicitation, LVMC 11.44, and the ban on informational tabling, LVMC 11.68 (100)(H). The basis for upholding the ban on tabling was the plaintiffs failure to assert an "as applied" challenge to the restriction. By submission of this letter, plaintiffs are formally seeking immediate permission to erect a table and display on Fremont Street for purposes of conducting informational tabling. By way of this letter, plaintiffs are also seeking immediate permission to sell message bearing T-shirts, baseball hats, and buttons on Fremont Street.

In addition to the foregoing, plaintiffs wish to engage in certain other activities on Fremont Street, including distributing literature, canvassing for signatures on petitions, carrying pickets or signs, and otherwise advancing their views on the public by speaking and communicating with them. While plaintiffs are aware of no city ordinances or written FSELLC policies that require that they obtain permission to go forward with these activities -- or even notify FSELLC or city officials in advance -- I am nevertheless bringing this matter to your attention to avoid any misunderstanding about the lawfulness of plaintiffs' intentions. If you have any basis to believe that plaintiffs actions are somehow in violation of any municipal ordinance or FSELLC policy, please notify me immediately.

Unfortunately, I am concerned that based on our April 25, 1999 meeting, your response will fail to shed any light on your actual policies, and that plaintiffs must act at their own peril. I expect that you will continue to obfuscate the issues in this case by refusing to state for certain the extent of the regulation. For this reason, we will follow-up this correspondence with written discovery seeking to ascertain the same information. The city, as you know, has already refused to provide the requested information and we will be asking the court to resolve the impasse if we

Nadine Strossen *President*          Ira Glasser *Executive Director*          Kenneth B. Clark *Chair, National Advisory Council*          Richard Zacks *Treasurer*

May 19, 1999
Page 2 of 3

cannot reach a satisfactory negotiation.[1]

      This correspondence, however, is not written to avoid the requirement of formal discovery. It is being written to ensure that my clients will not be harassed, intimidated, threatened with arrest or otherwise prevented from freely distributing literature on Fremont Street, canvassing for signatures, carrying signs or proselytizing. As noted above, I do not believe that my clients need permission from FSELLC officials to engage in the foregoing activities, or that to do so would violate any municipal ordinance or FSELLC policy. If I am mistaken, please contact me immediately as my clients plan to go forward with this action within the next ten days. In preparing your response to this correspondence, I would also ask that you respond to our previously made requests for permission to set up a small table to distribute literature and our request to sell merchandise (T-shirts, bumper stickers). LVMC § 11.680(101)(B) and (H) require prior approval from FSELLC officials.

      An additional matter that requires clarification is your interpretation of Judge Hagen's Order upholding the solicitation ordinance. Shortly after Judge Hagen issued his opinion upholding that ordinance, one of the organizational plaintiffs in this case, the Shundahai Network, was informed by FSELLC officials that a political leaflet advocating "food not bombs" could not be distributed on Fremont Street because it contained the solicitation, "We need help - anything - food - donations - people - cars - love - kitchen supplies." In a letter dated May 1, 1998 you brought this matter to the attention of Allen Lichtenstein with the observation that the leafletters were in violation of the solicitation ordinance because they were seeking donations or other forms of assistance and because they provided a phone number and a website where they could be contacted. The question I raise is whether the plaintiffs will be considered in violation of the solicitation ordinance if the literature that is distributed merely solicits persons to contact the organization for additional information about the organization without any reference to a contribution or membership fee. If it is your intention to instruct FSELLC security personnel to

---

[1]As you are no doubt aware, the district court refused to enter summary judgment with respect to some of the forgoing activities because of the existence of a dispute between the parties whether or not FSELLC officials or city officials purported to prohibit or regulate those activities as alleged in the complaint. We continue to believe that it is the intention of FSELLC officials to ban all speech on Fremont Street and have previously submitted the sworn declarations of Gary Peck, director of the ACLUN, to substantiate this claim. Therein, he recounts how he was asked to leave Fremont Street by the local police in connection with a small rally he participated in prior to the filing of this lawsuit and summarizes a follow-up conversation with Kristin McMillan of your office confirming that no First Amendment activity is allowed on Fremont Street. The fact that you may dispute the accuracy of Mr. Peck's account of those events, obscures the far more important fact that neither plaintiffs nor the court can discern from existing municipal ordinances or other materials made available in this case, the extent to which the broad range of activities alleged in the complaint are completely banned or regulated.

May 19, 1999
Page 3 of 3

enforce the ordinance against this type of solicitation, it would be helpful to know that in advance so that any dispute with FSELLC security can be headed off.

Finally, receipt of this letter should clarify any misunderstanding about the posture of this lawsuit. Plaintiffs have maintained all along that they properly asserted both a facial and as "an applied" challenge to the numerous restrictions on First Amendment activity alleged in the complaint. The record is somewhat confused on this point because of the litigation tactics you have adopted. This correspondence places you on notice that plaintiffs seek to engage in the full range of First Amendment activities alleged in the complaint and that any interference with those efforts clearly supports an "as applied" claim.

I look forward to your prompt reply to the requests made of you in this correspondence.

Yours truly,

Mark J. Lopez

MJL/pa

cc:   William Henry
      Allen Lichtenstein

# SCHRECK MORRIS
### ATTORNEYS AT LAW
1200 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
(702) 382-2101 · FAX (702) 382-8135
www.nevadafirm.com

FRANK A. SCHRECK
STEVE MORRIS
ANDREW S. BRIGNONE
LESLIE TERRY JONES
KRISTINA PICKERING
JOHN A. GODFREY
ANN MORGAN
SEAN T. McGOWAN
ELLEN SCHULHOFER
JAMES J. PISANELLI
CLARK VELLIS

JAMES R. CHAMBERLAIN
DENNIS GALLAGHER
THIERRY V. BARKLEY
MARGARET L. SANNER
F. EDWARD MULHOLLAND II
TODD L. BICE
ELIZABETH M. FIELDER
ANN LYTER THOMAS
ELAYNA YOUCHAH
SONIA CHURCH VERMEYS
DENISE MICHAELIDES
MARY J. DRURY
JOHN P. DESMOND
ADAM P. SEGAL
MATTHEW McCAUGHEY
AMELIA DE LOS SANTOS
JENNIFER L. YELTON
WENDY MEDURA
ROBERT J. GRASSO
SHAWN G. PEARSON
DAVID B. DORNAK
MATTHEW L. HEINHOLD
PAUL D. COLTON

June 11, 1999

Mark Lopez
American Civil Liberties Union    Exhibit 2, Attachment c
125 Broad Street
17th Floor
New York, NY 10004

Re:   ACLU v. City of Las Vegas

Dear Mark:

I am in receipt of your letter dated May 19, 1999. Your letter professes the need for an urgent response. However, it was sent by mail and concerns issues that the Court addressed over a year ago. Contrary to your claim, the letter does not "clarify" anything.

Any misunderstandings by your clients can most simply be resolved if the ACLU simply follows the Federal Rules of Civil Procedure. The position of my clients as well as that of the City have been known by you for over a year. While you now claim sudden urgency, the facts show otherwise. In that regard, we still have not received a proposed scheduling order from the plaintiffs from our meeting in April.

As to your proposal to conduct certain activities in the Mall, we expect your clients to conform their conduct to the Court's order as well as the terms of the City's ordinances.

Concerning your request that we respond to a previously made request for permission to set up tables and sell merchandise, your statement is untrue. To my knowledge, neither you nor your clients have ever made such a request. Like everyone else, your clients can submit an appropriate application. If you need a copy of an application, please let me know.

SCHRECK MORRIS
ATTORNEYS AT LAW

Mark Lopez
June 11, 1999
Page 2

Finally, both I and my co-counsel are always willing to work with opposing counsel to move cases forward. Your letter is not an effort to do so. The issues in this case have been joined for over a year. Self-serving correspondence will not change the facts, the Court's ruling or move this matter forward. Your clients have been treated more than fairly in this litigation and they are responsible for the posture of this case.

If you have any questions, please do not hesitate to call me.

Best regards.

Sincerely,

SCHRECK MORRIS

Todd L. Bice

TLB/mw
cc:   Mark Paris
      William P. Henry
      Kristin B. McMillan

LEGAL DEPARTMENT

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

National Headquarters 125 Broad Street, New York, NY 10004-2400        Tel (212) 549-2500   Fax (212) 549-2651

By Federal Express Overnight Mail

October 10, 2000

Kristen B. McMillan                    **Exhibit 2, Attachment d**
Hale, Lane, Peek, Dennison,
Howard, Anderson, and Pearl
2300 West Sahara Avenue
Eighth Floor, Box 8
Las Vegas, Nevada 89102

Dear Kristen:

Last week, Reinard Knutsen, a representative of the Shundahai Network and one of the organizational plaintiffs in this case, contacted FSELLC officials seeking permission to stage a small protest on FSELLC property prior to the November 2000 election. Approximately six members intended to participate and he sought clarification whether they would be permitted to assemble, speak to the public, carry a banner identifying the organization, distribute literature, sell T-shirts with a political message, and to set up a table and display in connection with the forgoing activities.

Mr. Knutsen was directed to you and advised that the FSELLC had no policies prohibiting or regulating the forgoing conduct. He was also told that city ordinances may come into play to prevent some or all of the activities. You then forwarded the relevant city ordinances, which have in turn been forwarded to me. After reviewing those ordinances, I find nothing in them that is specifically addressed to most of the forgoing activities (i.e. staging a gathering, proselytizing, collecting signatures, carrying a banner, etc.). Are my clients to assume that we safely can go forward with their planned activity without threat of arrest or must they proceed at their own risk?

Please note that the LVMC 11.68 is addressed to mall vending and the placement of tables or displays on mall property. The ordinance specifically grants FSELLC officials discretion to regulate those activities. Accordingly, consider this letter as a request on behalf of the Shundahai Network for permission to set up a table and display and to sell their T-shirts in conjunction with their planned gathering. If there is an application, please let me know.

dine Strossen *President*        Ira Glasser *Executive Director*        **Kenneth B. Clark** *Chair, National Advisory Council*        **Richard Zacks** *Treasurer*

In view of the immediacy of the November election, your prompt reply is requested. Please feel free to contact me if you have any questions.

Very Truly Yours,

Mark Lopez

cc : Allen Lichtenstein
     Todd Bice
     William Henry

LEGAL DEPARTMENT

Mark J. Lopez
Senior Staff
Attorney

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

National Headquarters 125 Broad Street, New York, NY 10004-2400

Tel (212) 549-2608 Fax (212) 549-2651 E-Mail: mlopez@aclu.org

By Facsimile

October 25, 2000

Kristen McMillan
Hale, Lane, Peek, Dennison,
Howard, Anderson and Pearl
2300 West Sahara Avenue
Eighth Floor, Box 8
Las Vegas, NV 89102

Exhibit 2, Attachment e

Dear Kristen:

On October 10, 2000, I wrote you an urgent letter seeking clarification whether a small group of activists I represent in this litigation would be permitted to assemble on Fremont Street and engage in various First Amendment activities. I explicitly sought permission on behalf of my clients to set up a small table from which to distribute literature, gather signatures and sell T-shirts, and the like, bearing political messages. Because of the discretion FSELLC officials have over the placement of tables and displays on the mall and over vending, I sought out advance permission from those officials (through your office) to go forward with the planned activities of my clients. I specifically asked you to notify me if there was an application process. I also told you that I needed a quick response because my clients wanted to proceed prior to the November election. As of this writing, I have had no response to my correspondence.

While I understand that you may be busy, the fact is that when my clients initially contacted Mark Paris' office seeking this permission, they were referred to your office and spoke with you directly. You advised them that there were no FSELLC policies prohibiting those activities. The practices of FSELLC security staff seem to be at odds with the information that you provided. On October 24, 2000, a small group of ACLU supporters set up a small table on the mall and started distributing literature and gathering signatures. Security immediately told them they had to leave. Only through the intervention of Gary Peck, were they eventually allowed to stay and continue their activities, but only on the condition that they remove the table.

In view of the forgoing, I ask you once again to clarify your position about the placement of tables and displays on the mall and about the sale of message-bearing merchandise. If there is a procedure we must follow or application we must file, please provide it.

e Strossen *President*        Ira Glasser *Executive Director*        Kenneth B. Clark *Chair, National Advisory Council*        Richard Zacks *Treasurer*

Thank you for your attention to this matter.

Very Truly Yours,

Mark Lopez,

cc: Allen Lichtenstein
    Todd Bice
    William Henry

**SCHRECK MORRIS**

ATTORNEYS AT LAW

300 BANK OF AMERICA PLAZA

300 SOUTH FOURTH STREET

LAS VEGAS, NEVADA 89101

(702) 382-2101 · FAX (702) 382-8135

www.SCHRECKMORRIS.COM

FRANK A. SCHRECK
STEVE MORRIS
ANDREW S. BRIGNONE
LESLIE TERRY JONES
KRISTINA PICKERING
JOHN A. GODFREY
ANN MORGAN
SEAN T. MCGOWAN
ELLEN SCHULHOFER
JAMES J. PISANELLI
CLARK V. VELLIS
TODD L. BICE

JAMES R. CHAMBERLAIN
DENNIS GALLAGHER
MARGARET L. SANNER
F. EDWARD MULHOLLAND II
ELIZABETH H. FIELDEN
ELAYNA YOUCHAH
SONIA CHURCH VORMERS
DENISE MICHAELIDES
MARY J. DRURY
JOHN R. DESMOND
ADAM P. SEGAL
MATTHEW MCCAUGHEY
AMELIA DE LOS SANTOS
WENDY MEDURA
ROBERT J. GRASSO
SHAWN G. PEARSON
DAVID S. DORNAK
MATTHEW L. REINHOLD
PAUL D. COLTON

October 26, 2000

*Via Facsimile & U.S. Mail*

Exhibit 2, Attachment f

Mark Lopez
American Civil Liberties Union
125 Broad Street
17th Floor
New York, NY 10004

Re:   Your Letters of October 10 and October 25

Dear Mark:

The delay in responding to your correspondence is my responsibility. However, I have nothing to add to the correspondence I previously sent you concerning all of these same issues. Respectfully, it seems that the ACLU sends out letters as a pretext to facilitate further litigation, not solve problems. The issues of protest, solicitation and erection of tables were addressed to you over a year ago. In fact, we were both in court last month and at no time did you suggest to the judge that there were outstanding matters that needed "immediate" attention. On the contrary, the parties agreed that the outstanding matters could be resolved by summary judgment. Summary judgment is appropriate when there is no dispute as to a material fact. There is none here. The remaining issues are questions of law for which you can fully advise your clients.

Furthermore, your letters are factually inaccurate. There was no intervention necessary concerning any incident on October 24, 2000. There was never any discussion by Mr. Knutsen concerning the erection of tables. Instead, Mr. Knutsen offered to send a letter to Ms. McMillan outlining the activities that he proposed and the dates. Instead of receiving the promised letter from Mr. Knutsen, we received your letter trying to rehash issues raised in correspondence last year. Again, the remaining issues are to be addressed by summary judgment under the Court's order. I look forward to reviewing your forthcoming motion.

**SCHRECK MORRIS**
ATTORNEYS AT LAW

Mark Lopez
October 26, 2000
Page 2

Best regards.

Sincerely,

Todd L. Bice

TLB/mw
cc:    Mark Paris
       William P. Henry
       Kristin B. McMillan

# Exhibit 3

# Allen Lichtenstein Declaration

Attachments to Lichtenstein Declaration
a.   May 1, 1998 letter from T. Bice to A. Lichtenstein
b.   March 3, 2000 letter from A. Lichtenstein to T. Bice

1
 Allen Lichtenstein
 3315 Russell Road #H222
2
 Las Vegas, Nevada 89120
 702-433-2666
3

4
 Mark Lopez
 American Civil Liberties Union
 125 Broad St., 17th Floor
5
 New York, NY 10004
 212-549-2608
6

7
 Attorneys for Plaintiffs

8
                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEVADA
9

10
 American Civil Liberties Union of          )
 Nevada, Gary Peck, Unitarian               )
 Universalist Social Justice Committee,     )
11
 Paul R. Brown, The Shundahai Network,      )
 and Greg Gable,                            )
12
                                            )
13
          Plaintiffs,                       )
                                            )
14
          vs.                               )       CV-S-97-01419-DWH (LRL)
                                            )
15
 The City of Las Vegas, Jan Laverty         )
 Jones, in her official capacity as the     )       **DECLARATION OF**
16
 Mayor of Las Vegas, The Fremont Street     )       **ALLEN LICHTENSTEIN**
 Limited Liability Corp., and Mark Paris,   )
 in his official capacity as the            )
17
 Executive Director of The Fremont Street   )
 Limited Liability Corp.                    )
18
                                            )
          Defendants.                       )
19
 _____)

20
 DECLARATION UNDER PENALTY OF PERJURY
21
 State of Nevada
22
          Allen Lichtenstein, pursuant to 28 USC § 1746 hereby makes the following declaration:
23
          1.       I am counsel of record for the Plaintiffs in the above entitled case.
24
          2.       In my capacity as Plaintiffs' counsel I have been in contact with  counsel for the
25
 Fremont Street Experience LLC.
26
          3.       I received the attached May 1, 1998 letter from Todd Bice (attachment 'a')
27
 concerning the flyer (attached to Mr. Bice's letter) handed out and the Fremont Street Experience
28
 by the group Food not Bombs.

1    4.    In his letter, Mr. Bice stated the FSELLC's position that the words "We need help"

2  as violating the ban against solicitation.

3    5.    On March 3, 2000 I wrote a letter to Mr. Bice (attachment 'b') concerning another

4  incident of what I perceived to be an over inclusive interpretation by the FSELLC of the ban on

5  soliciting at the Fremont Street Experience.

6    6.    The letter referred to an incident on February 3, 2000 in which the Shundai

7  Organization was told the phrase "join us" in the flyers was impermissible solicitation. The group was

8  only allowed to distribute its flyers after the "join us" phrase was crossed out.

9    I declare under penalty of perjury that the forgoing is true and correct.

10

11

12

13  Allen Lichtenstein

14  Executed October 31, 2000

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

## SCHRECK MORRIS
### ATTORNEYS AT LAW
1200 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
(702) 382-2101 · FAX (702) 382-8135

FRANK A. SCHRECK
STEVE MORRIS
ANDREW S. BRIGNONE
LESLIE TERRY JONES
KRISTINA PICKERING
JOHN A. GODFREY
ANN MORGAN*
SEAN T. McGOWAN
ELLEN SCHULHOFER
JAMES J. PISANELLI
CLARK VELLIS

*RENO MANAGING PARTNER

JAMES R. CHAMBERLAIN
THIERRY V. BARKLEY
F. EDWARD MULHOLLAND II
TODD L. BICE
AMANDA G. YOUNG
ANN LYTER THOMAS
ELAYNA YOUCHAM
SONIA CHURCH VERMEYS
DENISE BARTON
LISA A. NAPOLI
STEPHEN M. SULLIVAN
ADAM P. SEGAL
MATTHEW McCAUGHEY
ELIZABETH M. FIELDER
MARY J. DRURY
AMELIA DE LOS SANTOS
AKASH D. SETHI
JENNIFER L. YELTON
WENDY MEDURA
JOHN P. DESMOND

May 1, 1998

**VIA FACSIMILE**
**AND U.S. MAIL**

Exhibit 3, Attachment a

Allen Lichtenstein
3315 Russell Road, #H222
Las Vegas, Nevada 89120

> Re:   ACLU v. City of Las Vegas

Dear Allen:

I have read with interest your comments to the media concerning the above-referenced matter. Apparently, your client, Gary Peck, claims that handbilling, the sale of merchandise and protests of an unspecified form are all now freely allowed in the Fremont Street Experience Pedestrian Mall (the "Mall"). As lawyers, I think we are both quite cognizant of the significance of the Court's finding that the Mall is not a public forum for speech and that such claims are untrue.

In that regard, it has come to my attention that one of your clients was distributing copies of the enclosed document within the Mall. Your client's flyer clearly violates the solicitation ordinance. It asks for donations or other forms of assistance. It furthermore provides a phone number as well as a web site where your client can be contacted. The solicitation ordinance expressly prohibits any requests whether written or oral for charity, business or patronage.

You argued to the Court that the solicitation ordinance should be enjoined at least to the extent it prohibits the distribution of handbills or other documents which ask for or solicit funds at a future date or location. The Court declined that request. In fact, it awarded the defendants summary judgment on that question. It is unfortunate that your client chooses to ignore the Court's ruling. While I understand that both you and your client are disappointed with the Court's ruling that the Mall is a non-public forum, the appropriate response for the plaintiffs is to appeal, not ignore the Court's ruling.

Furthermore, the suggestion to the media by Mr. Peck that the Mall is now open for supposed vending of merchandise is irresponsible. First, I note that the plaintiffs represented to the Court that they do not "sell" merchandise. Instead, the plaintiffs claim that they merely give away merchandise in exchange for "donations." The Court's order clearly addresses that issue, noting that it constitutes solicitation and is prohibited by the solicitation ordinance. I assume that the plaintiffs did not make

SCHRECK MORRIS
ATTORNEYS AT LAW

Allen Lichtenstein
May 1, 1998
Page 2

a misrepresentation when they informed the Court that they are not engaged in the "sale" of any merchandise.

As you know, I have been engaged in representing several clients against the various t-shirt vendors that sought to inundate the strip in 1996. Like your clients, those vendors claimed that they were not "selling" any merchandise. They insisted that they were exempt from the state and local regulations applicable to those that "sell" merchandise (i.e. sales tax, business licenses, etc.) because they were engaged in charitable solicitation. This form of "solicitation" was furthermore a basis for maintaining a "charitable" tax-exempt status with the Internal Revenue Service. Your client's activities cannot be a "sale" for purposes of one law but yet constitute a "donation" for purposes of all others.

I hope that your clients will conform their activity to the Court's order and not necessitate further legal action.

Best regards.

Sincerely,

SCHRECK MORRIS

Todd L. Bice

TLB/mw
Enclosure

# *Las Vegas*
# **Food not Bombs**

Because **FOOD** is a **RIGHT** not a *privilege!*
Because there is enough food for everyone to eat!
Because SCARCITY is a LIE!

Because Food                    Grows on Trees

**POVERTY** is              *capitalism make*

a form of                     *food* a source

**VIOLENCE**                    of **profit** not a

**not** necessary              source of *nutrition*

or natural!                    Because we need

                               COMMUNITY

Because we need HOMES          not CONTROL!

not JAILS!

*FREE FOOD !!!*
# Pearson Park (Washington & D St)
EVERY Sunday  2- 4 pm  **Info 260-8378**
www.shundahai.org /fnb



Tables to provide info about food, peace, and promote non-violence

## WHY FOOD NOT BOMBS:?



No Nukes

Recent studies have indicated that 5 million children go hungry every night in the United States. Enough food is wasted each day to feed those children, and all the adults that go hungry in this country. Hunger is not an agricultural problem, it is a problem of distribution.

In 1980 Food Not Bombs was formed in Boston by a group of anti-nuclear activists to redistribute some of the food that is thrown away each day. They began by collecting edible food from warehouses and grocer stores that was either in surplus or deemed unsalable. If a produce warehouse has food that needs to be used within a day or two, it can no longer be sold to a retail grocer because it won't have the necessary shelf life. Grocers also have produce that needs to be used immediately, is partially damaged or is just physically unappealing and thus won't sell. This food would then be taken to local soup kitchens where it was prepared and served to hungry people the same day.

Nutrition is also an important aspect of fighting hunger. While there is no shortage of food, there is a predominance of unhealthy food and unhealthy diets—especially among poor people. This condition is reinforced by social agencies which serve people primarily meat based diets with mostly canned and processed fruits and vegetables. Food Not Bombs serves and distributes only vegetarian food. It would be very difficult to guarantee the safety of outdated or marginal meat products. Grains, beans, and fresh vegetables have a lower fat content than meat, and they also can provide high amounts of protein. Food Not Bombs also makes great efforts to provide organically grown foods. Many of the chemical fertilizers and pesticides leave residues or become ingrained within produce and are clear but insufficiently measured threats to one's health. The manufacture and use of these chemicals is also destroying our environment through toxic air emissions and runoff.

After developing this basic operation and solidifying their contact with suppliers, Food Not Bombs began preparing their own meals for political rallies and for serving to people on the streets. In this way they worked to feed hungry people where they were, in a non-institutional setting and to publicly demonstrate that hunger exists and that our country should be using its resources to feed people and not to create weapons of war.

WE NEED HELP ANYTHING—Food—donations—PEPOLE—CARS—LOVE—KITCHEN SUPPLIES

# ALLEN LICHTENSTEIN
### ATTORNEY AT LAW

3315 RUSSELL RD., #H222
LAS VEGAS, NV 89120
PHONE (702) 433-2666
FAX (702)-433-9591

March 3, 2000

Exhibit 3, Attachment b

Todd Bice
Schreck Morris
300 South Fourth Street, #1200
Las Vegas, NV 89101

Dear Mr. Bice:

An incident occurring on or about February 3, 2000 has come to my attention. Individuals attempting to distribute the attached flyer were prevented from doing so by Fremont Street Experience security personnel on the grounds that the material contained unlawful solicitation. As you can see, no appeal for money, goods or other material is included in the flyer's message. The security personnel determined that the phrase "join us" along with a phone number violated LVMC Chapter 10.44. Clearly, our position is that nothing in the handout in question comes anywhere close to fitting into the definition of "solicitation" contained within LVMC 10.44.010(A).

In the past, you have requested that we inform you of these incidents to help avoid unnecessary court proceedings. In that spirit I am writing this letter, along with the request that you inform me as to whether the actions of Fremont Street Experience security personnel and their interpretation of LVMC 10.44.010(A) conforms with your understanding of the scope of the term "solicitation" in the ordinance. As you are well aware the question of the breadth of that definition is the subject of an upcoming motion by the Plaintiffs. If the "join us" language is a matter of contention, that fact needs to be reflected in the argument of both sides. If it is not, and the security personnel exceeded their authority, then the matter is more one of training.

I appreciate your timely response to this letter so that we can clarify the scope of the areas of disagreement to allow both sides in the litigation to address to substantive issues.

Very truly yours,

Allen Lichtenstein
AL/ll

# NUCLEAR TEST TODAY
## OBOE 3

YOUR
TAX
$$$$
AT
WORK

END
THE
NUCLEAR
THREAT

RADIATION
WILL
KILL

YOU

YOUR
GOVERNMENT
DOESN'T
WANT YOU
TO KNOW

YOUR
HEALTH
AT
RISK

Join Us
702-647-3095
www.shundahai.org

---

# NUCLEAR TEST TODAY
## OBOE 3

YOUR
TAX
$$$$
AT
WORK

END
THE
NUCLEAR
THREAT

RADIATION
WILL
KILL

YOU

YOUR
GOVERNMENT
DOESN'T
WANT YOU
TO KNOW

YOUR
HEALTH
AT
RISK

Join Us
702-647-3095
www.shundahai.org

---

# NUCLEAR TEST TODAY
## OBOE 3

YOUR
TAX
$$$$
AT
WORK

END
THE
NUCLEAR
THREAT

RADIATION
WILL
KILL

YOU

YOUR
GOVERNMENT
DOESN'T
WANT YOU
TO KNOW

YOUR
HEALTH
AT
RISK

Join Us
702-647-3095
www.shundahai.org

---

# NUCLEAR TEST TODAY
## OBOE 3

YOUR
TAX
$$$$
AT
WORK

END
THE
NUCLEAR
THREAT

RADIATION
WILL
KILL

YOU

YOUR
GOVERNMENT
DOESN'T
WANT YOU
TO KNOW

YOUR
HEALTH
AT
RISK

Join Us
702-647-3095
www.shundahai.org

THE WESTERN SHOSHONE NATION
IS THE MOST BOMBED NATION IN THE **WORLD!!**

THE NEVADA TEST SITE
*(60 MILES NORTH OF VEGAS)*
HAS BECOME THE
PERMANENT LOW- LEVEL WASTE DUMP
OF THE NATION.

**OBOE 3** IS ONE OF **10,000 NUCLEAR TESTS!!**
FOR **EVERY** TEST, THERE IS A **DIRECT THREAT**
TO YOUR HEALTH.
AND TO THE **SURVIVAL** OF **ALL LIFE** TO COME.
**DON'T WAIT**
FOR THE GOVERNMENT TO TELL YOU WHY YOU'RE SICK.
HELP **STOP THE MADNESS.**
END THE NUCLEAR THREAT!

Join Us
702-647-3095
www.shundahai.org

THE WESTERN SHOSHONE NATION
IS THE MOST BOMBED NATION IN THE **WORLD!!**

THE NEVADA TEST SITE
*(60 MILES NORTH OF VEGAS)*
HAS BECOME THE
**PERMANENT LOW- LEVEL WASTE DUMP**
OF THE NATION.

**OBOE 3** IS ONE OF **10,000 NUCLEAR TESTS!!**
FOR **EVERY** TEST, THERE IS A **DIRECT THREAT**
TO YOUR HEALTH.
AND TO THE **SURVIVAL** OF **ALL LIFE** TO COME
**DON'T WAIT**
FOR THE GOVERNMENT TO TELL YOU WHY YOU'RE SICK
HELP **STOP THE MADNESS**
**END THE NUCLEAR THREAT!**

Join Us
702-647-3095
www.shundahai.org

# FREE
YOURSELF FROM **RADIATION** DAMNATION

THE **WESTERN SHOSHONE** NATION
IS THE MOST **BOMBED** NATION IN THE **WORLD!!**

THE NEVADA TEST SITE
*(60 MILES NORTH OF VEGAS)*
HAS BECOME THE
PERMANENT LOW- LEVEL WASTE DUMP
OF THE NATION.

**OBOE 3** IS ONE OF **10,000 NUCLEAR TESTS!!**
FOR EVERY TEST, THERE IS A **DIRECT THREAT**
TO YOUR HEALTH.
AND TO THE SURVIVAL OF **ALL LIFE** TO COME.
**DON'T WAIT**
FOR THE GOVERNMENT TO TELL YOU WHY YOU'RE SICK.
HELP **STOP THE MADNESS.**
END THE NUCLEAR THREAT!

Join Us
702-647-3095
www.shundahai.org

# FREE
YOURSELF FROM **RADIATION** DAMNATION

THE **WESTERN SHOSHONE** NATION
IS THE MOST **BOMBED** NATION IN THE **WORLD!!**

THE NEVADA TEST SITE
*(60 MILES NORTH OF VEGAS)*
HAS BECOME THE
PERMANENT LOW- LEVEL WASTE DUMP
OF THE NATION.

**OBOE 3** IS ONE OF **10,000 NUCLEAR TESTS!!**
FOR **EVERY** TEST, THERE IS A **DIRECT THREAT**
TO YOUR HEALTH.
AND TO THE **SURVIVAL** OF **ALL LIFE** TO COME.
**DON'T WAIT**
FOR THE GOVERNMENT TO TELL YOU WHY YOU'RE SICK
HELP **STOP THE MADNESS.**
END THE NUCLEAR THREAT!

Join Us
702-647-3095
www.shundahai.org

AVERY ™

RECYCLED PAPER MADE FROM 20% POST CONSUMER CONTENT

# Exhibit 4

## Harold Langert Affidavit

Attachments to Langert Affidavit
a.   Photographs 1 through 46

## AFFIDAVIT OF HAROLD LANGERT

Harold Langert, having been duly sworn, states and declares the following:

1.    I am over eighteen years of age and a resident of Clark County:

2.    At the request of Gary Peck, Director of the ACLU of Nevada, I was asked to photograph various features of the Freemont Street Experience.  I was asked to try to achieve three specific objectives.  The first objective was to show foot traffic densities on different days at representative times.  The second objective was to record an event where the ACLU set up a table passing out flyers and talking to the public.  The third objective was to show vendors passing out materials.

3.    I started shooting photographs on October 24, 2000.  From 1:57 pm to 2:31 pm, I photographed pedestrians along the length of the Freemont Street Experience at various places and angles.  I did  this at four different times during the day.  The photographs identified as numbers 1 through 10 were from this time slot.

4.    At  2:37 pm, I spotted Gary Peck, Alina Shell, and Joey Cohn, just to the west of 2nd Street.  They had set up a table on the Fremont Street Experience and were passing out flyers and talking to passersby.  The event lasted until 2:53 pm and is depicted in photographs identified as numbers 40 through 46.

5.    From 4:59 pm through 5:36 pm that same day, I again photographed the Freemont Street Experience.  The photographs taken during this period are numbered 11 through 16.

6.    The process was repeated on October 25, 2000, from 2:47 pm through 3:39 pm.  The photographs taken during this time period are numbered 17 through 28.

7.     The final shoot was on Saturday evening of October 28, 2000, from 5:35 pm to 5:57 pm.  The photographs taken during this time period are numbered 29 through 39.

8.     There are several photographs of various vendors handing out promotional items shot primarily on Saturday October 28, 2000.

9.     The time and dates that the pictures were taken are printed on the front of the photographs and are consistent with my notes and recollections.  I believe them to be accurate to within two minutes of the actual time and completely accurate as to the date.

Further  affiant sayeth naught.

_____

Harold Langert

Subscribed and sworn before me this 31st day of October 2000.

_____

Allen Lichtenstein, Notary Public for said county and state.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

















































































**Exhibit 5**

**G. Gable Declaration**

1 | CHUCK GARDNER
815 So. Third St.
2 | Las Vegas, NV 89101
702-382-9221
3

4 | MARK LOPEZ
American Civil Liberties Union
125 Broad St., 17th Floor
5 | New York, NY 10004
212-549-2608
6

Attorneys for Plaintiffs
7

8
UNITED STATES DISTRICT COURT
9
FOR THE DISTRICT OF NEVADA
10

11

12 | American Civil Liberties Union of Nevada,      )
Gary Peck, Unitarian Universalist Social         )
13 | Justice Committee, Paul R. Brown, The          )
Shundahai Network, and Greg Gable,               )
14                                                  )
                                                   )
15 |            Plaintiffs,                         )
                                                   )
16 |       vs.                                      )       CV-S-97-01419-LDG (RJJ)
                                                   )
17 | The City of Las Vegas, Jan Laverty Jones,      )
in her official capacity as the Mayor of Las     )
18 | Vegas, The Fremont Street Limited Liability    )
Corp., and Mark Paris, in his official capacity  )
19 | as the Executive Director of The Fremont       )
Street Limited Liability Corp.,                  )
20                                                  )
            Defendants.                            )
21 | ————————————————————————— )

22
DECLARATION UNDER PENALTY OF PERJURY
23 | State of Nevada:

24 |       Greg Gable, pursuant to 28 U.S.C. §1746, hereby makes the following declaration in support

25 | of Plaintiffs' Motion for a Preliminary Injunction:

26 |       1. I reside at 5007 Elmhurst Lane, Las Vegas, Nevada, and am a resident of Nevada

27 |       2. I am a member of the Shundahai Network and am a community-based activist who seeks

28 | to express to my political beliefs on the streets and in the parks of local communities through tradition?

1   First amendment vehicles such as leafleting and proselytizing.  I seek access to the Fremont Street
2   pedestrian zone for these purposes.

3       3.  The Shundahai Network is a community-based Nevada non-profit organization involved in
4   public education, organizing and political advocacy aimed at halting the nuclear arms race and
5   encouraging nuclear disarmament.  It carries out its activities by distributing educational literature,
6   gathering signatures on petitions addressed to public officials, staging rallies, and holding public
7   meetings and other activities directed to generating public discussion and activity on behalf of nuclear
8   arms control.  The Network on some occasions uses signs, displays and exhibits to communicate its
9   message.  In order to defray the cost of its political activities, the Network seeks and accepts street
10  donations.  Message-bearing merchandise, such as buttons, bumper-stickers, and T-shirts are
11  sometimes given away in return for a contribution in order to raise additional funds.

12      4. The Shundahai Network has a volunteer staff of eight to ten Nevada-based individuals.
13  Through their public education activities, the Network seeks to alert Nevada citizens and visitors to
14  Las Vegas to the danger of nuclear testing that occurs in the State of Nevada.

15      5.  The Fremont Street pedestrian zone provides a unique and effective forum for the
16  dissemination of the Network's message because of its location and the volume of visitors, particularly
17  out-of-state and foreign tourists who likely have no idea of the extent of nuclear activities that occur
18  in Nevada.  To a large extent, out-of-state visitors are the Shundahai Network's intended audience.

19      6.  On at least three occasions within the last six months, I have attempted to distribute
20  literature on the Fremont Street pedestrian zone. On each occasion, I was informed by Fremont Street
21  security and Metro Police that my activities were not permitted.  I was asked to leave under threat of
22  arrest.  On each occasion, I left the premises peacefully and without further incident.

23      7.  During the Summer of 1997, I participated in a rally on the Fremont Street pedestrian zone
24  to protest its policy of exclusion of First Amendment activity.  After being threatened with arrest by
25  Metro Police, the fifteen member group of protestors departed peacefully.

26      8.  There are no alternative locations in Las Vegas where the Shundahai Network can reach so
27  large an audience.  The public education activities the Network seeks to conduct are similarly banned
28  in the other major gathering places for visitors, including the Las Vegas Strip and McCarran Airport.

9.   The effectiveness of conducting the Network's activities on the perimeter of the Fremont Street pedestrian zone is greatly diminished by the fact that the overwhelming majority of visitors enter Fremont Street directly from the hotels and casinos that border it.

I declare under penalty of perjury that the foregoing is true and correct.

Greg Gable

Executed January _16_, 1998.

**9**

AVERY ™

RECYCLED PAPER MADE FROM 20% POST CONSUMER CONTENT

**Exhibit 6**

**Reinard Knutson Affidavit**

Attachment to Knutsen Affidavit
a.  Copies of ordinances sent by Kristen McMillen on October 2, 2000

## AFFIDAVIT OF REINARD KNUTSEN

State of Nevada        }
                       } ss:
County of Clark        }

Reinard Knutsen having been duly sworn, declares that:

1)      I am president and community organizer for Shundahai Network, a collective of international activists working on nuclear weapons, waste and indigenous rights issues. Shundahai Network has our main office in Las Vegas, Nevada.

2)      On October 2, 2000 at 10:20 am, I tried to contact Mark Paris, Chairman of the Fremont Street Experience Limited Liability Company (FSELLC), at his main office. I wanted to inform the Fremont Street Experience that our organization would like to hold a small public education event on October 28, at 1 pm. This event was planned for that date because of the upcoming election. I informed them that we intended to gather with around 20 supporters and that we would have banners and signs and hand out educational materials about the subcritical nuclear weapons test program and nuclear waste dumping programs at the Nevada Test Site. We would also be collecting signatures on a petition to stop nuclear weapons tests. I was referred to his personal secretary, Diana. Diana after hearing my request and putting me on hold for about 10 minutes referred me to Kristen McMillan of Hale Lane Peek Dennison Howard and Anderson, legal counsel for the FSELLC.

3)      I called Kristen McMillan at 10:35 am, on October 2, 2000, and left a detailed voice mail message explaining what we were planning for October 28. I said that we were requesting permision from the FSELLC so that we would not be harrassed by their private security force.

1

4)      Kristen returned my call at about 1 pm. She said that "the Fremont Street Experience does not have the discretion to approve or not to approve city ordinances that apply to the pedestrian mall." She also said that Fremont Street Experience security personnel would enforce all City ordinances. She said that she would fax me a copy of the City ordinances that apply to public behavior at the Fremont Street Experience.

5)      At 4:49 pm, on October 2, Kristen sent a fax to my office containing several City ordinances pertaining to the Fremont Street Experience (attached).

Further affiant sayeth naught.

Reinard Knutsen

Subscribed and sworn before me this 27th day of
October 2000.

Notary public for said county and state



NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

2

Exhibit 6, Attachment a

10.47.010

## Chapter 10.47

### PEDESTRIAN OR VEHICULAR INTERFERENCE

Sections:
    **10.47.010    Definitions.**
    **10.47.020    Intentional obstruction.**

    **10.47.010   Definitions.** The following definitions apply in this Chapter:
    (A)   "Area open and available for pedestrian or vehicular travel" means an area generally visible to public view and includes alleys, bridges, buildings, driveways, parking lots, parks, pedestrian mall, plazas, sidewalks and streets open to the general public, including those that serve food or drink or provide entertainment, and the doorways and entrances to buildings or dwellings and the grounds enclosing them.
    (B)   "Obstruct pedestrian or vehicular traffic" means to walk, stand, lie or place an object in such a manner as to block, obstruct, hinder, delay, hamper or interfere with passage by another person or a vehicle, or to require another person or a driver of a vehicle to take evasive action to avoid physical contact
    (1)   Any conduct "arguably protected" by the National Labor Relations Act is not included in this definition until or unless such conduct is determined to be unprotected pursuant to a decision of the National Labor Relations Board. "Arguably protected" as used in this Section has the same meaning as in San Diego Building and Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773 (1959).
(Ord. 3863 § 2 (part), 1995)

    **10.47.020   Intentional obstruction.** It is unlawful to intentionally obstruct pedestrian or vehicular traffic in an area open and available for pedestrian or vehicular traffic.
(Ord. 3863 § 2 (part), 1995)

10.44.030

## Division V. Offenses Against Public Peace

## Chapter 10.44

## SOLICITATION

Sections:
10.44.010   Definitions.
10.44.020   Solicitation, by coercion—Misdemeanor.
10.44.030   Solicitation at certain locations—Misdemeanor.
10.44.040   On private property.
10.44.050   Effective date.

**10.44.010  Definitions.** For purposes of this Chapter:

(A)  "Solicitation," for purposes of this Chapter, means to ask, beg, solicit or plead, whether orally, or in a written or printed manner, for the purpose of obtaining money, charity, business or patronage, or gifts of items of value for oneself or another person or organization.

(B)  "Coercion" means to wilfully and knowingly:

(1)  Approach or speak to a person in such a manner as would cause a reasonable person to believe that the person is being threatened with:

(a)  Imminent bodily injury, or

(b)  The commission of a criminal act upon the person or another person, or upon property in the person's immediate possession.

(2)  Persist in a solicitation after the person solicited has given a negative response;

(3)  Block, either individually or as part of a group of persons, the passage of a solicited person; or

(4)  Engage in conduct that would reasonably be construed as intended to compel or force a solicited person to accede to demands.
(Ord. 3862 § 3 (part), 1995)

**10.44.020  Solicitation, by coercion — Misdemeanor.** Any individual who personally commits solicitation by coercion shall be guilty of a misdemeanor.
(Ord. 3862 § 3 (part), 1995)

**10.44.030  Solicitation at certain locations — Misdemeanor.** Any individual who personally engages in solicitation at any of the following places shall be guilty of a misdemeanor:

(A)  At any bus, taxi, limousine, trolley or train stop;

(B)  In any public transportation vehicle or facility;

11.68.100

**11.68.100   Prohibited.** The following are prohibited within the Pedestrian Mall:

(A)   Animals unless used in connection with a mall activity authorized by The Fremont Street Experience Limited Liability Company or used for the purpose of assisting the visually or aurally impaired;

(B)   Mall vending, mall advertising, mall entertainment special events or other commercial activities unless conducted or authorized by The Fremont Street Experience Limited Liability Company;

(C)   Parades;

(D)   Unicycles, bicycles and other types of cycles, skateboards, roller skates, in-line skates and shopping carts except as authorized by The Fremont Street Experience Limited Liability Company in connection with special events and mall entertainment;

(E)   Sleeping or camping;

(F)   Littering;

(G)   Sexually oriented businesses as described in Section 19.74.020 of the Las Vegas Municipal Code;

(H)   The placement of any table, rack, chair, box, cloth, stand, booth, container, structure or other object within the Pedestrian Mall except as necessary for emergency purposes, or the maintenance or repair of the Pedestrian Mall, or as authorized by The Fremont Street Experience Limited Liability Company for special events, mall advertising, mall entertainment or mall vending or other commercial and entertainment activities;



(J)   Glass and metal beverage containers including, but not limited to, bottles, jugs, drinking glasses, aluminum cans and steel cans, during the hours of ten a.m. to 11:59 p.m. on December 31st, and the hours of twelve a.m. to eight a.m. on January 1st of each year;

(K)   Feeding birds.

(Ord. 3941 § 5 (part), 1995)

**11.68.110   License fee — Exemption from code requirements.** Notwithstanding the requirements set forth in other provisions of the Las Vegas Municipal Code, The Fremont Street Experience Limited Liability Company shall be licensed with a miscellaneous service license and pay a license fee according to its gross sales as provided in Section 6.04.050 of the

10.44.040

    (C)  At any enclosed parking structure;
    (D)  Within twenty feet of an Automatic Teller Machine (ATM);
    (E)  Within ten feet of a point of entry to or exit from any building open to the public, including commercial establishments;
    (F)  Within the area designated as a pedestrian mall in Ordinance 3747, in accordance with NRS 268.810 et seq.
(Ord. 3862 § 3 (part), 1995)

    **10.44.040  On private property.** If property is owned or controlled by a private owner or operator, nothing in this Chapter shall be construed as applying to the conduct or activity of a person on said property with the permission of the owner or operator of the property.
(Ord. 3862 § 3 (part), 1995)

    **10.44.050  Effective date.** Subsection (F) of Section 10.44.030 shall become effective only after adoption by the City Council of a Resolution declaring the pedestrian mall in Ordinance 3747 as being "substantially complete." All other parts of this ordinance shall become effective upon publication and signature.
(Ord. 3862 § 3 (part), 1995)

## Chapter 10.45

### CONDUCT AT ATHLETIC EVENTS

**Sections:**
    10.45.010    Definitions.
    10.45.020    Prohibited conduct.

    **10.45.010  Definitions.** As used in this Chapter, unless the context otherwise requires, the words and terms which are defined in this Section have the meanings which are ascribed to them herein, as follows:
    (A)  "Athletic event" means any sporting event between competing teams or individuals which is held in a public place and to which the public is invited.
    (B)  "Attendee" means any person who is presented at an athletic event as a spectator and whose presence is occasioned by either purchasing a ticket for admission to the athletic event or who has been admitted without charge.
(Ord. 3043 § 2, 1983)

AVERY

# Exhibit 7

## Marcus Patrick Blaise Page Affidavit

Attachment to Page Affidavit
a.   November 9, 1999 Flyer

# AFFIDAVIT

State of Nevada    )
                      ) ss
County of Clark    )

I, Marcus Patrick Blaise Page, having been duly sworn hereby state the following.

1.    On November 9, 1999 I was part of a group of seven persons who went to the Fremont Street Experience for the purpose of passing out leaflets protesting nuclear testing (Exhibit A).

2.    As we entered the pedestrian mall from Las Vegas Boulevard we were approached by three Fremont Street Experience security guards. We were told that we could pass out our literature but that we could not carry the sign we had with us. We agreed not to carry the sign. We were also told that their security supervisor was on her way over.

3.    Within a few minutes the supervisor arrived. She read our flyers and informed us that the line stating "join us call (702) 647-3095" was solicitation. She further stated that we could not pass out our leaflets unless the phrase "join us" was deleted. Nowhere on the flyer did the name of any group appear, nor was their any request for funds or any other donation.

4.    One of our party suggested to the security personnel that we could cross out the "j" and the "o" in the word "join" so that the line would read "in us call (702) 647-3095." They agreed to allow us to pass out our edited flyers.

5.    I then proceeded to pass out all of the edited flyers that I had.

6.    Further affiant saith naught.

Marcus Patrick Blaise Page

Subscribed and sworn before me this
9th day of November 1999.

Notary public for said county and state



NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

# *OBOE 2: A SUBCRITICAL NUCLEAR TEST*
## TODAY the U.S. GOVERNMENT
## CREATED MORE NUCLEAR WASTE IN NEVADA

The U.S. Department Of Energy (DOE) today conducted a "subcritical nuclear" test explosion. They called it "Oboe2" This is part of the U.S. program to gamble with YOUR future and YOUR GRANDCHILDREN'S FUTURE.

TESTING SUBCRITICAL NUCLEAR EXPLOSIONS
AT THE NEVADA TEST SITE
RELEASES PLUTONIUM INTO THE EARTH
THE D.O.E. KNOWS THAT
THIS RADIOACTIVE WASTE CAN
MIGRATE INTO OUR GROUNDWATER

Join us  Call (702) 647 3095

- The Department Of Energy (DOE) has scheduled 1,100 Subcritical Tests before 2005.
- Thousands of Nuclear tests have been conducted from the 1950's - 1980's, first developed at Los Alamos National Laboratories (LANL) during the 1958 - 1961 nuclear weapons moratorium. LANL conducted the first hydronuclear test on 1/12/1960. Some tests were conducted on the surface while others were conducted underground in shafts, shallow boreholes or tunnels.
- A dozen or more subcritical weapons tests are scheduled prior to the end of 2000. Some are assembled in the DAF Facility and exploded in the LYNER facility (also called U1a) at the NTS. Others are part of the Plutonium Hydrotesting Program at LANL.

## What You Can Do:
Educate YOURSELF and Others to Understand the Nuclear
Contamination Threat to our present and future generations.

Call or Write

**Bill Richardson**
Secretary of Energy
1000 Independence Ave
Washington DC 20585
(202) 586-5000

**President Bill Clinton**
The White House
1600 Pennsylvania Ave.
Washington DC 20001
(202) 456-1111
president@whitehouse.gov

**Your State Senators**
United States Senate
Washington DC 20510
(202) 224-3121 (switchboard)
www.senate.gov

**Your District Representative**
U.S. House of Representatives
Washington DC 20510
(202) 224-3121 (switchboard)
www.vote.smart.org



Break the nuclear chain! Stop mining uranium! Stop exploding plutonium! Stop nuclear waste!

**Exhibit 8**

**Graham Sullivan Affidavit**

Attachment to Sullivan Affidavit
a.  November 9, 1999  Flyer

# AFFIDAVIT

State of Nevada          )
                         ) ss
County of Clark          )

I, Graham Sullivan, having been duly sworn hereby state the following.

1.      On November 9, 1999 I was part of a group of seven persons who went to the Fremont Street Experience for the purpose of passing out leaflets protesting nuclear testing (Exhibit A).

2.      As we entered the pedestrian mall from Las Vegas Boulevard we were approached by three Fremont Street Experience security guards. We were told that we could pass out our literature but that we could not carry the sign we had with us. We agreed not to carry the sign. We were also told that their security supervisor was on her way over.

3.      Within a few minutes the supervisor arrived. She read our flyers and informed us that the line stating "join us call (702) 647-3095" was solicitation. She further stated that we could not pass out our leaflets unless the phrase "join us" was deleted. Nowhere on the flyer did the name of any group appear, nor was their any request for funds or any other donation.

4.      I suggested to the security personnel that we could cross out the "j" and the "o" in the word "join" so that the line would read "in us call (702) 647-3095." They agreed to allow us to pass out our edited flyers.

5.      We continued to leaflet on the pedestrian mall until we were stopped again approximately forty-five (45) minutes later. At that time we were told that they had found

unedited versions of the flyer we had given to two pedestrians. They then proceeded to check the rest of our flyers, which had all been edited.

6.     We then proceeded to pass out the rest of our flyers.

7.     Further affiant saith naught.


*Graham Sullivan*

Graham Sullivan


Subscribed and sworn before me this
9th day of November 1999.

*Allen Lichtenstein*

Notary public for said county and state



NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

Exhibit 8, Attachme   a

# *OBOE 2: A SUBCRITICAL NUCLEAR TEST*
# TODAY the U.S. GOVERNMENT
# CREATED MORE NUCLEAR WASTE IN NEVADA

**The U.S. Department Of Energy (DOE) today conducted a "subcritical nuclear" test explosion.
They called it "Oboe2" This is part of the U.S. program to gamble with YOUR future and
YOUR GRANDCHILDREN'S FUTURE.**

TESTING SUBCRITICAL NUCLEAR EXPLOSIONS
AT THE NEVADA TEST SITE
RELEASES PLUTONIUM INTO THE EARTH
THE D.O.E. KNOWS THAT
THIS RADIOACTIVE WASTE CAN
MIGRATE INTO OUR GROUNDWATER

Join us  Call (702)647-3095

- The Department Of Energy (DOE) has scheduled 1,100 Subcritical Tests before 2005.
- Thousands of Nuclear tests have been conducted from the 1950's - 1980's, first developed at Los
  Alamos National Laboratories (LANL) during the 1958 - 1961 nuclear weapons moratorium.
  LANL conducted the first hydronuclear test on 1/12/1960. Some tests were conducted on the
  surface while others were conducted underground in shafts, shallow boreholes or tunnels.
- A dozen or more subcritical weapons tests are scheduled prior to the end of 2000. Some are
  assembled in the DAF Facility and exploded in the LYNER facility (also called U1a) at the NTS.
  Others are part of the Plutonium Hydrotesting Program at LANL.

## What You Can Do:
Educate YOURSELF and Others to Understand the Nuclear
Contamination Threat to our present and future generations.

Call or Write

**Bill Richardson**
Secretary of Energy
1000 Independence Ave
Washington DC 20585
(202) 586-5000

**President Bill Clinton**
The White House
1600 Pennsylvania Ave.
Washington DC 20001
(202) 456-1111
president@whitehouse.gov

**Your State Senators**
United States Senate
Washington DC 20510
(202) 224-3121 (switchboard)
www.senate.gov

**Your District Representative**
U.S. House of Representatives
Washington DC 20510
(202) 224-3121 (switchboard)
www.vote.smart.org



Break the nuclear chain! Stop mining uranium! Stop exploding plutonium! Stop nuclear waste!

**Exhibit 9**

**Heather Burmeister Affidavit**

# AFFIDAVIT

State of Nevada      )
                     ) ss
County of Clark      )

I,      Heather Aelfgifu Burmeister, having been duly sworn hereby state the following.

1.      On November 9, 1999 I was part of a group of seven persons who went to the Fremont Street Experience for the purpose of passing out leaflets protesting nuclear testing (Exhibit A).

2.      As we entered the pedestrian mall from Las Vegas Boulevard we were approached by three Fremont Street Experience security guards. We were told that we could pass out our literature but that we could not carry the sign we had with us. We agreed not to carry the sign. I left the group and began leafleting on the pedestian mall.

3.      About thirty (30) minutes after I had started leafleting I encountered two members of the group who told me that Fremont Street Experience security would only allow us to distribute flyers that had been edited (Exhibit B). I then contiuted to pass out edited flyers.

4.      Approximately fifteen (15) minutes later we were stopped by security personnel who told that they had found unedited versions of the flyers that had been given to two pedestrians. They then proceeded to check the rest of our flyers, which had been edited.

5.      We then proceeded to pass out the rest of our flyers.

6.      Further affiant saith naught.

Heather Aelfgifu Burmeister

Subscribed and sworn before me this
9th day of November 1999.

_____
Notary public for said county and state



NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

Exhibit 9, Attachr     a

# *OBOE 2: A SUBCRITICAL NUCLEAR TEST*
## TODAY the U.S. GOVERNMENT
## CREATED MORE NUCLEAR WASTE IN NEVADA

The U.S. Department Of Energy (DOE) today conducted a "subcritical nuclear" test explosion. They called it "Oboe2" This is part of the U.S. program to gamble with YOUR future and YOUR GRANDCHILDREN'S FUTURE.

TESTING SUBCRITICAL NUCLEAR EXPLOSIONS
AT THE NEVADA TEST SITE
RELEASES PLUTONIUM INTO THE EARTH
THE D.O.E. KNOWS THAT
THIS RADIOACTIVE WASTE CAN
MIGRATE INTO OUR GROUNDWATER

Join us  Call (702) 647-3095

- The Department Of Energy (DOE) has scheduled 1,100 Subcritical Tests before 2005.
- Thousands of Nuclear tests have been conducted from the 1950's - 1980's, first developed at Los Alamos National Laboratories (LANL) during the 1958 - 1961 nuclear weapons moratorium. LANL conducted the first hydronuclear test on 1/12/1960. Some tests were conducted on the surface while others were conducted underground in shafts, shallow boreholes or tunnels.
- A dozen or more subcritical weapons tests are scheduled prior to the end of 2000. Some are assembled in the DAF Facility and exploded in the LYNER facility (also called U1a) at the NTS. Others are part of the Plutonium Hydrotesting Program at LANL.

## What You Can Do:
Educate YOURSELF and Others to Understand the Nuclear Contamination Threat to our present and future generations.

Call or Write



Bill Richardson
Secretary of Energy
1000 Independence Ave
Washington DC 20585
(202) 586-5000

Your State Senators
United States Senate
Washington DC 20510
(202) 224-3121 (switchboard)
www.senate.gov

President Bill Clinton
The White House
1600 Pennsylvania Ave.
Washington DC 20001
(202) 456-1111
president@whitehouse.gov

Your District Representative
U.S. House of Representatives
Washington DC 20510
(202) 224-3121 (switchboard)
www.vote.smart.org

Break the nuclear chain! Stop mining uranium! Stop exploding plutonium! Stop nuclear waste!

AVERY™

RECYCLED PAPER MADE FROM 20% POST CONSUMER CONTENT

# Exhibit 10

# Christiane Meier Affidavit

Attachment to Meier Affidavit
a.   November 9, 1999 Flyer

# AFFIDAVIT

State of Nevada      )
                     ) ss
County of Clark      )

I, Christiane M. Meier, having been duly sworn hereby state the following.

1.      On November 9, 1999 I was part of a group of seven persons who went to the Fremont Street Experience for the purpose of passing out leaflets protesting nuclear testing (Exhibit A).

2.      As we entered the pedestrian mall from Las Vegas Boulevard we were approached by three Fremont Street Experience security guards. We were told that we could pass out our literature but that we could not carry the sign we had with us. We agreed not to carry the sign. We were also told that their security supervisor was on her way over.

3.      Within a few minutes the supervisor arrived. She read our flyers and informed us that the line stating "join us call (702) 647-3095" was solicitation. She further stated that we could not pass out our leaflets unless the phrase "join us" was deleted. Nowhere on the flyer did the name of any group appear, nor was their any request for funds or any other donation.

4.      One of our party suggested to the security personnel that we could cross out the "j" and the "o" in the word "join" so that the line would read "in us call (702) 647-3095." They agreed to allow us to pass out our edited flyers.

5.      We continued on the pedestrian mall until we were stopped again approximately forty-five (45) minutes later. At that time we were told that they had found

unedited versions of the flyers to two pedestrians. They then proceeded to check the rest of our flyers, which had been edited.

6.      We then proceeded to pass out the rest of our flyers.

7.      Further affiant saith naught.


Christiene M. Meier

Subscribed and sworn before me this
9th day of November 1999.


Notary public for said county and state

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

# *OBOE 2: A SUBCRITICAL NUCLEAR TEST*
## TODAY the U.S. GOVERNMENT
## CREATED MORE NUCLEAR WASTE IN NEVADA

The U.S. Department Of Energy (DOE) today conducted a "subcritical nuclear" test explosion. They called it "Oboe2" This is part of the U.S. program to gamble with YOUR future and YOUR GRANDCHILDREN'S FUTURE.

TESTING SUBCRITICAL NUCLEAR EXPLOSIONS
AT THE NEVADA TEST SITE
RELEASES PLUTONIUM INTO THE EARTH
THE D.O.E. KNOWS THAT
THIS RADIOACTIVE WASTE CAN
MIGRATE INTO OUR GROUNDWATER

Join us  Call (702)647-3095

- The Department Of Energy (DOE) has scheduled 1,100 Subcritical Tests before 2005.
- Thousands of Nuclear tests have been conducted from the 1950's - 1980's, first developed at Los Alamos National Laboratories (LANL) during the 1958 - 1961 nuclear weapons moratorium. LANL conducted the first hydronuclear test on 1/12/1960. Some tests were conducted on the surface while others were conducted underground in shafts, shallow boreholes or tunnels.
- A dozen or more subcritical weapons tests are scheduled prior to the end of 2000. Some are assembled in the DAF Facility and exploded in the LYNER facility (also called U1a) at the NTS. Others are part of the Plutonium Hydrotesting Program at LANL.

## What You Can Do:
Educate YOURSELF and Others to Understand the Nuclear Contamination Threat to our present and future generations.

Call or Write



Bill Richardson
Secretary of Energy
1000 Independence Ave
Washington DC 20585
(202) 586-5000

Your State Senators
United States Senate
Washington DC 20510
(202) 224-3121 (switchboard)
www.senate.gov

President Bill Clinton
The White House
1600 Pennsylvania Ave.
Washington DC 20001
(202) 456-1111
president@whitehouse.gov

Your District Representative
U.S. House of Representatives
Washington DC 20510
(202) 224-3121 (switchboard)
www.vote.smart.org

Break the nuclear chain! Stop mining uranium! Stop exploding plutonium! Stop nuclear waste!

**Exhibit 11**

**Sarah Anderson Affidavit**

# AFFIDAVIT

County of Clark    )
                      ) ss
State of Nevada    )

I, Sarah Anderson, do swear and affirm the following:

1.      On October 22nd, at approximately 5:00 pm, I was part of a group of individuals handing out leaflets on Fremont Street, in the area known as the Fremont Street Experience.

2.      We had previously been informed by the ACLU of Nevada that leafletting is legal at the Fremont Street Experience based on an order from the Federal District Court.

3.      The leaflets that we were distributing involved a protest against police brutality. They contained no advertising or any solicitation for money. Nor did the distribution of this material block or impede pedestrian traffic.

4.      After we had been leafletting for approximately five (5) minutes, we were approached by a Fremont Street Experience security guard, who informed us that distributing flyers was not allowed at the Fremont Street Experience.

5.      I informed him that Gary Peck had told me about the Federal Court order. He said he was unaware of any court order allowing leafletting at the Fremont Street Experience, and that he would have to call his supervisor. He then called his supervisor, and informed me that the supervisor said distributing of leaflets would not be allowed. He also said that if we did not immediately stop distributing our leaflets, he would have to call Metro.

6.      At that point, he said he was calling Metro. I telephoned Gary Peck of the ACLU of Nevada, from Binion's Horshoe. Mr. Peck was not at home, so I left a message on his answering machine.

1

7.    When I returned to the pedestrian mall, the security guard had been joined by several other Fremont Street Experience security guards and three Metro officers.

8.    The Metro officers told me that they had no knowledge of any court order and asked why we didn't have the order with us. The Metro officers also told us that passing out leaflets was illegal, and that if we continued we would be arrested for that activity. We were further told that any member of our group who was over 18 years old would be charged with contributing to the delinquency of a minor in addition to being charged with leafleting. At no time did any issue or claim of obstruction of the sidewalk or solicitation arise.

9.    We ceased all leafletting until Gary Peck arrived, about thirty (30) minutes after the call to him was made.

10.    Mr. Peck spoke to the security guards and Metro officers explaining to them the court order, and about the fact that we were engaging in totally legal activity. He also spoke to a Mr. Brennan, the security supervisor, who said that no distribution of flyers would be allowed until his attorney, Todd Bice, arrived.

11.    After waiting for another fifteen (15) minutes, Mr. Bice still did not arrive, so Mr. Brennan said we could continue leafletting, which we did.

Further affiant sayith naught.

Dated this 29th day of October, 1999.



Subscribed and sworn before me this 29th day of October, 1999.

Notary public for said county and state.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

2

RECYCLED PAPER MADE FROM 20% POST CONSUMER CONTENT

AVERY™

**Exhibit 12**

**Paul Tompkins Affidavit**

# AFFIDAVIT

County of Clark     )
                     ) ss
State of Nevada     )

I, Paul Tompkins, do swear and affirm the following:

1.      On October 22nd at approximately 5:00 pm, I was part of a group of individuals handing out leaflets on Fremont Street, in the area known as the Fremont Street Experience.

2.      We had previously been informed by the ACLU of Nevada that leafleting is legal at the Fremont Street Experience based on an order from the Federal District Court.

3.      The leaflets that we were distributing involved a protest against police brutality (see attached). They contained no advertising or any solicitation for money. Nor did the distribution of this material block or impede pedestrian traffic.

4.      After we had been leafleting for approximately ten (10) minutes, someone informed me that my friends had been stopped by security. I then went to the area where several Fremont Street Experience security officers were talking with members of our group.

5.      A Fremont Street Experience security guard showed me a card stating that distributing of flyers at the Fremont Street Experience is illegal, according to a City ordinance. The security guard showed me a laminated card stating that it is illegal to pass out flyers at the Fremont Street Experience.

6.      Several Metro officers arrived. One of them showed me a copy of the City ordinance prohibiting leafleting at the Fremont Street Experience. Both the private security guards and Metro officers said they know nothing about any court order. I was asked why, since they had a copy of the City ordinance, I didn't have a copy of the Federal Court order.

1

7.      The Metro officers told us that passing out leaflets was illegal, and that if we continued we would be arrested for that activity. We were further told that any member of our group who was over 18 years old would be charged with contributing to the delinquency of a minor in addition to being charged with leafleting. At no time did any issue or claim of obstruction of the sidewalk or solicitation arise.

8.      We ceased all leafleting until Gary Peck arrived, about thirty (30) minutes after the call to him was made.

9.      Mr. Peck spoke to the security guards and Metro officers explaining to them the Court order, and about the fact that we were engaging in totally legal activity. He also spoke to a Mr. Brennan, the security supervisor, who said that no distribution of flyers would be allowed until his attorney, Todd Bice, arrived.

10.     After waiting for another fifteen (15) minutes, Mr. Bice still did not arrive, so Mr. Brennan said we could continue leafleting, which we did.

11.     While doing so, I noticed that security guards were stopping other people who were passing out flyers.

Further affiant saith naught.

Dated this 29th day of October, 1999.



Subscribed and sworn before me this 29th day of October, 1999.

Notary public for said county and state.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

2

# Exhibit 13

## Misty Nash Affidavit

AFFIDAVIT

County of Clark     )
                    ) ss
State of Nevada     )

I, Misty Nash, do swear and affirm the following:

1.      On October 22nd, at approximately 5:00 pm, I was   handing out leaflets on Fremont Street, in the area known as the Fremont Street Experience.

2.      We had previously been informed by the ACLU of Nevada that leafleting is legal at the Fremont Street Experience based on an order from the Federal District Court.

3.      The leaflets that we were distributing involved a protest against police brutality (see attached). They contained no advertising or any solicitation for money. Nor did the distribution of this material block or impede pedestrian traffic.

4.      After we had been leafleting for approximately ten (10) minutes, I encountered Sarah Anderson. She told me that she was approached by a Fremont Street Experience security guard, who informed her that distributing flyers was not allowed at the Fremont Street Experience.

5.      After Sarah left to telephone Gary Peck of the ACLU, several Metro officers and Fremont Street Experience security guards were with others who had been handing out leaflets. One Fremont Street Experience security guard told me that leafleting was not allowed at the Fremont Street Experience because of the City ordinance.

6.      Metro officers told us that passing out leaflets was illegal, and that if we continued we would be arrested for that activity. We were further told that any member of our group who was over 18 years old would be charged with contributing to the delinquency of a minor in addition to being charged with leafleting. At no time did any issue or claim of obstruction of the sidewalk or solicitation

1

arise.

7.    We ceased all leafleting until Gary Peck arrived, about thirty (30) minutes after the call to him was made.

8.    Mr. Peck spoke to the security guards and Metro officers explaining to them the court order, and the fact that we were engaging in totally legal activity. He also spoke to a Mr. Brennan, the security supervisor, who said that no distribution of flyers would be allowed until his attorney, Todd Bice, arrived.

9.    After waiting for another fifteen (15) minutes, Mr. Bice still did not arrive, so Mr. Brennan said we could continue leafleting, which we did.

Further affiant saith naught.

Dated this 29th day of October, 1999.



Subscribed and sworn before me this 29th day of October, 1999.

Notary public for said county and state.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

2

**Exhibit 14**

**Lauren Varner Affidavit**

# AFFIDAVIT

County of Clark    )
                ) ss
State of Nevada    )

I, Lauren Varner, do swear and affirm the following:

1.      On October 22nd, at approximately 5:00 pm, I was part of a group of individuals handing out leaflets on Fremont Street, in the area known as the Fremont Street Experience.

2.      We had previously been informed by the ACLU of Nevada that leafleting is legal at the Fremont Street Experience based on an order from the Federal District Court.

3.      The leaflets that we were distributing involved a protest against police brutality (see attached). They contained no advertising or any solicitation for money. Nor did the distribution of this material block or impede pedestrian traffic.

4.      After we had been leafleting for approximately ten (10) minutes, I encountered Sarah Anderson, who was part of our group. She told me that she was approached by a Fremont Street Experience security guard, who informed her that distributing flyers was not allowed at the Fremont Street Experience.

5.      After Sarah left to telephone Gary Peck of the ACLU, several Metro officers and Fremont Street Experience security guards were with members of our group. One Metro officer told me that leafleting was not allowed at the Fremont Street Experience because of the City ordinance. He implied that the ordinance overruled any Federal Court order.

6.      The Metro officers also told us that passing out leaflets was illegal, and that if we continued we would be arrested for that activity. We were further told that any member of our group who was over 18 years old would be charged with contributing to the delinquency of a minor in

1

addition to being charged with leafleting. At no time did any issue or claim of obstruction of the sidewalk or solicitation arise.

7.    We ceased all leafleting until Gary Peck arrived, about thirty (30) minutes after the call to him was made.

8.    Mr. Peck spoke to the security guards and Metro officers explaining to them the court order, and the fact that we were engaging in totally legal activity. He also spoke to a Mr. Brennan, the security supervisor, who said that no distribution of flyers would be allowed until his attorney, Todd Bice, arrived.

9.    After waiting for another fifteen (15) minutes, Mr. Bice still did not arrive, so Mr. Brennan said we could continue leafleting, which we did.

Further affiant saith naught.

Dated this 29th day of October, 1999.



Subscribed and sworn before me this 29th day of
October, 1999.

Notary public for said county and state.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

2

# Exhibit 15

## Alina Shell Affidavit

Attachments to Shell Affidavit
a. October 24, 2000 Petition
b. October 24, 2000 Flyer

## AFFIDAVIT OF ALINA SHELL

State of Nevada      }
                   } ss:
County of Clark      }

Alina Shell, having been duly sworn, states and declares the following:

1.      I over eighteen years of age, and a resident of Clark County, Nevada.

2.      On October 24, Gary Peck, Joey Cohn, and I went to the Fremont Street Experience to hand out fliers and gather signatures on a petition calling for support in the fight to preserve free speech on Fremont Street. We walked to the west side of Casino Center Blvd and began to set up our table at about 2:25pm. We hung an ACLU banner on the front of the table.

3.      At about 2:30 pm, a Fremont Street Experience (FSE) security guard named Bruce approached us. Bruce told us we were not allowed to be there and we were not allowed to hand out our fliers. We showed him our fliers and our petition. Mr. Peck told him that we had contacted the Fremont Street Experience and were told that as long as we did not violate any City ordinances, we were allowed to be there.

4.      A few minutes later, another FSE security guard named Richard arrived. Bruce then informed us that he was calling his supervisor. While we waited for the supervisor to arrive, Mr. Cohn and I passed out fliers and gathered signatures.

5.      At about 2:45 pm, the assistant security supervisor, Heidi Arnell, and another security supervisor, John Ruffner, arrived. They told us we were not allowed to have a table on Fremont Street. Mr. Peck asked them why, and Ruffner showed him a

1

copy of the Pedestrian Mall Ordinance banning tabling. Mr. Peck asked Ruffner if he knew about the Federal Court Order relating to the ordinance. Ruffner did not answer.

6.    Arnell then told us that we were not allowed to gather signatures on our petition. Mr. Peck asked Arnell to read the petition. It was not, he noted a solicitation for money, and thus was perfectly allowable.

7.    Arnell and Ruffner asked us to take our table down, and we did. Mr. Cohn took it back to the office. Mr. Peck asked Arnell if we were allowed to hold up our ACLU banner. Arnell said she wasn't sure she felt comfortable with that, but that she would ask her supervisor. Arnell then asked Mr. Peck's name. Mr. Peck replied that his name was not relevant, and that he wasn't going to tell her.

8.    After talking to her supervisor via radio, she told us we could continue to collect signatures and we could hold up the banner. She then told Mr. Peck that it didn't matter that he wouldn't give his name, because she saw him in the papers all the time.

Further affiant sayeth naught.

_Alina Shell_
Alina Shell

Subscribed and sworn before me this 31st day of October 2000.

_Allen Lichtenstein_
Allen Lichtenstein, Notary Public for said county and state.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

Exhibit 15, Attachment a

| **Name** | **Address** | **Telephone** |
|---|---|---|
| Thomas Davis | 611 S. 6TH St LV NV 89101 | — |
| James William Jr. | 2636 Donna St. | — |
| Orlo mitchell Brooks | P.O. Box 96482 L.V. NV. 89193-6482 | (702)-252-1968: |

**If you support the ACLU's efforts to defend the First Amendment on Fremont Street, please sign this petition calling on our elected officials to side with us.**

Exhibit 15, Attachment b

# Do you support Free Speech guaranteed by the 1st Amendment?

```
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
```

## Then you should support the Nevada ACLU as it continues to fight the Fremont Street Experience's policy of censorship!

## Call the Nevada ACLU at 366-1536 to find out how you can protect your civil liberties.

# Exhibit 16

## Joseph Cohn Affidavit

Attachments to Cohn Affidavit
a. October 24, 2000 Petition
b. October 24, 2000 Flyer

### AFFIDAVIT OF JOSEPH COHN

State of Nevada      }
               } ss:
Count of Clark      }

       Joseph Cohn having been duly sworn hereby states and declares the following:

1.      I am over eighteen years of age and a resident of Clark County, Nevada.

2.      At approximately 2:30 PM on October 24th, 2000, I arrived at the Fremont Street Experience with Alina Shell and Gary Peck in order to hand out fliers (attached as "A") and circulate a petition (attached as "B").

3.      As we set up our table, we were immediately approached by Fremont Street Experience security guards. The guards asked us what we were doing and proceeded to tell us that we were not able to distribute materials at the Fremont Street Experience.

4.      Gary Peck explained that he had contacted the Fremont Street Experience, and that he was told that we would have to follow city ordinances if we were to distribute our fliers.

5.      The guard then contacted his supervisors, and I began to hand out our fliers, while Alina Shell taped our Banner on the front of our table.

6.      Fifteen minutes later, Ms. Heidi Arnell, Assistant Supervisor of the Fremont Street Experience, and Mr. John Ruffner, also from the Fremont Street Experience arrived and told us that we were not permitted to have a table at Fremont Street. They also told us that they were uncomfortable with the gathering of signatures. They then showed us a copy of the ordinance and we agreed to remove the table as Ms.

1

Arnell and Mr. Ruffner checked with their supervisors about our signature gathering and also our banner.

7.     As Gary Peck and Alina Shell waited for Ms. Arnell's and Mr. Ruffner's instructions, I folded down our table and took it out of the Fremont Street Experience.

Further affiant sayeth naught

Dated this 31st day of October 2000.


_Joseph Cohn_
Joseph Cohn

Subscribed and sworn before me this 31st day of October 2000.


_Allen Lichtenstein_
Allen Lichtenstein
Notary Public for said count and state

```
NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003
```

2

Exhibit 16, Attachment a

| **Name** | **Address** | **Telephone** |
|---|---|---|
| Thomas Paiss | 611 S. 6TH St LV NV 89101 | — |
| James William Jr. | 2636 Jonna St. | — |
| Orlo mitchell Brooks | P.O. Box 96482 L.V. NV. 89193- 6482 | (702)-252-1968: |

**If you support the ACLU's efforts to defend the First Amendment on Fremont Street, please sign this petition calling on our elected officials to side with us.**

Exhibit 16, Attachment b

# Do you support Free Speech guaranteed by the 1st Amendment?

XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX

## Then you should support the Nevada ACLU as it continues to fight the Fremont Street Experience's policy of censorship!

## Call the Nevada ACLU at 366-1226 to find out how you can protect your civil liberties.