1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Allen Lichtenstein
3315 Russell Road, No.222
Las Vegas, Nevada 89120
Nevada Bar No. 003992
702-433-2666

Mark Lopez
American Civil Liberties Union Foundation
125 Broad St., 17th Floor
New York, NY 10004
212-549-2608

Attorneys for Plaintiffs

U.S. DISTRICT COURT
DISTRICT OF NEVADA
FILED
AFTER HOURS

SEP - 3 2004

CLERK, U. S. DISTRICT COURT
DISTRICT OF NEVADA
BY
DEPUTY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

American Civil Liberties Union of
Nevada, Gary Peck, Unitarian
Universalist Social Justice Committee,
Paul R. Brown, The Shundahai Network,
and Greg Gable,

      Plaintiffs,

      vs.

The City of Las Vegas, Jan Laverty
Jones, in her official capacity as the
Mayor of Las Vegas, The Fremont Street
Limited Liability Corp., and Mark Paris,
in his official capacity as the
Executive Director of The Fremont Street
Limited Liability Corp.

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED SEPARATELY**

DwH

CV-S-97-01419-DWB (LRL)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

    Come now the Plaintiffs, by and through the undersigned attorneys, and file this Motion

for Summary Judgment. This Motion is based on all pleadings and papers on filed herein, and

the Memorandum of Law attached hereto, and any further argument and evidence as may be

presented at hearing.

    Dated this 3rd day of September 2004.

    Respectfully submitted by:

136

Allen Lichtenstein
3315 Russell Road, No. 222
Las Vegas, Nevada 89120
(702) 433-2666
Nevada Bar No. 3992

and

Mark Lopez
*American Civil Liberties Union Foundation*
125 Broad St., 17th Floor
New York, NY 10004
(212)549-2608

1

**TABLE OF CONTENTS**

2

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................1

I.      INTRODUCTION............................................................................................................1

II.     PROCEDURAL HISTORY AND STATEMENT OF THE CASE...................................4

III.    STANDARD FOR GRANTING SUMMARY JUDGMENT..........................................10

IV.     ARGUMENT.................................................................................................................10

        A.      The Solicitation Ordinance Violates Both the First Amendment
                and the Equal Protection Clause of the Fourteenth Amendment..........................10

        B.      The Display/Tabling Ordinance Violates Both the First
                Amendment and the Equal Protection Clause.....................................................19

        C.      LVMC's 11.68.100(C) Prohibition on Parades and
                Demonstrations Violates both the First Amendment
                and the Equal Protection Clause.......................................................................25

        D.      LVMC 11.68.070(H) and the Entire Regulatory Scheme
                Governing the Regulation of Conduct on Fremont Street
                Violates the First Amendment Both Facially and as Applied...............................27

IV.     CONCLUSION.............................................................................................................29

TABLE OF EXHIBITS

        Exhibit 1       Gary Peck Affidavit...............................................................Tab 1
                        Exhibits to Peck Affidavit
                        a.  October 24, 2000 petition
                        b.  October 24, 2000 flyer

        Exhibit 2       Appellees'/Cross-Appellants' Answering/Opening Brief,
                        pp. 34-35, pp.52-53.............................................................Tab 2

        Exhibit 3       June 22, 2002 *Las Vegas Review* article...............................Tab 3

        Exhibit 4       March 21, 2003 *Las Vegas Sun* article..................................Tab 4

        Exhibit 5       September 24, 2003 *Las Vegas Sun* article...........................Tab 5

        Exhibit 6       Transcript of February 20, 1998 Hearing, pp. 21-25.............Tab 6

        Exhibit 7       Harold Langert Affidavit........................................................Tab 7
                        Exhibits to Langert

1

a.  Photographs

2

Exhibit 8        Mark Lopez Declaration.....................................................................Tab 8
                 Exhibits to Lopez Declaration

3

a.  *Defendant's Answers to Interrogatories*
b.  May 19, 1999 letter to T. Bice from M. Lopez

4

c.  June 11, 1999 letter from T. Bice to M. Lopez
d.  October 10, 2000 letter from M. Lopez to K. McMillan

5

e.  October 25, 2000 letter from M. Lopez to K. McMillan
f.  October 26, 2000 letter from T. Bice to M. Lopez

6

7

Exhibit 9        Allen Lichtenstein Declaration............................................................Tab 9
                 Exhibits to Lichtenstein

8

a.   May 1, 1998 letter from T. Bice to A. Lichtenstein
b.  March 3, 2000 letter from A. Lichtenstein to T. Bice

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**cases**

ACLU v. Las Vegas, 13 F.Supp. 2d 1064 (D.Nev. 1998)            7,11,21

ACLU v. Las Vegas, 333 F.3d 1092            passim
(9th Cir. 2003)

Adicks v. S.H. Kress & Co., 398 U.S. 144 (1970)            10

Arkansas Writers' Project v. Ragland, 481 U.S. 221 (1987)            15

Baker v. Centennial Ins. Co., 970 F.2d 660 (9th Cir. 1992)            10

Bay Area Peace Navy v. United States, 914 F.2d 1224 (9th Cir. 1990)            16,18,19,26

Blair v. Shanahan, 775 F. Supp. 1315 (N.D. Cal. 1991)            12

Boos v. Barry, 485 U.S. 312 (1988)            26

Carey v. Brown, 447 U.S. 455 (1980)            11,13,15,23,26

City of Cincinnati v. Discovery Network, 507 U.S. 410 (1993)            18,20,24,26

City of Ladue v. Gilleo, 512 U.S. 43 (1994)            18

Desert Outdoor Advertising, Inc. v. City of Moreno Valley, 103 F.3d            21,23
814 (9th Cir. 1996)

Edwards v. City of Coeur D'Alene, 262 F.3d 856 (9th Cir. 2001)            16,18,26

First National Bank of Boston v. Bellotti, 435 U.S. 765 (1978)            15

Foti v. City of Menlo Park, 146 F.3d 629 (9th Cir. 1998)            13,14,17,22,29

Frisby v. Schultz, 487 U.S. 474 (1988)

            26

Gaudiya Vaishanva Soc. v. City and County of San Francisco, 952            8,17,23
F.2d 1059 (9th Cir. 1990)

Gerristen v. City of Los Angeles, 994 F.2d 570 (9th Cir. 1993)            8,13,16

Grayned v. City of Rockford, 408 U.S. 104 (1972)            24

Grossman v. City of Portland, 33 F.3d 1200 (9th Cir. 1994)            26

Housing Works v. Safir, 101 F. Supp. 2d 163 (S.D.N.Y. 2000)            26,27

Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672            12
(1992)

1

Int'l Caucus of Labor Committees v. Montgomery, 111 F.3d
1548 (11th Cir. 1997) ..... 20

2

3

Loper v. New York City Police Dep't, 999 F.2d 699 (2d Cir. 1993) ..... 12

Members of the City Council of Los Angeles v. Taxpayers for
Vincent, 466 U.S. 789 (1984) ..... 19

4

5

NAACP v. City of Richmond, 743 F.2d 1346  (9th Cir. 1984) ..... 18

6

Nunez v. City of San Diego, 114 F.3d 935  (9th Cir. 1997) ..... 20,28

7

One World One Family Now v. City of Key West, 852 F. Supp.
1005 (S.D.Fla. 1994) ..... 20

8

9

One World One Family Now v. City of Miami Beach, 175 F.3d
1282 (11th Cir. 1999) ..... 20

10

One World One Family Now v. Nevada, 860 F. Supp. 1457 (D.
Nevada 1994) ..... 19,20,23

11

12

Perry v. Los Angeles Police Dep't, 121 F.3d 1365 (9th Cir. 1997) ..... 8,12,13,17,18,24,25

13

Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37
(1983) ..... 13

14

15

Police Dep't of City of Chicago v. Mosley, 408 U.S. 42 (1972) ..... 15,23

16

Project 80's Inc., v. City of Pocatello, 942 F.2d 635 (9th Cir. 1991) ..... 12

17

R.A.V. v. City of St. Paul, 505 U.S. 377  (1992) ..... 14

18

Riley v. Nat'l Fed. of the Blind, 487 U.S. 781 (1988) ..... 12

19

Roulette v. City of Seattle, 97 F.3d 300  (9th Cir. 1996) ..... 20,28

20

S.E.C. v. Seaboard Corp., 677 F.2d 1301  (9th Cir. 1982) ..... 10

21

S.O.C., Inc., v. County of Clark. 152 F.3d 1131 (9th Cir. 1998) ..... 9,12,13,14,17,18,24

22

Schenck v. Pro-Choice Network of Western New York, 519 U.S.
357 (1997) ..... 26

23

24

Schneider v. State, 308 U.S. 147  (1939) ..... 18

25

Simon & Schuster v. Members of the New York State Crime Victims
Board, 502 U.S. 105 (1991) ..... 15

26

United States v. Grace, 461 U.S. 171 (1983) ..... 26

27

Venetian Casino Resort v. Local Joint Exec. Bd., 257 F.3d 937
(9th Cir. 2001) ..... 8,17

28

vi

Village of Schaumburg v. Citizens for Better Environment,
444 U.S. 620 (1980)                                                          12,18

Zoslow v. MCA Distr. Corp., 693 F.2d 870 (9th Cir. 1982)                       10

**statutes/ordinances/rules**

FRCP 56                                                                         10

LVMC 10.44                                                                  passim

LVMC 10.47                                                                  3,27,29

LVMC 11.68                                                                  passim

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This case returns to the District Court following remand by the Court of Appeals for consideration of plaintiffs' remaining First Amendment claims under the heightened standard of scrutiny governing public fora. *American Civil Liberties Union v. Las Vegas*, 333 F.3d 1092 (9th Cir. 2003). This Court has entered an order directing the parties to submit memoranda of points and authorities addressed to the city ordinances still under challenge. (Rec. Doc. 120). Plaintiffs filed their memorandum of points and authorities on March 15, 2004. Defendants subsequently filed their own memorandum of points and authorities, together with a motion for summary judgment that incorporated the arguments made in their memorandum. On May 13, 2004, plaintiffs filed their response to that motion. Plaintiffs subsequently moved to amend the complaint in an effort to streamline this litigation and to focus the case on purely legal issues.

Plaintiffs submit that in view of Fremont Street's status as a public forum, the still extant provisions of the Las Vegas Municipal Code directly restraining expressive activity violate the First Amendment and that they are entitled to summary judgment as a matter of law. These provisions include a) LVMC 10.44, which prohibits all solicitation; b) LVMC 11.68.100(C), which prohibits parades and processions and, according to the defendants, demonstrations and picketing; c) LVMC 11.68.100(H), which prohibits the placement of tables and other fixtures used to facilitate First Amendment activity. The challenged ordinances also violate the Equal Protection Clause of the Fourteenth Amendment because they contain speaker-based distinctions and/or are not enforced even-handedly. Plaintiffs challenge these code provisions both facially and as applied.[1]

---

[1] Throughout this litigation plaintiffs have maintained the entire regulatory framework vesting unlimited authority in Fremont Street Experience Limited Liability Co. (FSELLC) officials to regulate conduct on the mall violates the First Amendment to the extent it authorizes those officials to prohibit demonstrations and other expressive activities on the mall. LVMC 11.68.070(H). Plaintiffs have sought leave to amend the complaint in order to drop this claim and to clarify others. Plaintiffs' motion is still pending.

1

1    The procedural history and facts in this case are a matter of record and are reported in the

2    Court of Appeals decision and in the decisions of this court.  The material facts in this case have not

3    changed as they are reported in those decisions.   Additionally, plaintiffs' affidavits and other

4    evidentiary submissions currently in the record continue to accurately reflect the facts as they exist

5    now.  For this reason, the affidavits submitted in support of this motion are copies of the affidavits

6    that were previously filed with this court in connection with earlier proceedings.  Rec. Doc. 75.

7    The only thing that has changed is the First Amendment legal standard applicable to public

8    fora by which this case must now be evaluated.  Thus, this case has been returned to the district court

9    by the Court of Appeals for consideration of plaintiffs' remaining First Amendment claims under the

10   heightened standard of scrutiny governing public fora.  Plaintiffs submit that pursuant to Federal Rule

11   of Civil Procedure 56, there is no genuine issue as to any material fact and that they are entitled to

12   judgment as a matter of law on their remaining claims.  The following facts related to these claims

13   are undisputed:1.  Las Vegas Municipal Code 10.44 prohibits solicitation of any kind on Fremont

14   Street, including the distribution of literature by the plaintiff organizations seeking contributions or

15   soliciting membership.  The code provision also prohibits the distribution or sale of the organization's

16   publications.

17   2.  Las Vegas Municipal Code 11.68.100(H) prohibits the placement of tables, displays, and

18

19   other structures on Fremont Street except... "as authorized by the FSELLC for special events, mall

20   advertising, mall entertainment, or mall vending or other commercial and entertainment activities."

21   Tables and displays are often used by the plaintiff organizations in association with core expressive

22   activities, such as gathering signatures, distributing literature, proselytizing, or selling message-

23   bearing merchandise.  *See 10/31/00 Affidavit of Gary Peck, ¶ 56, (Exh. 1).*  The activities of the

24   plaintiff organizations do not fit within the categories of exceptions and it would be futile for them

25   to seek permission from FSELLC officials to engage in First Amendment activities because, as

26   previously found by this court, "The ordinance in question does not give discretion to managers of

27   the mall to allow structures in the mall except for certain events enumerated in the ordinance." *See*

28

2

1  *4/4/01 Order.* Rec. Doc. 89 at 17. This is the defendants' position as well. *See excerpt from*

2  *Defendants'-Appellees'/Cross-Appellants' Answering/Opening Brief, pp. 52-53 (Exh. 2)*("The ACLU

3  does not seek to place a table in the mall for any commercial or entertainment purpose, the ordinance

4  contemplates. Instead, its desire to set up a table is to display its expressive materials. LVMC

5  11.68.100(H) absolutely prohibits structures in the mall for such non-commercial or non-

6  entertainment uses").

7      3. LVMC 11.68.100(C) prohibits parades on Fremont Street. "Parade" is defined as "a public

8  procession or march, and does not include a public procession or march in connection with a special

9  event." LVMC 11.68.020(H). "Special Event" is defined as including "festivals, sporting events,

10  exhibitions, entertainment, and similar activities..." 11.68.020(J). Marches, processions, picketing,

11  demonstrations, and protests by outside groups like the plaintiff organization are all activities which

12  are prohibited under this provision of the Municipal Code. As explained by the defendants before

13  the Court of Appeals, "LVMC 11.68.100(C) expressly prohibits any type of public procession or

14  march which, like parades, rallies or picketing, interferes with the Mall's purpose." *See* LVMC

15  11.68.020(H). *See excerpt from Defendant-Appellees'/Cross-Appellants' Answering/Opening Brief*

16  *at pp. 34-35 (Exh. 2).* The activities of the plaintiff organizations are not included within the

17  definition of special events.[2]

18

19      4. Plaintiffs have challenged the right and authority of FSELLC officials to enforce

20  restrictions on "picketing, protests, and rallies." *See Complaint,* ¶ 28. *See ACLU v. Las Vegas*, 333

21  F.3d at 1095-1096 (describing plaintiffs' allegations involving a protest on Fremont Street that was

22  broken up by the police). Plaintiffs have alleged that FSELLC officials have enforced these

23  restrictions as part of a broader policy of restricting First Amendment activity by all outside groups

24  based on the residual grant of authority vested in that entity to maintain Fremont Street for the

25  purposes for which it was created. *See Complaint.* ¶¶ *27-28, 32, 39.* Plaintiffs have moved to amend

26

27  ――――――――――――
[2] The defendants also maintain that LVMC 10.47 prohibits picketing and demonstration in a way that
28  obstructs pedestrian traffic on Fremont Street and other pedestrian malls. *See Exh. 2.*

3

the complaint to clarify that they are challenging LVMC 11.68.100(C) as the explicit source of authority for enforcing the restrictions on picketing, protests, and demonstrations.

5. Plaintiffs have also moved to amend the complaint to drop their claim that FSELLC officials have exercised their plenary power to regulate Fremont Street in a way that suppresses all First Amendment activity by outside groups.

Based on the foregoing, the court should enter summary judgment on each of the remaining claims described above. This motion is based upon the arguments made below, the affidavits and exhibits already on file, and the facts as they are reported in the decisions of this court and the opinion of the Court of Appeals in this case.

## II.   PROCEDURAL HISTORY AND STATEMENT OF THE CASE

In an attempt to restore its declining downtown hotel casino industry to its storied past, the City of Las Vegas followed the lead of towns across the United States and turned five blocks of its main downtown street into a publicly-owned pedestrian mall, the Fremont Street Mall. What was once known world-wide as "glitter gulch" because of the hotel casinos that rose up on both sides of Fremont Street with giant neon light displays was given an expensive make-over to compete with newer mega-hotel casinos that have been built on Las Vegas Boulevard, known as the "Strip." Fearful of the potential for disruption of merchants and customers attributable to commercial handbilling and panhandling, the City placed significant restrictions upon all First Amendment activities on the Fremont Street mall. However, the ban on First Amendment activity in fact gives the downtown casinos a competitive advantage over the casinos located on the Strip, where similar attempts broadly to prohibit First Amendment activity have been repeatedly invalidated. After running afoul of the restriction upon First Amendment activities, the American Civil Liberties Union of Nevada ("ACLU") and others brought suit in an attempt to restore their First Amendment rights to where they were when Fremont Street was an undisputed public forum.

The City of Las Vegas contracted with a private entity, the Fremont Street Experience Limited

Liability Corporation ("FSELLC"), to transform frumpy Fremont Street into the glamorous Fremont Street Experience. Five blocks of Fremont Street, the center of the downtown area, were closed off to automotive traffic. The street was decoratively repaved as one large promenade, and a canopy capable of generating a light show (known, with a dash of hyperbole, as the "celestial superstructure") was installed over certain parts of the street. In the evening, the light show plays overhead for a few minutes each hour. Although Fremont Street itself is partially covered by the canopy, it remains open to the elements from above and all sides. *ACLU v. Las Vegas*, 333 F.3d at 1094-95.

Despite its expensive makeover and the added attractions, Fremont Street's objective attributes as a major downtown street have not changed. The street mall is open to unrestricted pedestrian use and is part of the downtown transportation grid. Historic Fremont Street lies at the center of the mall and is the main axis, intersecting five city blocks. All First Amendment activity is prohibited on Fremont Street itself and on the streets that intersect with it and those that anchor both ends. The perimeter streets and sidewalks are continuous with and adjacent to downtown's other streets and sidewalks. A visitor to this area would not walk around the mall to travel to the other side, but would walk through the mall either on Fremont Street itself or on one of the streets that intersect it. Although cars are no longer permitted to drive down the length of Fremont Street itself, the enabling legislation and the agreement between FSELLC and the City requires that a route for pedestrians remain open at all times, limiting FSELLC's discretion to manipulate the landscape or otherwise obstruct pedestrian use. Additionally, automotive traffic is permitted to cross the Fremont Street Mall in two places, and pedestrians cross at each intersection. *Id.* at 1102. The street is seamlessly incorporated into the City's downtown transportation grid and continues to anchor the central business and gaming district. *Id* at 1103. The addition of entertainment to the Fremont Street Mall's uses did not alter the fact that it remains a public thoroughfare and one of the City's two premiere gaming and commercial districts. *Id.*

Fremont Street Mall is still a street as defined by the enabling legislation. City and state codes define pedestrian malls generally, and the Fremont Street Mall specifically, as streets and sidewalks.

*Id.* The same major hotels, casinos and many of the same retail establishments, such as McDonalds, still line the sides of Fremont Street just as they did before the renovation. Fremont Street is still located squarely in the middle of downtown, and pedestrians use it for the same purposes as they did previously. The Fremont Street Mall remains open to the elements despite the canopy and light-show. *Id.* Both before and after its transformation, Fremont Street remains a commercial district and public thoroughfare. The grime of Fremont Street has been scrubbed away and it has been dramatically redesigned in a way that the traditional curb and gutter sidewalks fit seamlessly into the street, but its character as a commercial street remains. *Id.* at 1105.

In an ill-conceived plan to protect the investment-backed expectations of the street mall's principal beneficiaries (the hotel casinos) from the competition of the type of First Amendment activity that was historically freely permitted on Fremont Street, the City enacted a number of ordinances broadly prohibiting those activities on Fremont Street. *Id.* Section 10.44 of the Las Vegas Municipal Code (LVMC) prohibits any form of solicitation in the Fremont Street Experience, and sections 11.68.100(I), (B), (C), and (H) respectively prohibit leafleting, unauthorized vending, parades, and the placement of displays and tables. The restriction on parades is statutorily defined as "a group of persons… in a public procession or march," and has been construed and enforced by the defendants to prohibit picketing and demonstrations. LVMC 11.68.020(H). *See Exh. 2.* Inexplicably, LVMC § 11.68.100, which contains the restrictions on handbilling, street sales, parades, and the placement of tables or displays on Fremont Street, carves out an exception for First Amendment activities by labor organizations. In fact, there have been a number of widely reported rallies and demonstrations staged on Fremont Street in recent years, including: (a) demonstrations by the culinary union on or about June 9, 2002 *(Exh. 3)*; (b) an anti-war demonstration on or about March 20, 2003 *(Exh. 4)*; and (c) an immigrant rights rally on or about September 23, 2003 *(Exh. 5)*. And, of course, there are no similar First Amendment restrictions on FSELLC sponsored events, displays, promotions, or the distribution of written material. *See Affidavit of Gary Peck (Exh. 1).* Additionally, plaintiffs-respondents have alleged from the start that, despite the ban on solicitation

1   contained in LVMC § 10.44, casino advertisements targeting gamblers and soliciting business are

2   constantly being forced upon the very same people whom the petitioners allegedly hope to protect

3   from this type of activity.  This Court has previously taken judicial notice of this fact.  *See 2/20/98*

4   *Rec. of Transcript, p. 21-24 (Exh. 6).*

5         In August 1997, during a small demonstration to protest the restrictions on First Amendment

6   activities, local police were called in by FSELLC officials and ordered the group to disperse.  *ACLU*

7   *v. Las Vegas*, 333 F.3d at 1095-1096.  Shortly thereafter, the American Civil Liberties Union of

8   Nevada and others challenged the restrictions on First Amendment activities.[3]  The defendants moved

9   for summary judgment, which was granted in part and denied in part.  This Court found that the City

10   had created a nonpublic forum because its principal purpose was to stimulate economic growth rather

11   than expression, and because the textured pavement and canopy distinguished the mall from

12   surrounding streets and sidewalks.  Applying the lesser First Amendment standard governing non-

13   public fora, the Court granted summary judgment to the City on the solicitation and tabling/display

14   bans.  *ACLU v. Las Vegas*, 13 F.Supp. 2d 1064 (D.Nev. 1998).  The defendants' motion was denied

15   as to the remaining claims.  In a later opinion, this Court granted summary judgment to the plaintiffs

16   

17   on the leafleting and vending bans, finding the ordinances contrary to the First Amendment even

18   under the more lenient reasonableness-viewpoint neutrality scrutiny applied to speech restrictions in

19      [3] In addition to the restrictions contained in LVMC 11.68 and LVMC 10.44, the complaint alleges

20   that residual authority to control conduct on Fremont Street is vested in FSELLC officials pursuant
     to LVMC 11.68.20(H).  Plaintiffs have further alleged that pursuant to this grant of authority,

21   FSELLC officials have flatly prohibited all First Amendment activity on Fremont Street, even if it
     is not otherwise explicitly defined and prohibited by municipal code.  Plaintiffs sought an injunction

22   and a declaration that this residual grant of authority is unconstitutional both facially and as applied.
     The defendants have sought to obfuscate this issue by disavowing the existence of any official or

23   unofficial policy of suppressing speech, but the ordinance speaks for itself, as do the defendants'
     actions. Rather than accommodating First Amendment activity, the entire regulatory scheme adopted

24   in connection with the Fremont Street Experience seeks to limit those activities.  The defendants

25   acknowledged as much in the Court of Appeals by conceding that they had the authority to prohibit
     demonstrations and picketing.  *ACLU v. Las Vegas*, 333 F.3d at 1095.  Plaintiffs have moved to

26   amend the complaint to drop this broad challenge to the plenary authority of FSELLC officials and

27   to refocus their claim on LVMC 11.68.100(C) as the source of the defendants' authority to prohibit
     demonstrations and protest activities.

28   

7

1    nonpublic fora. *See Order* (April 4, 2001). Rec. Doc. 89. As an alternative ground for invalidating

2    the leafleting ordinance, this Court held that it violated the Equal Protection Clause because of the

3    exemption for labor organizations. *Id.*[4] Finally, this Court denied plaintiffs' request for an injunction

4    based on their allegations that the defendants had adopted an unofficial policy and engaged in a

5    practice of prohibiting all First Amendment activity on Fremont Street, even though no specific

6    municipal code provision explicitly forbids certain other types of First Amendment activities,

7    including the gathering signatures, proselytizing, picketing, or holding demonstrations.

8          Affirming in part and reversing in part, the Ninth Circuit reversed this Court's determination

9    that Fremont Street's status as a public forum no longer existed, clearly establishing the pedestrian

10   mall as a public forum. The court noted at the outset that "as society becomes more insular in

11   character, it becomes essential to protect public spaces where traditional modes of speech and forms

12   of expression can take place." 333 F.3d at 1097. The court observed that this is "particularly true

13   with respect to downtown public spaces conducive to expressive activities." *Id.* The court also

14   addressed the growing phenomenon of the commercialization of public spaces and governmental

15   attempts to control speech in newly created entertainment, tourist, and commercial venues located in

16

17   the downtowns of many major American cities. *Id.* at 1103-1104.

18         The court held that public pedestrian malls and commercial zones are public fora despite their

19   concentration of businesses, their distinctive character, and their role in fostering commerce. *Id.*

20   Citing its cases involving the Las Vegas Strip and other downtown tourist and shopping districts, the

21   court held that the "use and purpose" of Fremont Street remains as a public thoroughfare and that its

22   "use and purpose" was not altered either by closing it to traffic or by the addition of entertainment.

23   *See Venetian Casino Resort v. Local Joint Exec. Bd.*, 257 F.3d 937 (9th Cir. 2001) (Las Vegas blvd.);

24   *Perry v. Los Angeles Police Dep't*, 121 F.3d 1365 (9th Cir. 1997) (Venice Beach boardwalk);

25   *Gerristen v. City of Los Angeles*, 994 F.2d 570 (9th Cir. 1993) (shopping plaza in Los Angeles'

26   Olvera Street Park); *Gaudiya Vaishnava Soc. v. City and County of San Francisco*, 952 F.2d 1059

27

28   [4] In its original reported decision, *supra*, this Court entered a preliminary injunction on plaintiffs'
     leafleting and vending claims. In its later unreported *Order*, the injunction was made permanent.

(9th Cir. 1990) (Fisherman's Wharf). *See also S.O.C., Inc., v. County of Clark*, 152 F.3d 1131 (9th Cir. 1998) (Las Vegas Blvd.). The court ultimately determined that although the "grime of Fremont Street has been scrubbed away and it has been dramatically redesigned, . . . its character as a commercial street remains unchanged." 333 F.3d at 1105.

Turning to the restrictions on speech, the court held that the district court properly granted the injunction prohibiting the distribution of literature – even under the lesser standard of reasonableness governing nonpublic fora. *Id.* at 1094. The court held that the complete ban on leafleting was "properly granted under any standard," and clearly "cannot survive the more rigorous standard appropriate for a public forum." *Id.* at 1106. The court also upheld the district court with respect to the section of the ordinance that prohibited unauthorized vending on the street. The court first observed that the sale of merchandise that carries or constitutes a political, religious, philosophical or ideological message is protected under its precedents. Adopting the analysis of the district court, the court held that the ban on vending not authorized by government officials is invalid—even under the reasonableness standard applicable to nonpublic forum restrictions -- because it leaves "unbridled discretion to regulate speech" with those officials. *Id.* at 1106-07.[5]

Finally, the court vacated and remanded the solicitation and tabling/display bans for this Court to assess whether the City could show that these restrictions are narrowly tailored to serve a significant government interest without burdening substantially more speech than necessary to do so. *Id. at* 1108. The court held that solicitation is expressive activity, and hence is protected under the First Amendment. *Id.* With respect to the tabling/display restriction, the court emphasized that the plaintiffs must show that the erection of tables falls under the First Amendment. *Id.* This issue has not been settled in the Ninth Circuit, although the court observed that "[o]ur cases indicate that tables are often used in association with core expressive activities, such as gathering signatures, distributing informational leaflets, proselytizing, or selling message-bearing merchandise." *Id.* at 1109 & n.15.

---

[5] In view of its holding on First Amendment grounds, the court did not consider the district court determination that the ordinances also violate the Equal Protection Clause by exempting certain labor-related activities. *Id.* at 1106, n.14.

The court also remanded for consideration the plaintiffs' claim that the defendants had adopted an unofficial policy and practice of prohibiting all First Amendment activity on Fremont Street such as demonstrations, picketing, canvassing for signatures, or proselytizing.

Following the Court of Appeals decision, the defendants were granted a stay while they petitioned the Supreme Court for review. On January 12, 2004, the petition for certiorari was denied. 124 S.Ct. 1077 (2004). The mandate issued by the Court of Appeals on January 20, 2004, and by the district court on February 23, 2004. (Rec. Doc. 120).

**III.    STANDARD FOR GRANTING SUMMARY JUDGMENT**

Summary judgment "shall be rendered forthright if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party, *Zoslow v. MCA Distr. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983), and for this purpose, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. *Adicks v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Baker v. Centennial Ins. Co.*, 970 F.2d 660, 662 (9th Cir. 1992). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982). Applying this standard, there are no material disputed facts that would preclude summary judgment.

**IV.    ARGUMENT**

   **A.    The Solicitation Ordinance Violates Both the First Amendment and the Equal
          Protection Clause of the Fourteenth Amendment**

Street solicitation at certain locations within Las Vegas, including the Fremont Street Experience, is prohibited by LVMC 10.44. The statute is grossly overbroad. "Solicitation" for

purposes of Chapter 10.44, means "to ask, beg, solicit or plead, whether orally or in a written or printed manner, for the purpose of obtaining money, charity, business or patronage, or gifts or items of value for oneself or another person or organization." The statute is broad enough to reach written material soliciting paid membership in an organization or providing information about the availability and cost of obtaining the organization's publications. It is also broad enough to reach newspapers or other publications containing advertisements. Violation of the ordinance is punishable as a misdemeanor. By its terms, the ordinance draws a content-based distinction based on the solicitation aspect of the communication. The broader ban on the distribution of all literature has been invalidated, leaving in place a regulatory scheme that targets only communications that meet the definition of solicitation. Despite the prophylactic reach of the ordinance, businesses and casinos that are located on the Fremont Street Experience are freely allowed to distribute promotional materials from the sidewalks directly in front of their entrances. At the hearing on February 20, 1998, Judge Hagen took judicial notice of this activity when questioning counsel for the FSELLC about the practice. *See Record of Transcript (Exh. 6). See also Peck Affidavit, ¶¶ 24-25. See also 2/13/98 Affidavit of Patricia Vasquez, with accompanying photographs (Exh. 3 to Pltfs' Reply Memo in Support of Motion for Preliminary Injunction), Rec. Doc. 33, 40.* In fact, the ordinance creates an exception for these businesses. LVMC 10.44.040.[6]

The breadth of the ordinance is sweeping and is not limited to panhandling or commercial handbills. The ordinance even prohibits oral and written requests for future donations. The ordinance prevents plaintiffs from distributing any literature that contains a request for funds or anything of value at some future date after the recipient has had opportunity to review the literature and consider the request. The ban extends to all requests for donations, not just in-hand requests for immediate payment of funds. This court has previously upheld this construction and application of the ordinance

---

[6] As an alternative grounds for invalidating the solicitation ordinance, plaintiffs submit that the restriction violates the Equal Protection Clause of the Fourteenth Amendment because it is not written and enforced in an even-handed manner. *See Carey v. Brown*, 447 U.S. 455 (1980). *See also ACLU v. Las Vegas*, 13 F.Supp. 2d 1064, 1079-1081 (2000) (invalidating LVMC 11.68.100(1) because it contained a speaker-based extension for labor organizations).

as reasonable under the lower First Amendment standard governing non-public fora. *See 4/4/01 Order at 34, Rec. Doc. 89.* Even if solicitation of funds could be completely banned in a public forum -- a dubious proposition at best -- the restriction could not extend, for example, to the distribution of literature or pre-addressed envelopes along with a written or oral plea to make a contribution at a later date. *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 704-705 (1992) (Kennedy, J., concurring). A considerable amount of public education and advocacy literature solicits the reader's financial help and includes information where contributions can be sent. Yet the Las Vegas ordinance prohibits precisely this activity. Plaintiffs have been prevented from distributing literature simply inviting the reader's "support" or "help" and providing contact information. *See Aff. of G. Peck (Exh. 1).* Although this Court has previously held that the ordinance cannot be enforced to prohibit the distribution of literature simply containing contact information for plaintiff organizations, it upheld the ordinance in all other respects. *4/4/01 Order at 34, Rec. Doc. 89.* The City has also construed the ordinance to include a ban on the distribution of any material with any commercial content whatsoever, even if the material is primarily non-commercial, such as a religious or advocacy group's publications. *See 10/31/01 Decl. Of A. Lichtenstein (Exh. 9).*

Solicitation of funds for charitable purposes is unquestionably protected First Amendment activity. *ACLU v. Las Vegas,* 333 F.3d at 1108; *Village of Schaumburg v. Citizens for Better Environment,* 444 U.S. 620 (1980); *Riley v. Nat'l Fed. of the Blind,* 487 U.S. 781 (1988); *Perry,* 121 F.3d at 1365 (protecting solicitation by street musicians under the First Amendment); *Project 80's Inc., v. City of Pocatello,* 942 F.2d 635 (9th Cir. 1991) (door to door solicitation). The sale or distribution of literature seeking contributions or containing advertising is also entitled to full First Amendment protection. *See S.O.C.,* 152 F.3d at 1136 (discussing the different types of news and organizational publications that would be affected by a ban on the distribution of materials containing commercial matter). Even panhandling is entitled to First Amendment protection. *Loper v. New York City Police Dep't,* 999 F.2d 699 (2d Cir. 1993) (holding that the exclusion of those who solicit on City streets in a peaceful manner is not a compelling state interest); *Blair v. Shanahan,* 775 F. Supp.

12

1   1315, 1324 (N.D. Cal. 1991) (preventing annoyance caused by solicitation is not a compelling

2   interest).

3       The Las Vegas ordinance imposes a complete ban on all of these types of solicitation in a

4   traditional public forum. The government's right to limit expressive activity in a public forum "is

5   sharply circumscribed." *S.O.C.*, 152 F.3d at 1145. "Regulation of speech in a traditional public

6   forum is subject to the highest scrutiny. *Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998).

7   Complete bans are extremely suspect and rarely upheld. *Gerristen*, 994 F.2d at 577. This is

8   particularly true when the restriction is content based or includes exceptions that undermine the

9   justification for the ordinance. *See S.O.C.*, 152 F.3d at 1145 (content based restriction on the

10  distribution of handbills based on their commercial content); *Perry*, 121 F.3d at 1368 (ban on

11  solicitation of donations undermined by exception for non-profit organization). In this case, the

12  ordinance is content-based because it only applies to communications that solicit. *See S.O.C.*, 152

13  F.3d at 1145-46. The ordinance, moreover, is not enforced even-handedly and raises the additional

14  objection of speaker-based discrimination. *See Carey v. Brown, supra*. Casinos and other businesses

15  are free to distribute promotional materials from the sidewalks in front of their establishments. We

16  are also unaware of any limits on the distribution of promotional materials distributed in connection

17  with FSELLC promotional events or sponsors.

18

19      The appropriate level of scrutiny to be applied in this case is tied to whether the ordinance

20  distinguishes between prohibited and permitted speech on the basis of content. *Foti*, 146 F.3d at 635-

21  36. Governmental restrictions in public fora must be content-neutral, narrowly tailored to serve a

22  compelling state interest, and leave open alternative channels of communication. *Id.* (quoting *Perry*

23  *Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). *See also ACLU v. Las Vegas*,

24  333 F.3d at 1098. Content-based restrictions must pass a more rigorous test. Thus, the First

25  Amendment prohibits government from regulating the content of speech in a public forum unless the

26  regulation is necessary to serve a compelling state interest and is narrowly tailored to achieve that end.

27  *Id.* The requirement of narrow tailoring under this standard means that the government must choose

28

13

the least restrictive means to further the articulated interest the restriction purportedly serves. Because of the availability of less restrictive means, this standard is rarely met and content-based regulations are viewed as presumptively invalid. *See id.* at 1145 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)).

Plaintiffs contend that the anti-solicitation ordinance is content-based since it only targets the solicitation aspect of the handbill or other expression. The same handbill can be distributed freely if it avoids words of solicitation. We understand that the solicitation ordinance was adopted in tandem with the ordinance prohibiting the distribution of literature on Fremont Street. The latter, however, has been struck down, leaving in place a regulatory scheme that is even more onerous than the commercial handbill ordinance, invalidated in *S.O.C. v. Clark County, supra.* In that case, the court held that a county ordinance that regulated only handbills that "propose one or more commercial transactions" on Las Vegas Boulevard was overbroad. The court made two findings, both of which are equally applicable here. First, the ordinance did not regulate purely commercial speech; it also reached ACLU publications. Therefore, the ordinance was not subject to the less protective First Amendment test for commercial speech. 152 F.3d at 1142-45. Second, the ordinance was justified by reference to its commercial content and thus drew an impermissible content-based distinction. *Id.* at 1145-46.[7]  *See also Foti*, 146 F.3d at 636-37 (invalidating content-based distinction in the regulation of the posting of signs on public property or the displaying of signs in the public right of way). In both cases, the court held that while the city's proffered interests in support of the restrictions on speech were substantial, they could not be considered compelling under the heightened First Amendment standard governing content-based regulation of speech. *S.O.C.*, 52 F.3d at 1146. In both cases the court also held that the restrictions on speech were invalid because there were less restrictive alternatives that addressed the ordinance's concerns without capturing speech unrelated to those concerns. *Id.* at 1146-48.

---

[7] Unlike the handbilling ordinance, the solicitation ordinance is not confined to Fremont Street. It prohibits solicitation at numerous other locations where handbilling is freely permitted. LVMC 10.44.030. This type of line-drawing is prohibited. *See S.O.C., supra.*

The solicitation ordinance is also *enforced* in a way that is not even-handed.  The casinos that anchor Fremont Street are regularly allowed to solicit business by distributing free coupons and other promotions designed to attract gambling and entertainment dollars.  Indeed, the ordinance by its terms carves out an exception for these activities if conducted on private property.  LVMC 10.44.040.  This exception allows casinos and other businesses to distribute literature from the private portion of the sidewalks in front of their establishments to individuals walking by and within an arm's length of the person distributing the promotional material.  The entrances and sidewalk areas in front of the casinos are seamlessly incorporated into the Fremont Street surface in a way that does not distinguish the mall property from the casino property. *See 10/31/00 Aff. of H. Langert and attached photgraphs (Exh. 7). See also affidavit and photographs of P. Velasquez, Rec. Doc. 33, 40.*  As the photographs show, the entryways are designed this way to allow casinos to draw customers in with promotions, giveaways, and the like.  Under these circumstances, the fact that this activity may take place out in front of the different casinos within their property line is irrelevant.  Commercial literature is also distributed in connection with mall promotional events from tables and kiosks. *See Aff. G. Peck, ¶ 24-25 (Exh. 1).*  The city's justification for the ban on solicitation is fatally undermined by the failure to enforce the ordinance even-handedly. *See Carey v. Brown,* 447 U.S. at 461.[8]

Even if the solicitation ordinance is analyzed as content neutral and non-discriminatory, it is not narrowly tailored and does not permit ample alternatives for communication.  The defendants have never attempted to justify their conduct under this standard, and for good reason.  There is virtually no case law supporting so sweeping a ban on the exercise of First Amendment rights in a traditional public forum. *ACLU v. Las Vegas,* 333 F.3d at 1106 ("an absolute ban is clearly not

---

[8] Speaker-based discrimination in the First Amendment context has sometimes been characterized as a violation of the First Amendment itself, *see Simon & Schuster v. Members of the New York State Crime Victims Board,* 502 U.S. 105 (1991); *Arkansas Writers' Project v. Ragland,* 481 U.S. 221 (1987); *Carey,* 447 U.S. at 471 (1980) (Stewart, J. concurring); *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 785-86 (1978); and has sometimes been characterized as a violation of the Equal Protection Clause, *see Carey,* 447 U.S. at 461; *Police Dep't of City of Chicago v. Mosley,* 408 U.S. 42, 95 (1972).  Under either analysis, however, independent justification of the discrimination is required.

narrowly tailored, nor does it leave open ample alternative channels for communication"); *see also*

*Gerritsen v. City of Los Angeles*, 994 F.2d at 577-78. *Gerritsen*, like this case, involved a municipal

ordinance which broadly prohibited the in-hand distribution of literature in the commercial section

of a downtown plaza.[9]  The court, like the court here, invalidated the ordinance because it targeted

core First Amendment activity in a traditional public forum, despite the heavy concentration of

businesses that anchored the shopping/tourist district.  Indeed, the facts in *Gerristen* parallel the facts

in this case in many critical respects.  City officials sought to reclaim the most popular area of a

downtown park and to restrict speech in order to "foster commercial exchange." *Id.* at 576.  In

addition to a plaza area with an open-air bandstand, the park contained the Olvera Street shopping

and dining area with 78 businesses, the Plaza Catholic Church and the Mexican Consulate.  Each year

two million people visited the park.  The challenged park regulations contained two basic policies.

First, the so-called blue line policy prohibited all handbill distribution in certain areas of the park.

These included two of the park's most popular areas -- the area around the Mexican Consulate and

the Olvera Street merchants area.  The second policy established a permit system for limited handbill

distribution in other areas of the park. *Id.* at 572-73.  The court found that the in-hand distribution

of literature was protected speech and that public forum analysis was triggered since it occurred in

a public park. *Id.* at 576.  Specifically, the court rejected the city's claim that the blue-lined areas

should be evaluated differently because they were distinct from other areas of the park with "a unique

historic and cultural atmosphere designed to foster commercial exchange." The court stated, "[w]hile

the Olvera Street area may have a special ambience, it is still part of the park and it is

indistinguishable from other sections in terms of visitor's expectations of its public forum status.

Indeed, to many visitors, Olvera Street is the heart of El Pueblo Park." *Id.* The court struck down

the ordinance because there was no evidence that the distribution of literature interfered with the

---

[9] The court noted that complete bans on a category of First Amendment expression are rarely upheld and could not be so here. *Id. See also Edwards v. City of Coeur D'Alene*, 262 F.3d 856 (9th Cir. 2001) (invalidating complete ban on the use of wooden or plastic poster supports during parades or demonstrations); *Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990) (invalidating complete ban on protesters within seventy-five foot security zone).

operation of the park. The court specifically considered and brushed aside the city's contention that the ban was necessary to (1) preserve the historic quality of the Olvera Street area; (2) maintain a calm, secure environment; and (3) avoid congestion in crowded areas. 944 F.2d at 577. *See also S.O.C.*, 152 F.3d at 1136 (rejecting the same arguments).[10]

In critical respects, this is an even stronger First Amendment case than *Gerristen* because the challenged ordinance is written and enforced in a way that undermines justification for the solicitation ban. *See id.* at 1136; *Foti*, 146 F.3d at 629; *Perry*, 121 F.3d at 1369-70. In *Perry*, the plaintiffs were street musicians and an animal rights activist who solicited street donations. The plaintiffs also engaged in street sales, respectively, of music, and of message-bearing merchandise promoting animal rights, such as books, t-shirts, bumper stickers, buttons and other articles bearing political slogans such as "Meat is Murder." A Los Angeles ordinance prohibited their activity, except as to bona fide non-profit organizations. Analyzing the ordinance as a content-neutral reasonable, time, place, manner regulation, the court invalidated the ordinance because of its under-inclusiveness. Crediting as "substantial" the asserted governmental interests in promoting public safety and the orderly movement of pedestrians, the court held that the ordinance was not narrowly tailored because there was nothing inherent in the distinction used to address the city's interests that would make solicitation and sales by non-profit organization any less harmful than the activities of plaintiffs.[11] *Id.* at 1369-70. *See also S.O.C.*, 152 F.3d at 1146-1147 ("all canvassers, whether distributing commercial or non-commercial handbills, contribute to the problems of sidewalk congestion, harassment of pedestrians,

---

[10] As acknowledged by the Court of Appeals in this case, numerous other cases recognize that commercial and tourist districts are subject to First Amendment constraints and have uniformly rejected governmental attempts to limit First Amendment activity. 333 F.3d at 1103-04. *See Venetian Casino Resort*, 257 F.3d at 937 (sidewalks on Las Vegas Blvd.); *Perry*, 121 F.3d at 1365 (solicitation of donations along Venice Beach boardwalk); *Gaudiya Vaishnava Soc.*, 952 F.2d at 1059 (Fisherman's Wharf and Union Square districts in San Francisco).

[11] In *Perry, supra*, the defendants also defended the ordinance prohibiting street sales on the grounds that it protected the merchant economy. The court rejected the argument because plaintiffs' activities were not purely commercial, but "inextricably intertwined" with expressive activities. Thus the lack of non-profit status "could not reasonably be a predictor of purely commercial activity." *Id.*

17

1  and littering').[12]

2      The solicitation ordinance suffers the same defect that was present in *Perry*, *S.O.C.* and in the

3  Supreme Court cases on which those decisions rely.  Whether the City's interests are safety,

4  aesthetics, or protecting the merchant economy, the distinction between handbills which may be

5  permissibly distributed because they do not solicit anything and handbills which are prohibited

6  because they seek the reader's financial support, affiliation, or patronage is not narrowly tailored to

7  achieve those objectives.  A religious or political tract presents no lesser or greater threat to the city's

8  legitimate interests simply because it exhorts the reader to support the organization.  Limits on

9  traditional commercial speech or on panhandling may require a different analysis, but this ordinance

10 reaches speech that has never been the subject of a permissible regulation in a public forum.

11     Finally, the solicitation ordinance is invalid because being completely banned from the

12 Fremont Street is not a viable alternative channel for free expression.  "[A]n absolute ban does not

13 leave open ample alternative channels for communication."  *ACLU v. Las Vegas*, 333 F.3d at 1106.

14 If an ordinance effectively prevents a speaker from reaching his intended audience, it fails to leave

15 open ample alternative means of communication. *Coeur D'Alene*, 262 F.3d at 866-867 (invalidating

16 ordinance banning fixed wooden or plastic picket/banner supports in a parade because the alternative

17 of holding signs up by hand is less effective); *Bay Area Peace Navy*, 914 F.2d at 1229 (invalidating

18 75 foot security zone because it interfered with protesters' ability to reach their intended audience).

19 Moreover, laws regulating public fora cannot be held constitutional simply because they leave

20 potential speakers alternative fora for communicating their views. *City of Ladue v. Gilleo*, 512 U.S.

21 43 (1994); *Schneider v. State*, 308 U.S. 147, 163 (1939); *NAACP v. City of Richmond*, 743 F.2d 1346,

22 1355 (9th Cir. 1984). In *Ladue*, the Court invalidated a ban on yard signs. The court found that other

---

[12] Both *Perry* and *S.O.C.* rely on three Supreme Court cases that struck down municipal ordinances on the same basis. *City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993) (distinction between newsracks distributing commercial handbills and newspapers); *Village of Schaumberg v. Citizens for a Better Environment*, 444 U.S. 620 (1980) (distinction between non-profits who used at least 75% of their receipts for charitable purposes and others); *Carey v. Brown*, 447 U.S. 455 (1980) (distinction between peaceful labor picketing and all other peaceful picketing).

18

1   means of communication were inadequate because the same audience "could not be reached nearly

2   as well by other means." *Id.* at 56. The same principle is at work in this case. Many visitors to the

3   Fremont Street enter directly from the casino-hotels that anchor the pedestrian mall. Those who do

4   enter from the adjacent streets that form the perimeter of the premises converge from streets on all

5   sides, and do not linger or gather as they do once within the Fremont Street. Public fora have

6   achieved a special status in our law; the government must bear an extraordinarily heavy burden to

7   regulate speech in such locales. Plaintiffs' ability to reach their intended audience is greatly

8   diminished under these circumstances. For this reason the restrictions are invalid: "[A]n alternative

9   mode of communication may be constitutionally inadequate if the speaker's 'ability to communicate

10  effectively is threatened' . . . . An alternative is not ample if the speaker is not permitted to reach the

11  'intended audience.'" *Bay Area Peace Navy*, 914 F.2d at 1229 (quoting *Members of the City Council*

12  *of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984)).[13]

13

14  **B.    The Display/Tabling Ordinance Violates Both the First Amendment and the
        Equal Protection Clause**

15      LVMC 11.68.100(H) regulates the placement of tables, racks, stands, and other movable

16  structures on Fremont Street. Tables and these other movable supports are often used in association

17  with core expressive activities, such as gathering signatures, distributing informational leaflets,

18  proselytizing, or selling message-bearing merchandise. *ACLU v. Las Vegas*, 333 F.3d at 1109 n.15;

19  *see also Gaudiya*, 952 F.2d at 1060 (message-bearing merchandise); *One World One Family Now v.*

20  *Nevada*, 860 F. Supp. 1457 (D. Nevada 1994) (Per J. Pro) (granting preliminary injunction allowing

21  portable tables and signs to sell message bearing t-shirts and other merchandise on sidewalks along

22  Las Vegas Blvd.); *see also Aff. of G. Peck,* ¶ *56 (Exh. 1)* (describing use of a table by ACLU to

23  distribute literature). They facilitate First Amendment activity by enabling the display of multiple

24  pamphlets or other items, as well as the distribution of a greater amount of material. Additionally,

25  the use of a table may convey a message by giving an organization the appearance of greater stability

26

27

---

28  [13] In *Bay Area Peace Navy*, city officials unsuccessfully attempted to restrict plaintiffs= peaceful
    protest activities to a less visible area where their message would reach fewer people.

1  and resources than that projected by a lone, roaming leafletter. *ACLU v. Las Vegas,* 333 F.3d at 1109.

2  Although the issue remains an open one in the Ninth Circuit, there is a growing consensus that

3  this activity is entitled to full First Amendment protection because the use of tables and displays

4  facilitates the exercise of First Amendment rights, just as newsracks do. *See City of Cincinnati v.*

5  *Discovery Network*, 507 U.S. at 410.[14]  Thus, a number of courts have held that the placement of

6  tables and display stands to distribute literature or gather signatures is entitled to First Amendment

7  protection. *One World One Family Now v. Nevada*, 860 F. Supp. 1457 (D. Nevada 1994) (Per J. Pro)

8  (granting preliminary injunction allowing portable tables and signs to sell message bearing t-shirts

9  and other merchandise on sidewalks along Las Vegas Blvd.); *see also One World One Family Now*

10  *v. City of Miami Beach*, 175 F.3d 1282 (11th Cir. 1999); *Int'l Caucus of Labor Committees v.*

11  *Montgomery*, 111 F.3d 1548 (11th Cir. 1997); *One World One Family Now v. City of Key West*, 852

12  F. Supp. 1005, 1009-10 (S.D.Fla. 1994).  Plaintiffs submit that the ordinance violates the First

13
14  Amendment both facially and as applied.  Plaintiffs further submit that the ordinance violates the

15  Equal Protection Clause because it contains speaker-based exemptions for 1) labor organizations, and

16  2) FSELLC sponsored speakers.

17  An ordinance or statute that directly targets "expression or conduct commonly associated with

18  expression" may be challenged on its face. *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir.

19  1996).  Plaintiffs need only show that "the erection of tables falls under the protection of the First

20  Amendment." *ACLU v. Las Vegas*, 333 F.3d at 1107 (affirming this Court's holding First

21  Amendment facial challenge to city vending ordinance was permissible since the vending ordinance

22  was broad enough to reach some conduct that was protected by the First Amendment); *see also Nunez*

23  *v. City of San Diego*, 114 F.3d 935, 950-51 (9th Cir. 1997) (allowing facial challenge to juvenile

24  curfew ordinance because it restricted access to all streets and sidewalks even though it did not

25  primarily target expressive activities); *compare Roulette*, 97 F.3d at 305 (rejecting facial challenge

26  to ordinance prohibiting sitting or lying on the sidewalk because the statute targeted general conduct,

27
28  [14] In fact, the ordinance is written broadly enough to prohibit newsracks or newsboxes on Fremont Street.

in which there was arguably a "kernel" of expression, was not expression or conduct commonly associated with expression). Although this court has previously held that LVMC 11.68.100(H) could not be challenged facially because it did not implicate conduct commonly associated with expression, 13 F. Supp. 2d 1064, 1073 (D. Nev. 1998), plaintiffs submit that in view of the Ninth Circuit's remand of the issue and its extended discussion of how tables and other supports facilitate the dissemination of ideas, the ordinance may be properly subject of a facial challenge.

Alternatively, plaintiffs submit that the tabling ordinance violates the First Amendment as applied. The ordinance, by its terms, does not allow organizations like the ACLU to place tables or other supports on Fremont Street to assist in the distribution of its materials. There is no dispute about the terms of the ordinance or the defendants' policy. The ordinance flatly prohibits the use of tables or displays by the plaintiffs and other similarly situated. In fact, the defendants have maintained throughout that the ordinance gives no discretion to permit or withhold permission because it only allows structures for "special events..." or other commercial entertainment activities. The defendants' position is that, unless it is for one of the specified purposes, all structures are prohibited. *See excerpt from Defendants'-Appellees'/Cross-Appellants' Answering/Opening Brief, p.52-53 (Exh. 2)*("The ACLU does not seek to place a table in the mall for any commercial or entertainment purpose, the ordinance contemplates. Instead, its desire to set up a table is to display its expressive materials. LVMC 11.68.100(H) absolutely prohibits structures in the mall for such non-commercial or non-entertainment uses"). This Court agreed with the defendants' construction of the ordinance and rejected plaintiffs' claim that the ordinance vested unbridled discretion in FSELLC officials. Rec. Doc. 89 at 17 (April 4, 2001) ("The ordinance in question does not give discretion to the managers of the mall to allow structures in the mall except for certain events enumerated in the ordinance"). Under these circumstances, plaintiffs need not apply for a permit or seek permission before challenging the ordinance, as any application would be an exercise in futility. *Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996) ("applying for a permit would have been futile because... the ordinance flatly prohibits [plaintiffs'

conduct]"). Similarly, "inadequate evidence of the city's alleged discriminatory enforcement of the ordinance does not defeat [plaintiffs] as applied challenge." *Foti,* 146 F.3d at 635. The evidence in this case does not purport to show discriminatory enforcement among similarly situated political or religious organizations, but it does unequivocally show that the tabling restriction is a flat prohibition against organizations and entities that are not associated with FSELLC events.[15]  Based on the defendants' own construction of the tabling restriction to flatly prohibit organizations like the ACLU from engaging in this type of activity, there is no reason the ordinance cannot be challenged as applied to the ACLU and the other plaintiff organizations.

Both facially and as applied, LVMC 11.68.100(H) is flawed for substantially the same reasons as the vending ordinance previously enjoined by this court and affirmed by the Court of Appeals. "[B]y placing the decision whether to authorize [the use of tables or displays] wholly within the discretion of an FSELLC official, the ordinance create[s] a situation ripe for abuse, in violation of the First Amendment." *ACLU v. Las Vegas,* 933 F.3d at 1107. By its terms, the ordinance prohibits the placement of tables or displays on Fremont Street except "as authorized by the FSELLC for special events, mall advertising, mall entertainment, or mall vending or other commercial and entertainment activities." The ordinance says nothing about how the power to regulate the table/display restriction is to be wielded. "As a result, there is a considerable danger that the content of prior speech, or simply the goals of an organization, might inform the permitting process."

---

[15]  *See ACLU v. Las Vegas,* 333 F.3d at 1096 (recounting plaintiffs' allegations involving the enforcement of the table/display ordinance). On October 24, 2000, three individuals associated with the ACLU of Nevada went to Fremont Street to distribute literature and collect signatures. They set up a small display table with an ACLU banner affixed to the front and commenced to distribute literature and gather signatures. FSELLC officials descended immediately and stated that the conduct was prohibited and the group had to leave. Only after Gary Peck, Director of the ACLU-NV, interceded and asserted his right to be there did security back off to consult their supervisor. When security returned, the ACLU was permitted to stay, but only on the condition that the table be removed. *See Peck Affidavit,* ¶¶ *56-61 (Exh. 1). See also 10/28/00 Affidavit of Harold Langert, photos 40-46 (Exh. 7)* (photographs of this event).  Plaintiffs have attached to this memorandum photographs of this event. What is particularly objectionable about the defendants' conduct is that the plaintiffs have repeatedly sought permission from FSELLC officials to conduct informational tabling prior to the forgoing incident. The defendants never responded to the plaintiffs' requests. *See 10/30/00 Decl. of M. Lopez (Exh. 8).*

22

Additionally, the restriction does not apply to conduct "arguably protected" by the National Labor Relations Act. Thus, like the handbilling ordinance previously invalidated by this court based in part on the presence of this exception, the enforcement of Section 11.68.100(H) turns on the identity or status of the speaker. 13 F.Supp. 2d 1079-1081.

Under any conception of the First Amendment, the government is not free to pick and choose which speakers can place displays and tables on the street based on the identity of the speaker, *Carey v. Brown*, 447 U.S. at 461-462, or the content of the message. *See Foti*, 146 F.3d at 636 (government exceptions built into municipal ban on the display of signs on public property). This is particularly true where the ordinance expresses a preference for commercial speech over non-commercial speech, *see id.*; *see also Desert Outdoor Advertising Inc.*, 103 F.3d at 819-820 ("ordinance is invalid if imposes greater restrictions on non-commercial speech then on commercial billboards"); or where the ordinance vests unchecked discretion in the approving authority, *see Gaudiya Vaishnava Soc.*, 952 F.2d at 1065-1066 (police chief has unconstitutional discretionary power to grant or withhold license to sell message-bearing merchandise from display tables set up in public forum); *One World One Family Now, Inc.*, 860 F. Supp. at 1457 (enjoining same restriction on Las Vegas Blvd. sidewalks). All these defects are present in this case.

Nothing in the ordinance limits the discretion of FSELLC officials. They are equally free to authorize the placement of displays or tables for a NASCAR promotion, a Christmas display or in connection with an appearance by an elected official. Conversely, the ordinance both as written and as applied does not allow the ACLU the same access. Even under the lesser First Amendment standard governing non-public fora, this type of standardless discretion is not permitted. *See ACLU v. Las Vegas*, 333 F.3d at 1107.

Whether analyzed as a content-based regulation or a content-neutral regulation, LVMC 11.68.100(H) is not narrowly tailored. This type of ordinance has no support in the law. The Supreme Court has on three occasions invalidated anti-picketing ordinances which contained an exception for peaceful labor picketing *Carey, supra*, (residential picketing); *Police Dep't of the City*

23

*of Chicago v. Mosley*, 408 U.S. 42 (1972) (picketing outside school); *Grayned v. City of Rockford*, 408 U.S. 104 (1972) (same). The defect in each of these cases was that the labor/non-labor distinction had no bearing on the asserted government interests in preserving the tranquility of the home and school place. Peaceful non-labor picketing was no more likely to intrude than peaceful labor picketing. Thus, the flat ban was not narrowly tailored. *See Perry*, 121 F.3d at 1369-70 (discussing *Carey*). In *Carey*, the Court made the additional observation that the state's interest in providing special protection for labor protestors recognized in federal and state legislation could not justify the distinction. 447 U.S. at 466-67 & n.10.[16]

LVMC 68.100(H) suffers the same defect. Whatever the City's interests are in prohibiting the placement of displays or tables on Fremont Street, its rationale is undermined by the exception for NLRB protected displays. This is true whether the City's interests are focused on the typical justifications of ensuring pedestrian traffic flow, protecting the interests of merchants, or both. The additional fact that FSELLC officials are granted the authority under the ordinance to authorize the placement of these structures for promotional or commercial purposes further undermines the rationale for the ordinance. *See Discovery Network*, 507 U.S. at 410. *Discovery Network* is closely analogous to the facts in this case. There, the Supreme Court invalidated a city ordinance that permitted newsracks on public streets for newspapers, but did not permit them for commercial handbills. The Court accepted the government's legitimate interest in safety and aesthetics on city streets, and the proposition that fewer newsracks would aid that interest. However, the Court found no basis for distinguishing between the commercial handbills. Finding that newsracks containing commercial handbills were no more harmful than the permitted newsracks, the Court determined that the city had failed to justify sufficiently its discrimination against the commercial use of newsracks. *Id.* at 418. Because each type of paper contributed equally to the safety and esthetics concerns generated by newsracks on public streets, the ordinance was not sufficiently tailored to the city's

---

[16] Speaker-based distinctions violate both the First Amendment and the Equal Protection Clause. *See supra* n. 8.

24

1  significant interests.[17] *See also Perry,* 121 F.3d at 1369-70 (invalidating prohibition against street

2  solicitations by individuals and organizations that contained exception for non-profit organizations);

3  *S.O.C.,* 152 F.3d at 1146-1147 (invalidating content-based distinction between regulation of

4  commercial and non-commercial handbills because the distinction was under-inclusive).

5

6    **C.    LVMC's 11.68.100(C) Prohibition on Parades and Demonstrations Violates both
           the First Amendment and the Equal Protection Clause.**

7

8      LVMC 11.68.100 explicitly prohibits a number of First Amendment activities that

9  have been the subject of this litigation. Subsection (C) prohibits parades. "Parade" is defined as a

10  group of persons… in a public procession or march *and* does not include a procession or march in

11  connection with a special event or mall entertainment. LVMC 11.68.020(H). The defendants have

12  construed this provision to "prohibit any type of public procession or march which, like parades,

13  rallies, or picketing, interferes with the mall's purposes." *See Defendant-Appellees'/ Cross-*

14  *Appellants' Answering/Opening Brief at 34-35.*[18] *See Exh. 2.* As defined by the ordinance, the

15  restriction on parades and demonstrations does not apply to FSELLC sponsored events. These events

16  are scheduled regularly and can involve crowds of thousands of people. Additionally, the ordinance

17  does not apply to these assemblies if they are arguably protected by the NLRB. In fact, during the life

18  of this litigation, labor organizations have staged a number of widely reported demonstrations and

19  rallies on the mall. (*Exh. 3, 4, 5*).

20      There is little question that parades, demonstrations, picketing, and carrying banners are

21

---

22  [17] Of particular relevance here, the Court specifically rejected the city's assertion that the ordinance
    was content neutral. Noting that the City's interests in safety and esthetics were totally unrelated to

23  the content of the publications, the Court held that "regardless of the *mens rea* of the city ... by any
    common sense understanding of the term, the ban in this case is content-based." 507 U.S. at 429.

24

25  [18] Plaintiffs submit that the defendants' construction of the parade restriction is broader than the text
    of the definition of "parade" itself. Nevertheless, the difference between a parade or procession as

26  defined by the ordinance and a demonstration where people are carrying signs and banners may
    amount to no difference at all. The important fact is that the defendants have taken the definitive

27  position that the parade restriction prohibits demonstrations and picketing. Moreover, the record
    shows that demonstrations are in fact prohibited. *ACLU,* 333 F.3d at 1095-1096. The statute is thus

28  unconstitutional either on its face and/or as applied.

classic forms of protest that fit easily within the Supreme Court cases upholding protest activities in traditional public forums. *See Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357 (1997) (protests in front of abortion clinics); *Boos v. Barry*, 485 U.S. 312 (1988) (carrying banners within 500 feet of foreign embassies); *Frisby v. Schultz*, 487 U.S. 474 (1988) (protests in residential neighborhoods); *United States v. Grace*, 461 U.S. 171 (1983) (complete ban on protest activities on sidewalks in front of United States Supreme Court building); *Edwards*, 262 F.3d at 861-852 (parades and picketing); *Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir. 1994) (demonstration in park); *Bay Area Peace Navy*, 914 F.3d at 1224 (demonstrations). In each of these cases, the courts have struck down different types of restrictions because they were not narrowly tailored to serve the government's purported interests.

LVMC 11.68.100(C) suffers from the same problem of under-inclusiveness that undermines the justification for the leafleting and tabling restrictions contained in the same ordinance, and the separate solicitation ordinance discussed *supra*. *See Discovery Network*, 507 U.S. 410. Like those other provisions of the municipal code, the speaker-based exception to the parade restriction also raises the objection that the restriction is discriminatory. *Carey*, 447 U.S. at 461-62. *See also supra* note 7 (collecting cases). The ordinance also raises the objection that unchecked discretion has been vested in FSELLC officials to determine which events, performers, or speakers will be allowed in connection with a "special event or mall entertainment." LVMC 11.68.020(H). These are all grounds for invalidating the ordinance. *ACLU v. Las Vegas*, 333 F.3d at 1106-1107 (invalidating LVMC 11.68.100(B) on these grounds); *see also Housing Works v. Safir*, 101 F. Supp. 2d 163 (S.D.N.Y. 2000).

In *Housing Works*, the court invalidated a content-based limit on which groups could hold demonstrations on City Hall steps and in City Hall Park because the policy was not written or enforced in an even-handed manner. *Id.* at 168-70. The ordinance allowed demonstrations for city-sponsored or city-connected events but excluded other groups. The court also struck down a numerical limit on the number of protesters that could participate in a demonstration because it was

1   shown that the city had sanctioned the same city-sponsored events beyond the numerical limits

2   prescribed in the policy. *Id.* at 170-71. The facts of this case are virtually indistinguishable. Under

3   the terms of the ordinance, if a private organization has political connections to FSELLC officials or

4   to city officials, or is considered worthy of attention or promotion by those officials, those officials

5   have the authority to hold a very large event sponsoring that organization, whereas an unpopular

6   group is shut out. Thus, there are two standards governing the right to assemble on Fremont Street,

7   one for demonstrators and another for FSELLC speech.

8       **D.     LVMC 11.68.070(H) and the Entire Regulatory Scheme Governing the**
         **Regulation of Conduct on Fremont Street Violates the First Amendment Both**
9        **Facially and as Applied**

10          The final piece of the regulatory scheme governing conduct on Fremont Street arises from the

11   broad grant of authority delegated to the FSELLC officials to control and regulate conduct on Fremont

12   Street. LVMC 11.68.070(H). Plaintiffs have moved to amend the complaint to drop this claim and

13   to refocus the relief they are seeking on the enforcement of those provisions of the municipal code

14   that specifically target marches, processions, protests, and demonstrations. The court has yet to act

15   on plaintiffs' motion. In order to preserve their original claim, until the motion to amend is acted

16   upon, plaintiffs submit that they are entitled to summary judgment on that original claim.

17          Although most of the restrictions on First Amendment activity are set forth in Section

18   11.68.100 (vending, handbilling, and tables/displays) and LVMC 10.44 (solicitation), Section

19   11.68.070 provides a residual source of authority for regulating all other First Amendment activity.[19]

20   Plaintiffs have alleged (and the record shows) that the defendants have repeatedly interfered with

21   demonstrations and rallies by calling the police. The only limit on the FSELLC's regulatory

22   discretion is that it be used to "promote the best interests of the public and to carry out the provisions

23

24   _____

25   [19] The defendants cite LVMC Section 10.47 as an additional source for regulating plaintiffs' conduct.
     That ordinance specifically prohibits conduct within the mall that is directed at obstructing the
26   patrons. Remarkably, this ordinance also contains an exception for labor activities. LVMC
     10.47.010(B)(1). Plaintiffs have also alleged and the defendants acknowledge that this ordinance
27   provides authority to prevent demonstrations, rallies, and picketing. *See ACLU v. Las Vegas*, 333
     F.3d at 1093.
28

1    of the Pedestrian Mall Act." *Id.* Plaintiffs have alleged from the start that FSELLC officials have

2    exercised their authority to prohibit all First Amendment activity on Fremont Street that is not

3    somehow tied into the mall's commercial objectives. *See* Plaintiffs' Complaint for Declaratory and

4    Injunctive Relief ¶ 27. Plaintiffs have alleged that this statutory provision violates the First

5    Amendment facially and as applied to the extent it is enforced to prohibit expressive activities. *Id.*

6    ¶¶ 2, 4, 27, 28, 32-35, 38, 39. Based on the record before it, this Court has thus far refused to enter

7    an injunction preventing the defendants from interfering with plaintiffs' First Amendment rights

8    under this grant of authority. The Court of Appeals has reversed the denial of the requested injunction

9    and remanded the issue for further consideration in light of its determination that Fremont Street is

10   a public forum.

11         Plaintiffs submit that LVMC 11.68.070(H) violates the First Amendment both on its face and

12   as applied. Like the juvenile curfew statute in *Nunez*, 114 F.3d at 950-51, which was facially

13   invalidated because it broadly restricted access to the streets and sidewalks, this ordinance broadly

14   regulates all conduct on Fremont Street. In *Nunez*, the court held that "San Diego's broader

15   restriction prohibit[ed] conduct that is a necessary precursor to most public expression—thus

16   qualifying as conduct 'commonly associated with' expression." *Id.* The court held that the San Diego

17   curfew ordinance (unlike the situation in *Roulette, supra*) had an "integral effect on the ability of

18   minors to express themselves," even though the ordinance did not expressly reference First

19   Amendment activities. *Id.* The same is true in this case. Although regulation of First Amendment

20   activity is not specifically referenced in the ordinance, the broader restriction necessarily encompasses

21   the narrower restriction on expressive activities that are incompatible with the mall's purposes. In

22   contrast to *Nunez*, the ordinance imposes a direct restraint on speech. Moreover, by placing the

23   decision whether to approve First Amendment activities wholly within the discretion of FSELLC

24   officials, "the ordinance create[s] a situation ripe for abuse in violation of the First Amendment."

25   *ACLU v. Las Vegas*, 333 F.3d at 1107.

26         LVMC 11.68.070(H) also violates the First Amendment as applied. It has been enforced to

27

28

28

prohibit the ACLU and the other plaintiffs in this case from holding a demonstration on Fremont Street and to otherwise interfere with their peaceful First Amendment activities. *Id.* at 1195-96. Plaintiffs have offered abundant record evidence supporting this claim. *See Aff. of G. Peck (Exh. 1).* While the defendants have sought to obfuscate this issue, nothing in the record or in LVMC 11.68 (which governs pedestrian malls) can be construed as allowing the type of unrestricted First Amendment activity plaintiffs seek. The entire regulatory regime governing Fremont Street is designed to exclude First Amendment activity, not accommodate it. This conclusion is reinforced by the defendants' own admission that LVMC 10.47.010 specifically prohibits conduct within the mall that is directed at obstructing patrons. Furthermore, as noted previously, the defendants have construed LVMC 11.68.100(C) to expressly prohibit any type of public procession or march that, like parades, rallies, or picketing, interferes with the mall's purpose.

Finally, plaintiffs reiterate that any dispute over the defendants' actual enforcement practices is irrelevant. Inadequate evidence of the city's alleged discriminatory enforcement of the ordinance does not defeat plaintiffs as-applied challenge. *Foti,* 146 F.3d at 636. The defendants' policy to limit First Amendment activity is perfectly clear. Since the opening day of the new Fremont Street, the defendants' policy has been to flat out prohibit First Amendment activity. They may quibble over their actual actions in this case, but there is no dispute over their policy.

## IV.   CONCLUSION

In view of the determination that Fremont Street is a public forum, plaintiffs submit that the restrictions on expressive activities contained in LVMC 10.44 and 11.68.100, subsections (C) and (H), violate the First Amendment both facially and as applied. Those code provisions also violate the Equal Protection Clause because they are written and enforced in a discriminatory manner. Plaintiffs further submit that the residual grant of authority vested in FSELLC officials to control conduct on Fremont Street is no longer tenable and violates the First Amendment to the extent that it restricts expressive activities. Plaintiffs submit that there are no genuine issue of material fact in dispute, and that they are entitled to judgment as a matter of law.

Dated this 3rd day of September 2004.

Respectfully submitted by:

Allen Lichtenstein
3315 Russell Road, No. 222
Las Vegas, Nevada 89120
(702) 433-2666
Nevada Bar No. 3992

and

Mark Lopez
*American Civil Liberties Union Foundation*
125 Broad St., 17th Floor
New York, NY 10004
(212)549-2608

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of September 2004, I caused to be deposited for mailing postage prepaid, at Las Vegas, Nevada, a copy of the foregoing Plaintiffs' Motion and Memorandum in Support of Motion for Summary Judgment, addressed to the following:

William P. Henry, Esq.
Office of the City Attorney
City of Las Vegas
400 East Stewart Avenue, 9th Floor
Las Vegas, NV 89101

Todd L Bice, Esq.
Schreck Godfrey Brignone
1200 Bank of America Plaza
300 South Fourth Street
Las Vegas, NV 89101

Kristen B. McMillan, Esq.
Hale, Lane, Peek, Dennison,
Howard, Anderson & Pearl
2300 West Sahara Avenue
Eighth Floor, Box 8
Las Vegas, Nevada 89102

Allen Lichtenstein

**TABLE OF EXHIBITS**

Exhibit 1   Gary Peck Affidavit
                Exhibits to Peck Affidavit
                    a.   October 24, 2000 petition
                    b.   October 24, 2000 flyer

Exhibit 2   Appellees'/Cross-Appellants' Answering/Opening Brief, pp. 34-35, pp.52-53

Exhibit 3   June 22, 2002 *Las Vegas Review* article

Exhibit 4   March 21, 2003 *Las Vegas Review* article

Exhibit 5   September 24, 2003 *Las Vegas Review* article

Exhibit 6   Transcript of February 20, 1998 Hearing, pp. 21-25

Exhibit 7   Harold Langert Affidavit
                Exhibits to Langert
                    a.   Photographs

Exhibit 8   Mark Lopez Declaration
                Exhibits to Lopez Declaration
                    a.   *Defendant's Answers to Interrogatories*
                    b.   May 19, 1999 letter to T. Bice from M. Lopez
                    c.   June 11, 1999 letter from T. Bice to M. Lopez
                    d.   October 10, 2000 letter from M. Lopez to K. McMillan
                    e.   October 25, 2000 letter from M. Lopez to K. McMillan
                    f.   October 26, 2000 letter from T. Bice to M. Lopez

Exhibit 9   Allen Lichtenstein Declaration
                Exhibits to Lichtenstein
                    a.   May 1, 1998 letter from T. Bice to A. Lichtenstein
                    b.   March 3, 2000 letter from A. Lichtenstein to T. Bice

# AFFIDAVIT OF GARY PECK

State of Nevada     }
                     } ss:
County of Clark     }

Gary Peck, having been duly sworn, hereby states and declares as follows:

1. I reside at 5050 Tamarus St., No. 202, Las Vegas, Nevada and am a resident of Nevada.

2. I am Executive Director of the American Civil Liberties Union of Nevada. The American Civil Liberties Union of Nevada is a non-profit advocacy membership organization dedicated to the preservation of individual liberties and rights. The effectiveness of the ACLU depends on its ability to persuade people to its point of view through its public education and legal advocacy programs. A critical and strategic component of the organization's efforts is its work with and support of other community-based organizations. Acting alone, and in its capacity as a member organization in a broader coalition, the ACLUN and its members often participate in traditional First Amendment activities on the streets, sidewalks and other public places in Las Vegas.

3. The ACLUN frequently participates in assemblies where they speak out on a public issue, distribute literature, gather signatures, circulate petitions, solicit membership, carry a sign or banner, distribute or sell politically-oriented T-shirts, buttons, bumper stickers, etc., or to set up a small table in connection with these activities. One such occasion occurred on August 1997 when I participated in a small rally on Fremont Street with approximately 15 other local activists. After a short while, we were approached by local police and told that our conduct was illegal and ordered to disperse.  4 Immediately thereafter, I contacted FSELLC officials and the Las Vegas Metropolitan Police to determine under what authority the protestors' activities were prohibited and whether we would be at risk of arrest if we came onto Fremont Street again. Despite repeated phone calls to these officials, I was

never able to determine for certain whether we could proceed without risking arrest or prosecution.

5. The ACLU of Nevada, together with other groups seeking access to Fremont Street initiated this litigation shortly after these events.

6. I have previously submitted a number of sworn statements in this case, pursuant to 28 USC §1746, describing myself, the American Civil Liberties Union of Nevada, the importance of Fremont Street as a forum for free expression, the restrictions imposed by city and FSELLC officials on my right to engage in public education and protest activities at the forum, and the impact of those restrictions on my rights. For purposes of this declaration, I reallege the statements made in those sworn declarations and offer the following additional statements in support of plaintiffs' *Summary Judgement*.

**A. A Description of Fremont Street**

7. Fremont Street is an outdoor or open-air mall dedicated to pedestrian use and enjoyment. It is public property and anchors the downtown commercial and casino district.

8. Fremont Street is a public thoroughfare that is contiguous on all sides to public streets. There are no barriers to pedestrian entry or movement. Public streets run right through the middle of the area

9. The Fremont Street Experience was built by and is maintained utilizing public funds. Fremont Street is part of the city's transportation grid for both pedestrian and vehicle traffic.

10. Fremont Street covers an area six blocks long from Main Street on the east to Las Vegas Boulevard on the west and anchors the downtown gaming and commercial district.

11. The streets and sidewalks were demolished and one large promenade was created by paving the area with a smooth surface. The sidewalks on Main Street and Las Vegas Boulevard are incorporated into the Fremont Street Mall where they intersect with Fremont Street and extend for some distance in each direction. Fremont Street extends one block to the north and south on each of the intersecting streets.

2

12.   First and Third streets bisect Fremont Street and have been converted to cul-de-sacs to enlarge the plaza. Vehicles can no longer use these streets which are dedicated to pedestrian use only. Casino Center Boulevard and Fourth Street also bisect Fremont Street, but allow vehicle traffic to pass as part of the downtown traffic grid. The sidewalks adjacent to these traffic-bearing streets are incorporated into the Fremont Street Mall.

13.   Although Fremont Street is located in the heart of downtown, the surrounding area is not particularly visitor-friendly, especially after dark.

14.   Based on my familiarity with the development of Fremont Street it was conceived as a gaming attraction to compete with the "Strip". This is one of it's principal functions.

15.   For visitors to downtown, Fremont Street is more than a gaming attraction. It provides a respite from casino action, where they can stretch their legs, get some fresh air, and enjoy the street scene. In this sense, the function of Fremont Street is very similar to the "Strip".

16.   For Las Vegans and people who work downtown or have other business there, Fremont Street serves a much more basic function -- it is a centrally located section of the city that may have to be regularly traversed.

17.   Fremont Street is sometimes crowded, but more often it is uncrowded. On the overwhelming majority of the occasions that I have visited Fremont Street, the promenade is not crowded or congested. The crowds gather for the seven minute light show which runs on the hour after dark and for other special events. Even these activities do not always draw large crowds. At it's busiest, Fremont Street is no more crowded than sections of the "Strip" where similar "extravaganzas" are regularly scheduled for the public's enjoyment.

18.   On the "Strip", individual's are permitted to distribute literature and conduct other First Amendment activity.

3

19.   The Fremont Street Experience is a unique and essential forum for engaging in protest activities because of its location and function as a central gathering place for both Nevada and out-of-state residents.  The ACLU and other organizations to which I and the ACLU are allied can reach the largest single audience in the state on Fremont Street on a day-to-day basis.

20.   There are few alternative locations in Las Vegas where the ACLU can reach so large an audience .

21.   The effectiveness of conducting the ACLU's activities on the perimeter of the Fremont Street Experience is greatly diminished by the fact that the overwhelming majority of visitors enter Fremont Street directly from hotels and casinos that border it.

22.   I have reviewed a letter written by then Mayor Jones sent to the editor of the *Las Vegas Review Journal* in which Mayor Jones states that Fremont Street is the modern version of the "Town Square."  I have also reviewed articles in that publication in which both Mayor Jones and FSELLC Executive Director Mark Paris have described Fremont Street as a public park.  These materials are attachments 'a' through 'd' to my affidavit.

23.   LVMC 11.68.100 (I) prohibits the distribution of literature on Fremont Street and the intersecting streets and sidewalks incorporated into it's boundaries.  It is also prohibited on the sidewalk adjacent to  Las Vegas Boulevard and Main Street to the extent they have been incorporated into Fremont Street.

24.   Despite the restriction, casinos and other businesses on Fremont Street freely distribute thousands of handbills daily from the entrance ways or patios  of their establishments. I have observed casino employees distribute literature soliciting business in front of the casinos which anchor Fremont Street.  On a typical night thousands of handbills are distributed by the casinos.  These entrance ways open onto Fremont Street and are situated under building overhangs.  They are approximately the width

4

of the old sidewalk that was demolished and are indistinguishable from the smooth pavement which anchors Fremont Street. A thin line carved or painted into the pavement marks the property line.

25.   FSELLC-sponsored events and promotions also occur regularly to attract visitors and gambling dollars. I have attended free concerts and other entertainment on Fremont Street Experience promenade. During the events, tables and displays are placed on the street, signs and banners appear, there are promotional give-aways where literature or souvenirs are distributed or sold, individuals are invited to sign up for things, and of course there are performances. I have observed the placement of displays, tables and advertisements on the Fremont Street Experience promenade. Kiosk sales of Las Vegas souvenirs are also set up on several locations on Fremont Street. I have observed the sale of message-bearing merchandise, (i.e. T-shirts, from kiosks and stands, located on the Fremont Street Experience promenade).

**b.  Interference With the ACLU of Nevada's Right to Exercise Their First Amendment Rights on Fremont Street.**

26.   The public education and protest activities the ACLU of Nevada is prohibited from engaging in on Fremont Street promenade are peaceful and orderly. As can be seen from the photographs and exhibits submitted, plaintiffs conduct in no way is disruptive or obstructive.

27.   In the summer of 1997 I participated in a small peaceful rally on Fremont Street. FSELLC security contacted the local police and the group was told that our conduct was illegal and ordered to disperse. On or about September of 1997, I contacted the offices of the Las Vegas City Attorney to find out whether ACLU members or members of the Unitarian Social Justice Committee, the Shundahai Network, and other organizations could solicit funds, leaflet, demonstrate, set up informational tables, or protest on the Fremont Street Experience. I was informed that the City Attorney could not answer that question for me, but that I should contact the offices of Mark Paris because he was responsible for

5

such decisions.

28.  On or about September of 1997, I contacted the offices of Mark Paris to inquire about the permissibility of the aforementioned activities on the Fremont Street Experience.  The Secretary to Mr. Paris informed me that I should contact Kristen McMillen, who I was told was the attorney for the Fremont Street Experience Liability Corporation.  I therefore made that call and had a lengthy conversation with Ms. McMillen.

29.  Ms. McMillen informed me that leafleting and solicitation were strictly prohibited and that demonstrating, informational tabling, speech making, and protesting were at the discretion of Mr. Paris. I was further informed that the ban on leafleting and solicitation was no problem because I and the others who wished to engage in such activities could enter a lottery for newspaper rack space provided by the Fremont Street Experience on adjacent streets.

30.  I asked Ms. McMillen whether there was a written policy regarding these matters that I could share with individuals and organizations wishing to engage in the aforementioned activities.  Ms. McMillen informed me there was no such policy and the decision was at the discretion of Mr. Paris.

31.  Based on the forgoing events, the ACLU of Nevada, together with other local organizations, filed a lawsuit seeking to enjoin any further interference with their First Amendment rights.

32.  Following the entry of the Court's April 24, 1998 Order, I repeatedly have had to intercede in situations with FSELLC officials and the local police to protect the rights of political organizations to distribute literature on Fremont Street.

33.  On or about July 17, 1999 I was contacted by Pastor Mike Robinson who told me he and other members of his church had been stopped by Fremont Street Experience security guards while attempting to distribute religious leaflets to passerby.  He stated that he and his group were informed by the security guards that in accordance with the Las Vegas Pedestrian Mall ordinance there was a blanket

ban on leafleting.

34. Pastor Robinson asked me if such leafleting was permitted and whether I could come to the Fremont Street Experience to help him explain the Federal Court Order prohibiting enforcement of the anti-leafleting provisions of the ordinance.

35. I immediately went to the Fremont Street Experience and asked Pastor Robinson what the situation was. I was again told that the security guards were asserting that no leafleting of any type was allowed on the pedestrian mall, and that the security guards had shown him and his group hand cards stating that the passing of printed materials in a repetitive fashion was prohibited at the Fremont Street Experience.

36. ACLU of Nevada General Counsel, Allen Lichtenstein, arrived. He and I approached the security guards and informed them they were in violation of a Federal Court Order enjoining the anti-leafleting provision of the Pedestrian Mall ordinance.

37. The security guards said they knew nothing about the court Order and said they would call their supervisor to get clarification as to the matter of leafleting.

38. Mr. Lichtenstein and I asked the security guards to show us the cards stating the prohibition against leafleting. They did so, but refused to give us a copy of the card. The security guards also pointed out that there were signs also stating that leafleting was prohibited. Both the signs and the cards contained a list of enumerated prohibitions including those enjoined by the Court. Both the cards and the signs stated that violators of any of the listed prohibitions were subject to citation and arrest.

39. Mr. Lichtenstein and I informed the security guards that their actions, as well as the signs and cards, were in violation of the court Order. We insisted that Pastor Robinson and his group be permitted to continue leafleting.

40. The security guards' supervisor arrived. He also expressed a lack of knowledge concerning

7

the court <u>Order</u>. Mr. Lichtenstein and I informed him that the court had enjoined the anti-leafleting prohibition.

41.    After a period of discussion the supervisor stated to us that repetitive or obstructive leafleting was still prohibited. Mr. Lichtenstein and I informed him that he was wrong about repetitive leafleting. We also stated that while obstruction was clearly prohibited, Pastor Robinson's group was not engaged in and was not accused of engaging in any obstructive behavior. We further stated that claims of obstruction could not be used as a pretext to ban lawful, non-obstructive leafleting and that the misleading signs and cards should be removed.

42.    At this point Pastor Robinson and his group were allowed to continue passing out their religious material.

43.    On or about October 20, 1999 a group wanting to distribute material regarding National Anti-Police Brutality Day contacted the ACLU of Nevada to ask about the rules concerning leafleting at the Fremont Street Experience. I told them non-obstructive leafleting was permitted pursuant to a Federal Court <u>Order</u> and that they should call me if anyone attempted to stop such activity.

44.    On October 22, 1999 I was contacted by this group. They informed me they were at the Fremont Street Experience and were being prohibited from passing out material at the pedestrian mall by security guards and Metro police officers. They informed me that they had told security and police officers about the court <u>Order</u>, but both guards and police professed ignorance about the <u>Order</u>.

45.    I arrived to find the group still being prevented from distributing their leaflets. They told me the security guards had shown them the hand cards that stated leafleting was prohibited. They also told me the guards pointed them to the signs stating the same prohibition. They further told me the security guards and police officers repeatedly asked them for a copy of the court <u>Order</u>.    4 6 .      I identified myself to the police officers, J. Harrison (#5312), J. Hendricks and R. Wood (#5266), and

8

informed them about the court <u>Order</u> and the right of the group to distribute their material. The police told me they knew nothing about any court <u>Order</u> and asked me to produce a copy. I responded that it was their responsibility to know the law and that I had worked with Undersheriff Richard Winget to draft a Department Directive that would insure that they would be properly informed regarding such matters.

47. I was informed by police officers that the Fremont Street Experience Chief of Security, Bill Brennan, was on his way and was asked if I would stop the group from leafleting until he arrived. I responded that I would not do so, especially since this was not the first time I was called to Fremont Street to defend the rights of lawful leafleters.

48. When Mr. Brennan arrived I informed him about the Federal Court <u>Order</u>. He, too, professed complete ignorance about it and told me there should be no leafleting until the Fremont Street Experience attorney, Todd Bice, arrived. I told him he was wrong and that I was advising the group that they could legally continue to leaflet.

49. After some time, Mr. Brennan informed me that Mr. Bice would not be coming to the pedestrian mall. Mr. Brennan proceeded to read a copy of the leaflet being distributed, telling me he was checking to determine whether the materials constituted unlawful solicitation. He informed me as well that obstruction was prohibited and that I was personally responsible for any unlawful behavior on the part of the leafleters.

50. I told Mr. Brennan I was in no way responsible for the activities of the group and that no claim of solicitation or obstruction had been made. I further informed him that any such pretextual claims made after the fact did not justify the Fremont Street Experience's repeated violations of the court <u>Order</u>. I told him as well that the cards stating a prohibition on leafleting must be removed.

51. I then informed the group that they could continue leafleting and instructed them to call me

9

if they were again prevented from doing so.

52.  On or about November 9, 1999 I was contacted by the Shundahai Organization notifying me that they wanted to distribute literature on Fremont Street. At this juncture, a representative of the organization routinely contacted me in advance of the activities to seek assurance their conduct were legal and that they would not be run-off or arrested. I told them that they could distribute literature under the court's <u>Order</u>, provided they did not solicit donations. I told them that I would stand by and intercede if there was any trouble.

53.  On November 9, 1999, several members of the group proceeded to Fremont Street and commenced to distribute literature. They were stopped by FSELLC security and prohibited from distributing the leaflet unless they deleted the solicitation inviting the reader to "join us, call (702) 647-3045". They were also prohibited from carrying a sign. When the organizers of the group decided to delete the words "Join us", they were permitted to distribute the leaflets. I was immediately informed of these developments.

54.  On yet another occasion on February 3, 2000, I was contacted by the Shundahai organization about distributing literature on Fremont Street. I again assured them that they would be acting within their rights and told them I would stand by and intervene if any trouble arose.

55.  Once again, FSELLC security told the member of the group that the leaflet could not be distributed because it invited the reader to "Join us (702) 697-3094."

56.  On October 24, 2000, at approximately 2:25 p.m., Alina Shell, Joseph Cohn, and I went to the Fremont Street Experience. We set up a table on the west side of Casino Center Boulevard on the Experience mall. We hung an ACLU banner on the front of the table. We had petitions with us that asked simply for support in our fight to preserve the First Amendment on the Experience. We placed the petitions on the table (see attachment 'e'). We had flyers with us that also called on the public

10

to support our fight to protect free speech (see attachment 'f'). We intended to hand out the flyers and ask people to sign our petition.

57.     As soon as we set up the table and hung the banner on it, Fremont Street security guards wearing name tags approached us. The tags said "Bruce" and "Richard." Bruce told us that we were not allowed to engage in the type activities we were involved in on the Experience. We told him he was wrong and he informed us he would contact his supervisor to find out who was right. He began using his radio, I presume to call his supervisor.

58.     We began handing out flyers and asking people to sign the petition. While we were doing this, a pedestrian began talking to Bruce. Bruce informed him that people could not engage in the activities we were involved in. I intervened and said that was wrong.

59.     At about 2:45PM, two more security guards arrived. One wore a name tag saying "Heidi Arnell, Assistant Supervisor." The other guard did not have a name tag, but he told us his name was John Ruffner. They asked what we were doing and I told them we were handing out flyers and gathering signatures in support of our organization's efforts.

60.     She told us we would have to remove the table. I said we would remove it, but asked why it had to be taken away. John showed me a copy of the Pedestrian Mall Ordinance, which banned tabling and other First Amendment activities. I asked if he knew about the Federal court Order relating to the ordinance. John did not answer.

61.     I then asked about signature gathering, flyers, and the sign. Heidi said she was uncomfortable with the sign, but she would check. At some point, she asked my name. I informed her I believed that was irrelevant. She asked if she could read the petition and the flyer. I told her she could. After a brief delay of several minutes, she informed us that we could continue with our

11

activities as long as we did not obstruct passers by.  She also told me she knew who I was, because she had seen me several times on television and in the newspapers.

Dated this 31st day of October 2000

_Gary Peck_
Gary Peck

Subscribed and sworn before me this 31st day of October 2000.

_Allen Lichtenstein_
Allen Lichtenstein
Notary Public for said county and state.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003

12

| **Name** | **Address** | **Telephone** |
|----------|-------------|---------------|
| Thomas Paers | 611 S. 6th St LV NV 89101 | — |
| James William Jr. | 2636 Sonna St. | — |
| Orlo mitchell Brooks | P.O. Box 96482 L.V. NV. 89193-6482 | (702)-252-1968° |

**If you support the ACLU's efforts to defend the First Amendment on Fremont Street, please sign this petition calling on our elected officials to side with us.**

# Do you support Free Speech guaranteed by the 1st Amendment?

```
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXX
```

# Then you should support the Nevada ACLU as it continues to fight the Fremont Street Experience's policy of censorship!

# Call the Nevada ACLU at 366-1536 to find out how you can protect your civil liberties.

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Nos. 01-15958 and 01-15966

American Civil Liberties Union of Nevada, Gary Peck, Unitarian
Universalist Social Justice Committee, Paul R. Brown,
The Shundahai Network, and Greg Gable,

Appellants/Cross-Appellees,

v.

The City of Las Vegas, Jan Laverty Jones, in her official capacity
as the Mayor of Las Vegas, The Fremont Street Experience
Limited Liability Corp., and Mark Paris, in his official
capacity as the Executive Director of The Fremont
Street Limited Liability Corp.

Appellees/Cross-Appellants.

Appeal From The United States District Court,
District of Nevada, The Honorable David W. Hagen, Presiding
District Court Case No. CV-S-97-1419-DWH (LRL)

APPELLEES'/CROSS-APPELLANTS'
ANSWERING/OPENING BRIEF

| TODD L. BICE | KRISTIN B. McMILLAN | WILLIAM P. HENRY |
|---|---|---|
| SCHRECK BRIGNONE | HALE LANE PEEK DENNISON | OFFICE OF THE CITY |
| GODFREY | HOWARD & ANDERSON | ATTORNEY |
| 300 S. Fourth St., #1200 | 2300 W. Sahara Ave., #800 | 400 E. Stewart Ave., 9th Fl. |
| Las Vegas, NV 89101 | Las Vegas, NV 89102 | Las Vegas, NV 89101 |
| (702) 382-2101 | (702) 222-2500 | (702) 229-6201 |
| Fax: (702) 382-8135 | Fax: (702) 365-6940 | Fax: (702) 386-1749 |

Attorneys for Appellees/Cross-Appellants

that the property should be deemed a public forum.  (ACLU's Opening Brief 20).

Yet, the law and record here show otherwise.

The "government does not create a public forum by inaction or by permitting

limited discourse. . . ." Cornelius, 473 U.S. at 802 (citations omitted).  "[T]he test is

simply whether the government has intended to open up the facility to public debate

on the particular subject matter sought to be addressed by the person seeking access

to that government facility." Brown v. Palmer, 944 F.2d 732, 739 (10th Cir. 1991).[9]

The record here contradicts the ACLU's portrayal of this as some extraordinary

case where the City created an irrational scheme of prohibiting solicitation and in-

hand distribution while simultaneously allowing all kinds of obstructive and

expressive activities.  (ACLU's Opening Brief at 21).  The City has hardly thrown

open the Mall's doors to everything but solicitation and in-hand distribution.

Rather, the City did what the law requires – it acted reasonably and did not go

overboard.  Because of the historical problems with solicitation and in-hand

distribution, the City appropriately enacted specific ordinances for those problems.

---

[9] In Board of Airport Comm'r v. Jews for Jesus, Inc., 482 U.S. 569 (1987), the court held that even in a non-public forum, the government cannot prohibit all forms of expression. Obviously then, just because the government does not suppress every manner of speech possible cannot mean that the property loses its intended use as a non-public forum.

- 34 -

The record did not, however, reveal other instances of intrusive speech occurring. Thus, rather than overreacting with a laundry list of prohibitions (which the ACLU would undeniably then claim is overbroad), the City relies upon other ordinances to prohibit conduct that is inconsistent with the Mall's purpose.[10]

Other laws prohibit the ACLU's parade of so-called horrors. For example, LVMC § 10.47.010 specifically prohibits conduct within the Mall that is directed at obstructing the patrons. Furthermore, LVMC § 11.68.100(C) expressly prohibits any type of public procession or march which, like parades, rallies or picketing, interferes with the Mall's purpose. See LVMC § 11.68.020(H).

Again, the ACLU's argument that the City's laws are too permissive has been repeatedly rejected by courts in the non-public forum context, including Cohen, 131 F.3d 273, where the court considered the constitutionality of regulations concerning the sale of sexually explicit materials on military property. The regulations prohibited sexually explicit speech in audio, video and periodical materials but allowed it in books. Id. at 285. The regulation was challenged because, like the ACLU here, the

_____

[10]   Indeed, the ACLU fails to cite any proof that any of the activities it lists have actually happened within the Mall, other than the limited instances when the ACLU has itself attempted to create disturbances. Again, the record simply does not reveal any evidence that the City has opened the Mall for expression.

added).  Thus, the ACLU admitted that it was only presenting a facial challenge.  Its
attempt to now rewrite the record is meritless.[17]

But, even if the ACLU rewrites the record, an as applied challenge would still
fail.  The ordinance gives no discretion to permit the ACLU's proposed placement of
structures within the Mall.  LVMC § 11.68.100(H) only allows structures for "special
events, mall advertising, mall entertainment or mall vending or *other* commercial
entertainment activities."  (emphasis added).  Unless it is for one of the specified
purposes, all structures are prohibited.

The ACLU certainly does not seek to place a table within the Mall for any
commercial or entertainment purpose the ordinance contemplates.  Instead, its desire
to set up a table is to display its expressive materials.  (ACLU's Opening Brief at 54).
LVMC § 11.68.100(H) absolutely prohibits structures within the Mall for such non-

---

[17] The ACLU claims that this all changed on October 24, 2000, when it went
to the Mall and set up a table to distribute literature, a table which they were forced
to remove as violating LVMC § 11.68.100(H).  (ACLU's Opening Brief at 54).  The
ACLU thus claims that this event now constitutes the basis for an as applied
challenge.  But, what the ACLU fails to tell this Court is that the October 24, 2000
event is one that it orchestrated after the close of discovery in this case and after the
Court's status conference on September 14, 2000 wherein the ACLU conceded that
discovery was closed and that the remaining issues could be resolved by summary
judgment.  Not coincidentally, the ACLU offers no explanation for how such a new
as applied claim would be before the district court or in this appeal.

commercial or non-entertainment uses. The Mall's Management is not vested with discretion to attack the ordinance in this regard. <u>See</u> <u>Gannett Satellite Info. Network,</u> <u>Inc. v. Berger</u>, 894 F.2d 61, 68 (3d Cir. 1990) (because airport regulation prohibiting vending machines in certain areas was absolute, it could not be attacked as vesting the airport's director with too much discretion).

And, it is perfectly reasonable for the City to prohibit all structures that do not concern the Mall's commercial or entertainment purposes. Again, the Mall is a business and generates revenue by licensing space to vendors for retail activity. Allowing someone to simply enter the Mall and erect structures for free would completely disrupt the Mall's operations, including its ability to generate necessary revenues by renting space. No vendor would pay rent if outsiders could simply enter the Mall, set up a table and begin selling merchandise. (Sup. ER 17, ¶ 16). <u>See</u> <u>Grutzmacher v. County of Clark</u>, 33 F. Supp.2d 896, 902-03 (D. Nev. 1999) (it is reasonable to prohibit people from placing structures in airport because it would disrupt pedestrian traffic and drive down lease revenue that airport depends upon).

Westlaw.

factiva
Dow Jones & Reuters

6/22/02 LVRJ 1D                                                          Page 1

6/22/02 Las Vegas Rev.-J. 1D
2002 WL 6876513

The Las Vegas Review-Journal
Copyright 2002 The Las Vegas Review-Journal

Saturday, June 22, 2002

BUSINESS

CASINO LABOR: Spirits high at marches

Jeff Simpson

By JEFF SIMPSON

GAMING WIRE

An estimated 12,000 **union** members and their families took to the **streets** of downtown Las Vegas twice Friday to send a clear message to casino owners.

"They say 'Take away,' we say 'No way!,' " chanted the **union** members as they marched in  columns stretching more than six city blocks for the morning march and eight blocks for the afternoon version.

After winding their way past Jackie Gaughan's Western toward rallies at the head of **Fremont Street**, in the shadow of the Plaza, **Culinary** Secretary D. Taylor challenged the maids, food-service workers and bartenders massed by the **union's** loudspeaker trucks.

"Are you ready to fight?" Taylor yelled to the estimated 7,000 people crowding the west end of **Fremont Street**.

"Yes," the crowd roared back.

"Tonight we show who owns **Fremont Street**," Taylor bellowed. "It is us!"

A festive rather than an angry crowd, the workers and their families danced as the loudspeakers blared '70s-era disco hits "She Works Hard for the Money," and "We Are Family."

Metropolitan Police Lt. Pat Charoen confirmed Friday evening that there were no arrests and no incidents at either march.

But Taylor promised a fight if downtown casino workers don't get new contracts by the **union's** July 1 strike deadline.

The **union** plans to picket all properties that haven't signed new deals by 3 p.m.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

6/22/02 LVRJ 1D                                                      Page 2

on June 29, 33 hours before the strike deadline.

"We want to give them a taste of what a strike will be like," **Culinary** Political Director Glen Arnodo said.

As the casino executives gathered in their properties' doorways or under the **Fremont Street** Experience canopy to watch Friday's dual marches, **union** members marched by with their banners chanting: "We want a contract" and **"Union**, Yes."

And if they don't get a new five-year deal before the July 1 deadline, the workers' elected officials promise to strike the 10 downtown, two near-downtown and two Strip properties that have yet to agree to new pacts.

One Friday march began at 11 a.m., the second started at 5:30 p.m., with the twin rallies intended to allow shift workers to participate.

Tourists Ron and Nancy Aldag of Apple Valley, Calif., were outside the Golden Gate watching and listening to the marchers during the **union's** Friday evening rally.

"It's overwhelming," Ron Aldag said, and his wife nodded in agreement.

The couple visit Las Vegas about every six weeks, generally staying at the Plaza or the Four Queens.

They said they'd wait to see what a strike was like before returning to Las Vegas.

"We'd want to see how crazy it gets before we'd come back," Aldag said.

Nancy Aldag said they could decide to visit and stay with relatives instead of downtown.

New deals with Stardust and Sahara on the Strip are expected to be inked next week, and Boyd Gaming Corp. executives hope to reach a deal Sunday with Main **Street** Station and **Fremont** workers.

Fitzgeralds bosses also expect a deal before the **union**-imposed July 1 deadline.

**Union** officials and at least some downtown executives have said they hope that a possible Boyd deal could serve as a model contract for stalled negotiations with representatives of Binion's Horseshoe, Four Queens, Western, El Cortez, Las Vegas Club, Plaza, Jerry's Nugget, Golden Gate and Castaways.

---- INDEX REFERENCES ----

NAMED PERSON:      SIMPSON, JEFF; TAYLOR, D; ALDAG, NANCY

NEWS SUBJECT:      Business, Finance & Economy Section; English language content
(BFN ENGL)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

6/22/02 LVRJ 1D                                                    Page 3

REGION:          United States - Nevada; United States; North American
Countries; Nevada; North America; United States; Western U.S. (USNV USA NAMZ NV
NME US USW)

Language:  EN
SOURCE REGION:   NME NV US USW


EDITION:         FINAL

Word Count: 544

6/22/02 LVRJ 1D

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.                                                        factiva
                                                               Dow Jones & Reuters

3/21/03 LVSUN 16                                                Page 1

3/21/03 Las Vegas Sun 16
2003 WL 7819800

                        Las Vegas Sun
          Copyright 2003 Las Vegas Sun. All Rights Reserved.

                     Friday, March 21, 2003

                              A

             Anti-war **demonstrators** march in downtown LV

                        By Mary Manning

   About 200 anti-war **demonstrators** marched down **Fremont Street** Thursday night
protesting the U.S. war in Iraq and giving downtown tourists and those supporting
the war an unexpected Las Vegas experience.

   The protesters blew whistles, held signs high and chanted "No blood for oil" and
"Hell, no, we won't go. We won't fight for Texaco." The crowd stayed on the
sidewalk, escorted by Metro Police officers on motorcycles, bicycles and
horseback.

    "This is an immoral and illegal war," Kalynda Tilges, executive director of the
Shundahai Network, said. Tilges organized "A funeral for peace" march with the
Coalition to Prevent the Erosion of Human Rights.

   Another **demonstration** is scheduled for 6 p.m. tonight outside New York-New York
on the Las Vegas Strip.

   As Thursday's crowd, including members of the Service Employees International
Union, gathered about 5:30 p.m., a man leaned out of a van and shouted at police
officers, "Tell them to have Saddam stay at their house tonight."

   Metro officers and federal marshals ignored verbal taunts and stood shoulder to
shoulder at the top of the stairs leading into the George Federal Building on Las
Vegas Boulevard.

   There were no arrests and no acts of civil disobedience.

   A family of three stood on the courthouse steps waving flags in support of U.S.
troops heading to Baghdad and played a recording of the theme song from the movie
"The Green Berets."

   Dan Dew, dressed in a Hawaiian shirt covered by a light windbreaker, said he and
his two daughters, Taylor and Summer, who danced the hula to the "Green Beret"
music, supported the war effort.

             Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

3/21/03 LVSUN 16                                                          Page 2

   "There are more human rights under the American system than anywhere else in the
world," Dew said. "No one can ever sway me."

   Las Vegas resident Aziz Eddebbarh and his sons Mehdi and Amin, ages 16 and 17,
stood quietly in the midst of signs that urged people to "Pray for Peace" and
"Stop the Bushit."

   "Of course, I don't support the war," said Eddebbarh, who was born in Morocco
and has been in the United States for 24 years. He said he brought his two sons to
the protest as a sign of solidarity.

   World War II veteran Norb Drouhard of Washington state held a hand-lettered sign
that listed most of the wars of the 20th century.

   "I am down here to oppose nuclear weapons and nuclear waste at Yucca Mountain,"
Drouhard said, referring to federal plans to build a high-level nuclear waste
repository 90 miles northwest of Las Vegas. "In all of these conflicts the U.S.
killed people on their own soil, and we're doing it again."

   As the marchers filed out from under the **Fremont Street** Experience canopy, the
light and sound show blazed into life, drawing some tourists to stare upward. One
visitor in Bermuda shorts yelled "Communists!" at the **demonstrators**.

   Several of those standing under the canopy swigging Budweiser beers lifted a
middle finger at the marchers, but nothing dampened the marchers' spirits.

   When the crowd returned to the federal courthouse, most dropped to the sidewalk
in a "die-in" for war victims as police directed traffic on Las Vegas Boulevard.

   "Metro Police did a great job handling the crowd," Gary Peck of the American
Civil Liberties Union said. "Five years ago you'd never see this on **Fremont Street**
because they (Las Vegas officials) wouldn't have allowed it."


                         ---- INDEX REFERENCES ----


NEWS SUBJECT:      English language content (ENGL)


REGION:            United States - Nevada; United States; North American
Countries; Nevada; North America; United States; Western U.S. (USNV USA NAMZ NV
NME US USW)

Language:  EN
SOURCE REGION:     NME NV US USW


Word Count: 556

3/21/03 LVSUN 16

END OF DOCUMENT

                    Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# Westlaw.

factiva
Dow Jones & Reuters

9/24/03 LVSUN 02                                                      Page 1

9/24/03 Las Vegas Sun 02
2003 WL 62390545

Las Vegas Sun
Copyright 2003 Las Vegas Sun. All **Rights** Reserved.

Wednesday, September 24, 2003

B

New Freedom Ride shines light on plight of **immigrants**

By Dan Kulin

Hoping to evoke the force and spirit behind the Freedom Ride of the civil **rights** era more than 40 years ago, hundreds of supporters of **immigrant** workers **rallied** at the **Fremont Street** Experience Tuesday afternoon.  The **rally** doubled as send-off for the 40 Nevadans who head east today on the **Immigrant** Workers Freedom Ride, which is intended to draw attention to the problems facing **immigrant** workers and pressure legislators to change some laws to make life better for **immigrants**.

"I want to see all the families together," said Manuel Rosales, 38, a cleaning attendant at a Las Vegas casino and freedom rider. "I want civil **rights** for all **immigrants**."

Fellow rider Miguel Barrientos, 43, publisher of Hispanic Guide and a son of Mexican **immigrants**, said he hopes laws will be changed to allow **immigrant** families to stay together.

"I saw this as a great opportunity to voice out on issues that affect the **immigrant** community," he said.

For example, in some **immigrant** families the parents are in the United States illegally, but then their children are citizens because they are born in the United State, he said.

"These are law-abiding families that just want the best for their children," Barrientos said.

Barrientos said he also hopes that the freedom ride makes people see that **immigrant** workers need to be treated like all other workers.

"It seems like **immigrant** workers are always going to be hit the hardest," he said about economic downturns.

University of Nevada, Reno Spanish literature professor Emma Sepulveda said she hopes the bus ride, which will make a series of stops for **rallies** in cities on the way to the final demonstration in New York City, will help people "put a human

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

9/24/03 LVSUN 02                                                    Page 2

face to the problem."

Sepulveda, an **immigrant** from Chile, said the 8.5 million undocumented workers in
the country need to have their status legalized. Also, laws should be passed to
allow **immigrant** families to bring their children to the U.S.

According to a Freedom Ride statement and organizers, the ride has four main
goals: legalization for all **immigrant** workers; granting **immigrant** workers the **right**
to reunite their families; protecting the **rights** of **immigrants** in the workplace;
and civil **rights** for all people.

The Freedom Ride has the backing and support of a variety of groups, including the
American Civil Liberties Union, the NAACP and several unions, including the
Culinary Workers Union.

Las Vegas Mayor Oscar Goodman gave the Freedom Riders a key to the city during the
Tuesday **rally** and said he hopes the riders will travel safely and be able to
accomplish their goal.

Dean Ishman, first vice president of the Las Vegas chapter of the National
Association for the Advancement of Colored People, said he hopes this Freedom Ride
will be just the beginning of a new civil **rights** movement.


                          ---- INDEX REFERENCES ----


NEWS SUBJECT:        (Asylum/**Immigration** (GIMM); Political/General News (GCAT))


REGION:              (United States (USA); North American Countries (NAMZ))

Language:  EN
Word Count: 484

9/24/03 LVSUN 02

END OF DOCUMENT


Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4    AMERICAN CIVIL LIBERTIES       : No. CV-S-97-1419-DWH
     UNION,                         : United States Courthouse
5                                   : 400 South Virginia Street
                         Plaintiff, : Reno, Nevada
6                                   : February 20, 1998
               -vs-                 : 2:00 p.m.
7                                   :
     CITY OF LAS VEGAS, et al.,     :
8                                   :
                        Defendants. :
9    . . . . . . . . . . . . . .

10                  TRANSCRIPT OF PLAINTIFF'S MOTION
11                    FOR PRELIMINARY INJUNCTION
                  BEFORE THE HONORABLE DAVID W. HAGEN,
12                   UNITED STATES DISTRICT JUDGE

13   APPEARANCES:
     FOR THE PLAINTIFF:        MARK LOPEZ and ALLEN LICHTENSTEIN
14                             Attorneys at Law
                               3315 Russell Road, #H222
15                             Las Vegas, Nevada

16   FOR THE DEFENDANTS:       SCHRECK - MORRIS
                               Attorneys at Law
17                             By Todd Bice
                               300 South Fourth Street, #1200
18                             Las Vegas, Nevada

19                             HALE LANE LAW FIRM
                               Attorneys at Law
20                             By Kristin B. McMillan
                               2300 West Sahara, #800
21                             Las Vegas, Nevada

22                             WILLIAM HENRY
                               Assistant City Attorney
23

24   Proceedings recorded by mechanical stenography produced by
     computer-aided transcript

25   Reported by:   Margaret E. Griener, CCR #3, RDR
                    Official Reporter

1      I do not -- I personally do not know the extent to
2  which that happens.

3      I think the difference is that those properties
4  anchor this facility.  All right.  They are down there.  They
5  are not the, quote, competition coming in taking away
6  business from you.

7      They're not out in the middle of this thing
8  intermingling with the pedestrians out in here.  The only way
9  that you're going to get these handbills from these people is
10  if you're walking up to their facility.

11      It's no different than if they were standing, your
12  Honor -- respectfully, if I can move --

13      THE COURT:  Sure.

14      MR. BICE:  -- ten feet inside the doorway.  They're
15  still -- the people are going to come in, this is where
16  they're going to hand them things.

17      THE COURT:  Well, no, the -- actually, that -- and,
18  obviously, I can't be a witness in the case, but actually
19  it's my experience walking down that street, not intending to
20  go into any of the establishments, that I was certainly
21  within arm's length of people trying to hand me stuff who
22  were standing on the private openings to the various
23  commercial establishments along the way, and I think that
24  happens to everybody that walks down that street.

25      So leave that distinction aside.  If that can be

1   done, then what's the harm of in-person distribution to

2   passersby right in the middle of Fremont?

3          MR. BICE:  What is the harm?

4          THE COURT:  Yes, what's the harm?

5          MR. BICE:  The harm is what was established in the

6   legislative record in developing this, is that this has to

7   operate like a commercial venture.

8          You go to other places in Las Vegas out on the --

9   you want to go to the Forum Shops, you want to go to any of

10  the shops at the Mirage or to the Fashion Show Mall or to the

11  MGM Theme Park, you're not going to have this environment

12  created by these people standing in the middle of here either

13  begging for money or trying to hand you things constantly.

14        The difference -- let me give you another

15  difference, Judge.  As these things are occurring on private

16  property, there's really nothing that can be done to prohibit

17  them.  They can use their property essentially as they see

18  fit.  I don't know what basis -- I don't know what basis one

19  would have to prohibit them.

20        It's kind of like out on -- let me give you another

21  example because it was a case that I am intimately involved

22  in, and that's the Strip litigation involving the commercial

23  distribution out on the Strip.

24        There's nothing that prohibits the Mirage from

25  positioning someone right outside the sidewalk property line

1    on its private property and handing stuff out because it is

2    private property.

3           There's nothing that could really be done about

4    that.  That did not, at least in that case, render that

5    ordinance unconstitutional.

6           THE COURT:  Well, correct me if I'm wrong or

7    misremembering, the Mirage property, wasn't that property of

8    the Mirage over which an easement was given by the Mirage to

9    the county?

10          MR. BICE:  I used the Mirage only as an example

11   there.  That is true, but I can give you the same example at

12   any hotel along the Strip.

13          Let's assume -- you have the sidewalks which

14   parallel the Strip.  Any property owner can set a person out

15   on his or her private property and pass stuff to people as

16   they walk by.

17          That distinction did not somehow render -- well,

18   then render the prohibition on off-premises canvassing

19   thereby unconstitutional in the sense that, well, now the law

20   is underinclusive because you're allowing people from their

21   own private property to do this sort of thing.

22          THE COURT:  All right.  Please go on.

23          MR. BICE:  All right.  I would like to start, your

24   Honor -- but I do not want to take up too much time, there

25   are an awful lot of things to respond to in what Mr. Lopez

1    says.

2            But I would like to start out with actually part of

3    my own argument is, as I'm sure the Court is aware, we have

4    filed and we did file back in January a motion to dismiss or

5    for summary judgment in this case.

6            THE COURT:  Yes, I'm not taking argument on that.

7            MR. BICE:  I understand, your Honor, but in part

8    the issues are quite interrelated.

9            And what I want to bring to the Court's attention

10   is Mr. Lopez is attempting to make hay or suggest that, well,

11   we have conceded that if this is a public forum, all these

12   activities -- we lose the case, I guess, is his argument,

13   that I have conceded that fact.  That is certainly not the

14   case.

15           What has happened is, before they even filed this

16   motion for summary -- or for preliminary injunction, we had

17   moved.  In fact, it is my position that that is what prompted

18   this motion for preliminary injunction.

19           THE COURT:  That this was responsive to the motion

20   for summary judgment.

21           MR. BICE:  Yes.  Our motion is what prompted them

22   to suddenly find this urgency after two years and three

23   months.

24           But, nonetheless, the point is we filed that motion

25   because we contend that this is a nonpublic forum, and it is

24

1   a nonpublic forum, and, under the standards, we can prevail,

2   and this case should be resolved by motion up front.

3        That's why we didn't address the time, place and

4   manner analysis, because we believe this case can be resolved

5   up front.

6        If, for example, the Court finds that this is a

7   public forum, I will be back here, and I will fully brief the

8   Court as to the applicable time, place and manner

9   restrictions and why these ordinances survive that standard.

10       But we were the original moving parties here, and

11  that's why we moved on this issue.

12       If the Court would like, or as the Court can see,

13  I'll show the Court, as the Court knows, the pleadings in

14  this case in the short time it has existed has grown rather

15  lengthy.  We all have exceeded the page limitations.

16       If I were to brief every conceivable issue that

17  these particular parties want to raise, I would have yet

18  another fifty-page to brief to submit to you.

19       THE COURT:  Oh, I think you can do it in fewer than

20  fifty pages, but I think you better respond to everything the

21  plaintiffs say.

22       MR. BICE:  All right.  Well, originally, I would

23  like to point out, it is our position, and it is, this is a

24  nonpublic forum.

25       What they are trying to tell you is that they want

# AFFIDAVIT OF HAROLD LANGERT

Harold Langert, having been duly sworn, states and declares the following:

1.    I am over eighteen years of age and a resident of Clark County:

2.    At the request of Gary Peck, Director of the ACLU of Nevada, I was asked to photograph various features of the Freemont Street Experience. I was asked to try to achieve three specific objectives. The first objective was to show foot traffic densities on different days at representative times. The second objective was to record an event where the ACLU set up a table passing out flyers and talking to the public. The third objective was to show vendors passing out materials.

3.    I started shooting photographs on October 24, 2000. From 1:57 pm to 2:31 pm, I photographed pedestrians along the length of the Freemont Street Experience at various places and angles. I did this at four different times during the day. The photographs identified as numbers 1 through 10 were from this time slot.

4.    At 2:37 pm, I spotted Gary Peck, Alina Shell, and Joey Cohn, just to the west of 2nd Street. They had set up a table on the Fremont Street Experience and were passing out flyers and talking to passersby. The event lasted until 2:53 pm and is depicted in photographs identified as numbers 40 through 46.

5.    From 4:59 pm through 5:36 pm that same day, I again photographed the Freemont Street Experience. The photographs taken during this period are numbered 11 through 16.

6.    The process was repeated on October 25, 2000, from 2:47 pm through 3:39 pm. The photographs taken during this time period are numbered 17 through 28.

7.    The final shoot was on Saturday evening of October 28, 2000, from 5:35 pm to 5:57 pm.  The photographs taken during this time period are numbered 29 through 39.

8.    There are several photographs of various vendors handing out promotional items shot primarily on Saturday October 28, 2000.

9.    The time and dates that the pictures were taken are printed on the front of the photographs and are consistent with my notes and recollections.  I believe them to be accurate to within two minutes of the actual time and completely accurate as to the date.

Further  affiant sayeth naught.

_Harold Langert_

Subscribed and sworn before me this 31st day of October 2000.

Allen Lichtenstein, Notary Public for said county and state.

```
NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ALLEN LICHTENSTEIN
Appt. No. 98-24643-1
My Appt. Expires Aug. 1, 2003
```

2















Case 2:97-cv-01419-DAE-LRL   Document 126   692181   Filed 09/03/04   Page 83 of 148











































Case 2:97-cv-01419-DAE-LRL   Document 136-2692181   Filed 09/03/04   Page 109 of 148



















ALLEN LICHTENSTEIN
3315 Russell Road #H222
Las Vegas, Nevada 89120
702-433-2666

MARK LOPEZ
American Civil Liberties Union
125 Broad St., 17th Floor
New York, NY 10004
212-549-2608

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| American Civil Liberties Union of Nevada, Gary Peck, Unitarian Universalist Social Justice Committee, Paul R. Brown, The Shundahai Network, and Greg Gable, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CV-S-97-01419-LDG (RJJ) |
| The City of Las Vegas, Jan Laverty Jones, in her official capacity as the Mayor of Las Vegas, The Fremont Street Limited Liability Corp., and Mark Paris, in his official capacity as the Executive Director of The Fremont Street Limited Liability Corp. | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION UNDER PENALTY OF PERJURY

State of New York:

Mark Lopez, pursuant to 28USC §1746, hereby makes the following declaration:

1.  I am counsel of the record in the above referenced case and have been since it's

inception;

2.  In that capacity, I have contacted counsel for the Fremont Street Experience Liability Corporation and for the City of Las Vegas to determine whether my clients could freely assemble on Fremont Street and engage in peaceful First Amendment activities and under what circumstances;

3.  From the start of this litigation there has been some confusion about the defendant's authority to prohibit First Amendment activity on Fremont Street except as provided by LVMC 11.68.100 (I) (leafleting) and 11.44 (solicitation).  In their answers to interrogatories, the defendants refused to state what other activities were allowed or not allowed.  *See City Defendant's Answer to Interrogatories*, attached as Exhibit A to this declaration.

4.  Following the dismissal of the appeal and cross-appeal in this case, I sent Todd Bice, attorney for the FSELLC, a letter formerly seeking immediate permission to erect a table and display on Fremont Street for purposes of conducting informational tabling.  In that correspondence, plaintiffs also sought immediate permission to sell message-bearing merchandise, such as T-shirts, baseball hats, and buttons on Fremont Street. *See May 19, 1999 correspondence from M. Lopez to T. Bice*, attached as exhibit B.  Mr. Bice did not respond to my request until June 11, 1999, when he advised me that my clients would have to submit an application.  Despite the delay in responding to my correspondence, Mr. Bice did not include an application in his response. Instead he offered to provide an application if I again requested one. *See June 11, 1999 correspondence from T. Bice to M. Lopez*, attached as Exhibit C.  By the time I received Mr. Bice's response, however, the event my clients had planned had already passed .

5.  I did not contact FSELLC officials or counsel again about the tabling and vending regulations until October 10, 2000. Most of the plaintiffs efforts in the interim period were

directed at securing their right to distribute literature under the protection of the court's <u>Order</u>. This odyssey is explained elsewhere.  On October 10, 2000, I wrote Kristen McMillan, counsel for FSELLC, a letter specifically requesting permission on behalf of my clients to set up a small table from which to distribute literature, gather signatures, and sell T-shirts bearing political messages. I explicitly asked if there was an application that I needed to file.  *See October 10, 2000 correspondence from M. Lopez to K. McMillan,* (By overnight mail) attached as Exhibit D. I also sought clarification from Ms. McMillan whether my clients could proceed with their plans to distribute literature, gather signatures, and carry a sign or banner without threat of interference by  FSELLC security.   I asked Ms. McMillan for an immediate response because my clients wanted to schedule an activity prior to the November elections.  As of this writing, I have not received a response.  What is particularly objectionable about counsel's failure to respond to my correspondence is that the reason that I wrote Ms. McMillan in the first place is because my clients had directly contacted Mark Paris' office seeking permission to assemble on Fremont Street and conduct various First Amendment activities and they were referred to her.  Her response failed to clarify whether my clients could proceed without risking arrest and necessitated my letter to her.

5.  Not having received a response to my correspondence to Ms. McMillan, I advised my clients that they were free to go to Fremont Street, set up a small table, affix a banner to it, distribute literature, and gather signatures.  On October 24, 2000, my clients assembled on Fremont Street to proceed with their activities, only to be stopped by FSELLC security and told that their conduct was prohibited. Through the intercession of Gary Peck, the Executive Director of the ACLU of Nevada and the lead plaintiff in this case, my clients were permitted to continue with their activities, but only on the condition that they remove the table.  When I learned of this,

3

I immediately wrote Ms. McMillan a second letter objecting to the requirement that the table be removed and asking her once again to clarify the FSELLC position governing the placement of tables and the sale of message-bearing merchandise. I once again asked for an application, if that was the procedure required to be followed. *See October 24, 2000 correspondence from M. Lopez to K. McMillan* (by facsimile), attached as Exhibit E to this declaration. I never received a response from Ms. McMillan

6. On October 26, 2000, I did receive a response from Todd Bice. My letters to Ms. McMillan were apparently forwarded to him. Mr. Bice raises a number of objections to the substance of my correspondence but he fails to respond to my repeated requests for permission or an application to go forward with informational tabling on Fremont Street or to sell message-bearing merchandise. As of this writing, I have never received an application. *See October 26, 2000 correspondence from T. Bice to M. Lopez,* attached as Exhibit F to this declaration.


I declare under penalty of perjury that the forgoing is true and correct.


Mark Lopez


Executed October 30, 2000

4

1   BRADFORD R. JERBIC
    City Attorney
2   By:  WILLIAM P. HENRY
    Senior Litigation Counsel
3   Nevada Bar No. 101
    400 East Stewart Avenue, Ninth Floor
4   Las Vegas, NV 89101
    Attorneys for CITY DEFENDANTS

5

6

7               UNITED STATES DISTRICT COURT

8               FOR THE DISTRICT OF NEVADA

9                       *   *   *

10  AMERICAN CIVIL LIBERTIES UNION
    OF NEVADA, GARY PECK, UNITARIAN
11  UNIVERSALIST SOCIAL JUSTICE COM-
    MITTEE, PAUL R. BROWN, THE
12  SHUNDAHAI NETWORK and GREG
    GABLE,
13
                Plaintiffs,
14                                          CASE NO. CV-S-97-1419-DWH(LRL)

15       vs.

16  THE CITY OF LAS VEGAS, JAN
    LAVERTY JONES, in her official capacity
17  as the Mayor of Las Vegas, THE
    FREMONT STREET LIMITED LIABIL-
18  ITY CORP., and MARK PARIS, in his offi-
    cial capacity as the Executive Director of the
19  Fremont Street Limited Liability Corp.,

20              Defendants.

21

22          ANSWERS TO PLAINTIFFS' FIRST SET OF
            INTERROGATORIES TO THE CITY DEFENDANTS
23

24  TO:   AMERICAN CIVIL LIBERTIES UNION OF NEVADA, GARY PECK, UNITARIAN
          UNIVERSALIST SOCIAL JUSTICE COMMITTEE, PAUL R. BROWN, THE
25        SHUNDAHAI NETWORK and GREG GABLE, Plaintiffs, and

26  TO:   ALLEN K. LICHTENSTEIN, ESQ., and MARK LOPEZ, ESQ., their attorneys:

27        Pursuant to FED. R. CIV. P. 33(b), Defendants CITY OF LAS VEGAS, and JAN

28  LAVERTY JONES, in her official capacity as the Mayor of Las Vegas, through their

ANSWER TO INTERROGATORY NO. 15:

Yes.  The portions of the Fremont Street Experience extending north on First and Third Streets are to be extended towards Ogden Avenue.

INTERROGATORY NO. 16:

Prior to the development of the FSE, which of the following activities were permitted on the downtown streets and sidewalks now within the borders of the FSE:

(1)     In-hand distribution of literature?

(2)     Circulating petitions and collecting signatures?

(3)     Carrying of signs, banners, and placards?

(4)     Proselytizing or speaking to a gathering of listeners?

(5)     Street sales or distribution of message bearing merchandise (T-shirts, bumper stickers, hats, books) in exchange for either direct payment or a contribution?

(6)     Street solicitation of donations?

(7)     The placement of stands, tables, exhibits or displays?

OBJECTION TO INTERROGATORY NO. 16:

Defendants object to this interrogatory on the grounds that it seeks legal opinions and conclusions and that it seeks the mental impressions, conclusions, opinions, and legal theories of Defendants' attorneys.

INTERROGATORY NO. 17:

Since the opening of the FSE, which of the activities described in interrogatory number 16 are prohibited by city ordinance and which are prohibited by regulation or practice of the FSE?

OBJECTION TO INTERROGATORY NO. 17:

Defendants object to this interrogatory on the grounds that it seeks legal opinions and conclusions and that it seeks the mental impressions, conclusions, opinions, and legal theories of Defendants' attorneys.

. . . .

. . . .



1   INTERROGATORY NO. 18:

2       In the two years prior to the opening of the FSE, is there any record of disturbances,

3   citations or arrests in connection with the activities listed in interrogatory number 16? If so,

4   describe the records and the circumstances of each incident.

5   ANSWER TO INTERROGATORY NO. 18:

6       Any such records would be in the custody of the Las Vegas Metropolitan Police

7   Department.

8   INTERROGATORY NO. 19:

9       Is there any record of disturbances, citations or arrests on the FSE since its opening?

10  This question is limited to incidents related to the activities described in interrogatory number

11  16. If so, describe the records and the circumstances of each incident.

12  ANSWER TO INTERROGATORY NO. 19:

13      See answer to Interrogatory No. 18.

14  INTERROGATORY NO. 20:

15      Have city, county, or consolidated metropolitan officials issued any oral or written

16  instructions or rendered any advice to FSELLC or city officers or emplyees [sic] for regulating

17  First Amendment activity on the FSE, including any guidelines or suggestions for

18  accommodating the activities described in the complaint and in interrogatory number 16?

19  OBJECTION TO INTERROGATORY NO. 20:

20      Defendants object to this interrogatory on the grounds that it is vague, ambiguous, over

21  broad, unduly burdensome and seeks, in part, information protected by the attorney-client

22  privilege.

23  INTERROGATORY NO. 21:

24      What authority do FSELLC security personnel have to detain, arrest or remove, or

25  threaten to detain, arrest, or remove, persons from the FSE for violating its regulations or city

26  ordinances or for any reason? Cite all statutory, municipal, or other lawful authority for that

27  power.

28  . . . .

1  OBJECTION TO INTERROGATORY NO. 21:

2      Defendants object to this interrogatory on the grounds that it seeks legal opinions and

3  conclusions and that it seeks the mental impressions, conclusions, opinions, and legal theories

4  of Defendants' attorneys.

5  INTERROGATORY NO. 22:

6      Does the exception for NLRB protected activities contained in LVMC 11.68.100 apply

7  to all NLRB activities (i.e., picketing, circulating petitions, soliciting donations, holding

8  rallies, giving speeches) or just the in-hand distribution of literature?

9  ANSWER AND OBJECTION TO INTERROGATORY NO. 22:

10      Defendants object to this interrogatory on the grounds that it seeks legal opinions and

11  conclusions.  Without waiving said objection, Las Vegas Municipal Code § 68.100 does not

12  create an exception for NLRB-protected activities.  The ordinance recognizes the general

13  federal preemption of all state and local laws for any matters arguably within the purview of

14  the National Labor Relations Act as held by the United States Supreme Court in *San Diego*

15  *Building Trades Council v. Garmon*, 359 U.S. 236 (1959).

16  INTERROGATORY NO. 23:

17      Is solicitation or in-hand distribution of literature exempted from LVMC 10.44 or

18  11.68.100 if conducted by a business or agent of a member of the FSELLC or a business located

19  in or about the FSE?  If so, what is the scope of the permissible activities and source of the

20  exemption?

21  ANSWER TO INTERROGATORY NO. 23:

22      No.

23  INTERROGATORY NO. 24:

24      List all the governmental interests purportedly served by LVMC 11.68.100 and LVMC

25  11.44, and by the grant of authority to FSELLC agents to regulate or prohibit Plaintiffs' activities

26  as described in the complaint and in interrogatory number 16.  Identify all studies, reports, or

27  other documents which support or refute those interests.

28  . . . .

1  I have read th   egoing CITY OF LAS VEGAS' AN   ERS TO PLAINTIFF'S

2  INTERROGATORIES and know the contents thereof and that the same are true except as to

3  those matters therein stated on information and belief, and as to such matters, I believe them to

4  be true.  Further, I have been advised of my duty to supplement these responses to include

5  information acquired hereafter and agree to that.

6

7                                             LARRY K. BARTON

8

9  SUBSCRIBED AND SWORN to before

10  me this 9th day of February, 1998.

11  NOTARY PUBLIC

12

13  OBJECTIONS.

14  DATED this 9th day of February, 1998.

15                          BRADFORD R. JERBIC
                             City Attorney
16

17  By:

18                          WILLIAM P. HENRY
                             Senior Litigation Counsel
                             Nevada Bar No. 101
19                          400 East Stewart Avenue, Ninth Floor
                             Las Vegas, NV 89101
20                          Attorneys for CITY DEFENDANTS

21

22

23

24

25

26

27

28

LEGAL DEPARTMENT

Mark J. Lopez
*Senior Staff*
*Attorney*

# ACLU

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

National Headquarters 125 Broad Street, New York, NY 10004-2400

Tel (212) 549-2608  Fax (212) 549-2651

May 19, 1999


Todd L. Bice
Schreck Morris
300 South Fourth St., Ste 1200
Las Vegas, NV 89101


Dear Todd:

Judge Hagen has entered a preliminary injunction enjoining the enforcement of LVMC 11.68.100(I) and LVMC 68.100(B). He has also granted the defendants motion for summary judgment as it pertains to solicitation, LVMC 11.44, and the ban on informational tabling, LVMC 11.68 (100)(H). The basis for upholding the ban on tabling was the plaintiffs failure to assert an "as applied" challenge to the restriction. By submission of this letter, plaintiffs are formally seeking immediate permission to erect a table and display on Fremont Street for purposes of conducting informational tabling. By way of this letter, plaintiffs are also seeking immediate permission to sell message bearing T-shirts, baseball hats, and buttons on Fremont Street.

In addition to the foregoing, plaintiffs wish to engage in certain other activities on Fremont Street, including distributing literature, canvassing for signatures on petitions, carrying pickets or signs, and otherwise advancing their views on the public by speaking and communicating with them. While plaintiffs are aware of no city ordinances or written FSELLC policies that require that they obtain permission to go forward with these activities -- or even notify FSELLC or city officials in advance -- I am nevertheless bringing this matter to your attention to avoid any misunderstanding about the lawfulness of plaintiffs' intentions. If you have any basis to believe that plaintiffs actions are somehow in violation of any municipal ordinance or FSELLC policy, please notify me immediately.

Unfortunately, I am concerned that based on our April 25, 1999 meeting, your response will fail to shed any light on your actual policies, and that plaintiffs must act at their own peril. I expect that you will continue to obfuscate the issues in this case by refusing to state for certain the extent of the regulation. For this reason, we will follow-up this correspondence with written discovery seeking to ascertain the same information. The city, as you know, has already refused to provide the requested information and we will be asking the court to resolve the impasse if we

Nadine Strossen *President*          Ira Glasser *Executive Director*          Kenneth B. Clark *Chair, National Advisory Council*          Richard Zacks *Treasurer*

May 19, 1999
Page 2 of 3

cannot reach a satisfactory negotiation.[1]

     This correspondence, however, is not written to avoid the requirement of formal discovery. It is being written to ensure that my clients will not be harassed, intimidated, threatened with arrest or otherwise prevented from freely distributing literature on Fremont Street, canvassing for signatures, carrying signs or proselytizing. As noted above, I do not believe that my clients need permission from FSELLC officials to engage in the foregoing activities, or that to do so would violate any municipal ordinance or FSELLC policy. If I am mistaken, please contact me immediately as my clients plan to go forward with this action within the next ten days. In preparing your response to this correspondence, I would also ask that you respond to our previously made requests for permission to set up a small table to distribute literature and our request to sell merchandise (T-shirts, bumper stickers). LVMC § 11.680(101)(B) and (H) require prior approval from FSELLC officials.

     An additional matter that requires clarification is your interpretation of Judge Hagen's Order upholding the solicitation ordinance. Shortly after Judge Hagen issued his opinion upholding that ordinance, one of the organizational plaintiffs in this case, the Shundahai Network, was informed by FSELLC officials that a political leaflet advocating "food not bombs" could not be distributed on Fremont Street because it contained the solicitation, "We need help - anything - food - donations - people - cars - love - kitchen supplies." In a letter dated May 1, 1998 you brought this matter to the attention of Allen Lichtenstein with the observation that the leafletters were in violation of the solicitation ordinance because they were seeking donations or other forms of assistance and because they provided a phone number and a website where they could be contacted. The question I raise is whether the plaintiffs will be considered in violation of the solicitation ordinance if the literature that is distributed merely solicits persons to contact the organization for additional information about the organization without any reference to a contribution or membership fee. If it is your intention to instruct FSELLC security personnel to

---

    [1]As you are no doubt aware, the district court refused to enter summary judgment with respect to some of the forgoing activities because of the existence of a dispute between the parties whether or not FSELLC officials or city officials purported to prohibit or regulate those activities as alleged in the complaint. We continue to believe that it is the intention of FSELLC officials to ban all speech on Fremont Street and have previously submitted the sworn declarations of Gary Peck, director of the ACLUN, to substantiate this claim. Therein, he recounts how he was asked to leave Fremont Street by the local police in connection with a small rally he participated in prior to the filing of this lawsuit and summarizes a follow-up conversation with Kristin McMillan of your office confirming that no First Amendment activity is allowed on Fremont Street. The fact that you may dispute the accuracy of Mr. Peck's account of those events, obscures the far more important fact that neither plaintiffs nor the court can discern from existing municipal ordinances or other materials made available in this case, the extent to which the broad range of activities alleged in the complaint are completely banned or regulated.

May 19, 1999
Page 3 of 3

enforce the ordinance against this type of solicitation, it would be helpful to know that in advance so that any dispute with FSELLC security can be headed off.

Finally, receipt of this letter should clarify any misunderstanding about the posture of this lawsuit. Plaintiffs have maintained all along that they properly asserted both a facial and as "an applied" challenge to the numerous restrictions on First Amendment activity alleged in the complaint. The record is somewhat confused on this point because of the litigation tactics you have adopted. This correspondence places you on notice that plaintiffs seek to engage in the full range of First Amendment activities alleged in the complaint and that any interference with those efforts clearly supports an "as applied" claim.

I look forward to your prompt reply to the requests made of you in this correspondence.

Yours truly,

Mark J. Lopez

MJL/pa

cc:   William Henry
      Allen Lichtenstein

**SCHRECK·MORRIS**

ATTORNEYS AT LAW

1200 BANK OF AMERICA PLAZA

300 SOUTH FOURTH STREET

LAS VEGAS, NEVADA 89101

(702) 382-2101 · FAX (702) 382-8135

www~~June 11, 1999~~.com

FRANK A. SCHRECK
STEVE MORRIS
ANDREW S. BRIGNONE
LESLIE TERRY JONES
KRISTINA PICKERING
JOHN A. GODFREY
ANN MORGAN
SEAN T. McGOWAN
ELLEN SCHULHOFER
JAMES J. PISANELLI
CLARK VELLIS

JAMES R. CHAMBERLAIN
DENNIS GALLAGHER
THIERRY V. BARKLEY
MARGARET L. SANNER
F. EDWARD MULHOLLAND II
TODD L. BICE
ELIZABETH M. FIELDER
ANN LYTER THOMAS
ELAYNA VOUCHAH
SONIA CHURCH VERNEYS
DENISE MICHAELIDES
MARY J. DRURY
JOHN P. DESMOND
ADAM P. SEGAL
MATTHEW McCAUGHEY
AMELIA DE LOS SANTOS
JENNIFER L. YELTON
WENDY MEDURA
ROBERT J. GRASSO
SHAWN G. PEARSON
DAVID B. DORNAK
MATTHEW L. HEINHOLD
PAUL D COLTON

Mark Lopez
American Civil Liberties Union
125 Broad Street
17th Floor
New York, NY 10004

Re:   ACLU v. City of Las Vegas

Dear Mark:

I am in receipt of your letter dated May 19, 1999. Your letter professes the need for an urgent response. However, it was sent by mail and concerns issues that the Court addressed over a year ago. Contrary to your claim, the letter does not "clarify" anything.

Any misunderstandings by your clients can most simply be resolved if the ACLU simply follows the Federal Rules of Civil Procedure. The position of my clients as well as that of the City have been known by you for over a year. While you now claim sudden urgency, the facts show otherwise. In that regard, we still have not received a proposed scheduling order from the plaintiffs from our meeting in April.

As to your proposal to conduct certain activities in the Mall, we expect your clients to conform their conduct to the Court's order as well as the terms of the City's ordinances.

Concerning your request that we respond to a previously made request for permission to set up tables and sell merchandise, your statement is untrue. To my knowledge, neither you nor your clients have ever made such a request. Like everyone else, your clients can submit an appropriate application. If you need a copy of an application, please let me know.

SCHRECK MORRIS
ATTORNEYS AT LAW

Mark Lopez
June 11, 1999
Page 2

Finally, both I and my co-counsel are always willing to work with opposing counsel to move cases forward. Your letter is not an effort to do so. The issues in this case have been joined for over a year. Self-serving correspondence will not change the facts, the Court's ruling or move this matter forward. Your clients have been treated more than fairly in this litigation and they are responsible for the posture of this case.

If you have any questions, please do not hesitate to call me.

Best regards.

Sincerely,

SCHRECK MORRIS

Todd L. Bice

TLB/mw
cc:   Mark Paris
      William P. Henry
      Kristin B. McMillan

**LEGAL DEPARTMENT**

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

National Headquarters 125 Broad Street, New York, NY 10004-2400                    Tel (212) 549-2500  Fax (212) 549-2651

By Federal Express Overnight Mail

October 10, 2000

Kristen B. McMillan
Hale, Lane, Peek, Dennison,
Howard, Anderson, and Pearl
2300 West Sahara Avenue
Eighth Floor, Box 8
Las Vegas, Nevada 89102

Dear Kristen:

Last week, Reinard Knutsen, a representative of the Shundahai Network and one of the organizational plaintiffs in this case, contacted FSELLC officials seeking permission to stage a small protest on FSELLC property prior to the November 2000 election. Approximately six members intended to participate and he sought clarification whether they would be permitted to assemble, speak to the public, carry a banner identifying the organization, distribute literature, sell T-shirts with a political message, and to set up a table and display in connection with the forgoing activities.

Mr. Knutsen was directed to you and advised that the FSELLC had no policies prohibiting or regulating the forgoing conduct. He was also told that city ordinances may come into play to prevent some or all of the activities. You then forwarded the relevant city ordinances, which have in turn been forwarded to me. After reviewing those ordinances, I find nothing in them that is specifically addressed to most of the forgoing activities (i.e. staging a gathering, proselytizing, collecting signatures, carrying a banner, etc.). Are my clients to assume that we safely can go forward with their planned activity without threat of arrest or must they proceed at their own risk?

Please note that the LVMC 11.68 is addressed to mall vending and the placement of tables or displays on mall property. The ordinance specifically grants FSELLC officials discretion to regulate those activities. Accordingly, consider this letter as a request on behalf of the Shundahai Network for permission to set up a table and display and to sell their T-shirts in conjunction with their planned gathering. If there is an application, please let me know.

Nadine Strossen *President*          Ira Glasser *Executive Director*          Kenneth B. Clark *Chair, National Advisory Council*          Richard Zacks *Treasurer*

In view of the immediacy of the November election, your prompt reply is requested.
Please feel free to contact me if you have any questions.

Very Truly Yours,

Mark Lopez

cc : Allen Lichtenstein
     Todd Bice
     William Henry

LEGAL DEPARTMENT

Mark J. Lopez
*Senior Staff
Attorney*

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

National Headquarters 125 Broad Street, New York, NY 10004-2400

Tel (212) 549-2608 Fax (212) 549-2651 E-Mail: mlopez@aclu.org

By Facsimile

October 25, 2000

Kristen McMillan
Hale, Lane, Peek, Dennison,
Howard, Anderson and Pearl
2300 West Sahara Avenue
Eighth Floor, Box 8
Las Vegas, NV 89102

Dear Kristen:

On October 10, 2000, I wrote you an urgent letter seeking clarification whether a small group of activists I represent in this litigation would be permitted to assemble on Fremont Street and engage in various First Amendment activities. I explicitly sought permission on behalf of my clients to set up a small table from which to distribute literature, gather signatures and sell T-shirts, and the like, bearing political messages. Because of the discretion FSELLC officials have over the placement of tables and displays on the mall and over vending, I sought out advance permission from those officials (through your office) to go forward with the planned activities of my clients. I specifically asked you to notify me if there was an application process. I also told you that I needed a quick response because my clients wanted to proceed prior to the November election. As of this writing, I have had no response to my correspondence.

While I understand that you may be busy, the fact is that when my clients initially contacted Mark Paris' office seeking this permission, they were referred to your office and spoke with you directly. You advised them that there were no FSELLC policies prohibiting those activities. The practices of FSELLC security staff seem to be at odds with the information that you provided. On October 24, 2000, a small group of ACLU supporters set up a small table on the mall and started distributing literature and gathering signatures. Security immediately told them they had to leave. Only through the intervention of Gary Peck, were they eventually allowed to stay and continue their activities, but only on the condition that they remove the table.

In view of the forgoing, I ask you once again to clarify your position about the placement of tables and displays on the mall and about the sale of message-bearing merchandise. If there is a procedure we must follow or application we must file, please provide it.

Thank you for your attention to this matter.

Very Truly Yours,

Mark Lopez,

cc: Allen Lichtenstein
    Todd Bice
    William Henry

FRANK A. SCHRECK
STEVE MORRIS
ANDREW S. BRIGNONE
LESLIE TERRY JONES
KRISTINA PICKERING
JOHN A. GODFREY
ANN MORGAN
SEAN T. McGOWAN
ELLEN SCHULHOFER
JAMES J. PISANELLI
CLARK V. VELLIS
TODD L. BICE

SCHRECK MORRIS

ATTORNEYS AT LAW

1200 BANK OF AMERICA PLAZA

300 SOUTH FOURTH STREET

LAS VEGAS, NEVADA 89101

(702) 382-2101 · FAX (702) 382-8135

WWW.SCHRECKMORRIS.COM

JAMES R. CHAMBERLAIN
DENNIS GALLAGHER
MARGARET L. SANNER
F. EDWARD MULHOLLAND II
ELIZABETH M. PELDER
ELAYNA YOUCHAH
SONIA CHURCH VERMEYS
DENISE MICHAELISCE
MARY J. DRURY
JOHN R. DESMOND
ADAM R. SEGAL
MATTHEW McCAUGHEY
AMELIA DE LOS SANTOS
WENDY MEDURA
ROBERT J. GRASSO
SHAWN G. PEARSON
DAVID B. DORNAK
MATTHEW L. MEINHOLD
PAUL D. COLTON

October 26, 2000

*Via Facsimile & U.S. Mail*

Mark Lopez
American Civil Liberties Union
125 Broad Street
17th Floor
New York, NY 10004

      Re:    Your Letters of October 10 and October 25

Dear Mark:

The delay in responding to your correspondence is my responsibility. However, I have nothing to add to the correspondence I previously sent you concerning all of these same issues. Respectfully, it seems that the ACLU sends out letters as a pretext to facilitate further litigation, not solve problems. The issues of protest, solicitation and erection of tables were addressed to you over a year ago. In fact, we were both in court last month and at no time did you suggest to the judge that there were outstanding matters that needed "immediate" attention. On the contrary, the parties agreed that the outstanding matters could be resolved by summary judgment. Summary judgment is appropriate when there is no dispute as to a material fact. There is none here. The remaining issues are questions of law for which you can fully advise your clients.

Furthermore, your letters are factually inaccurate. There was no intervention necessary concerning any incident on October 24, 2000. There was never any discussion by Mr. Knutsen concerning the erection of tables. Instead, Mr. Knutsen offered to send a letter to Ms. McMillan outlining the activities that he proposed and the dates. Instead of receiving the promised letter from Mr. Knutsen, we received your letter trying to rehash issues raised in correspondence last year. Again, the remaining issues are to be addressed by summary judgment under the Court's order. I look forward to reviewing your forthcoming motion.

SCHRECK MORRIS
ATTORNEYS AT LAW

Mark Lopez
October 26, 2000
Page 2

Best regards.

Sincerely,

Todd L. Bice

TLB/mw
cc:   Mark Paris
      William P. Henry
      Kristin B. McMillan

Allen Lichtenstein
3315 Russell Road #H222
Las Vegas, Nevada 89120
702-433-2666

Mark Lopez
American Civil Liberties Union
125 Broad St., 17th Floor
New York, NY 10004
212-549-2608

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| American Civil Liberties Union of Nevada, Gary Peck, Unitarian Universalist Social Justice Committee, Paul R. Brown, The Shundahai Network, and Greg Gable, <br><br>    Plaintiffs, <br><br>        vs. <br><br> The City of Las Vegas, Jan Laverty Jones, in her official capacity as the Mayor of Las Vegas, The Fremont Street Limited Liability Corp., and Mark Paris, in his official capacity as the Executive Director of The Fremont Street Limited Liability Corp. <br><br>    Defendants. | CV-S-97-01419-DWH (LRL) <br><br> **DECLARATION OF** <br> **ALLEN LICHTENSTEIN** |

DECLARATION UNDER PENALTY OF PERJURY

State of Nevada

Allen Lichtenstein, pursuant to 28 USC § 1746 hereby makes the following declaration:

1.    I am counsel of record for the Plaintiffs in the above entitled case.

2.    In my capacity as Plaintiffs' counsel I have been in contact with  counsel for the Fremont Street Experience LLC.

3.    I received the attached May 1, 1998 letter from Todd Bice (attachment 'a') concerning the flyer (attached to Mr. Bice's letter) handed out and the Fremont Street Experience by the group Food not Bombs.

1        4.     In his letter, Mr. Bice stated the FSELLC's  position that the words "We need help"

2    as violating the ban against solicitation.

3        5.     On March 3, 2000 I wrote a letter to Mr. Bice (attachment 'b') concerning another

4    incident of what I perceived to be an over inclusive interpretation by the FSELLC of the ban on

5    soliciting at the Fremont Street Experience.

6        6.     The letter referred to an incident on February 3, 2000 in which the Shundai

7    Organization was told the phrase "join us" in the flyers was impermissible solicitation. The group was

8    only allowed to distribute its flyers after the "join us" phrase was crossed out.

9        I declare under penalty of perjury that the forgoing is true and correct.

13    Allen Lichtenstein

14    Executed October 31, 2000

2

SCHRECK MORRIS

ATTORNEYS AT LAW

1200 BANK OF AMERICA PLAZA

300 SOUTH FOURTH STREET

LAS VEGAS, NEVADA 89101

(702) 382-2101 · FAX (702) 382-8135

FRANK A. SCHRECK
STEVE MORRIS
ANDREW S. BRIGNONE
LESLIE TERRY JONES
KRISTINA PICKERING
JOHN A. GODFREY
ANN MORGAN*
SEAN T. MCGOWAN
ELLEN SCHULHOFER
JAMES J. PISANELLI
CLARK VELLIS

*RENO MANAGING PARTNER

JAMES R. CHAMBERLAIN
THIERRY V. BARKLEY
F. EDWARD MULHOLLAND II
TODD L. BICE
AMANDA O. YOUNG
ANN LYTER THOMAS
ELAYNA YOUCHAM
SONIA CHURCH VERMEYS
DENISE BARTON
LISA A. NAPOLI
STEPHEN M. SULLIVAN
ADAM P. SEGAL
MATTHEW MCCAUGHEY
ELIZABETH M. FIELDER
MARY J. DRURY
AMELIA DE LOS SANTOS
AKASH D. SETHI
JENNIFER L. YELTON
WENDY MEDURA
JOHN P. DESMOND

May 1, 1998

VIA FACSIMILE
AND U.S. MAIL

Allen Lichtenstein
3315 Russell Road, #H222
Las Vegas, Nevada 89120

Re:    ACLU v. City of Las Vegas

Dear Allen:

I have read with interest your comments to the media concerning the above-referenced matter. Apparently, your client, Gary Peck, claims that handbilling, the sale of merchandise and protests of an unspecified form are all now freely allowed in the Fremont Street Experience Pedestrian Mall (the "Mall"). As lawyers, I think we are both quite cognizant of the significance of the Court's finding that the Mall is not a public forum for speech and that such claims are untrue.

In that regard, it has come to my attention that one of your clients was distributing copies of the enclosed document within the Mall. Your client's flyer clearly violates the solicitation ordinance. It asks for donations or other forms of assistance. It furthermore provides a phone number as well as a web site where your client can be contacted. The solicitation ordinance expressly prohibits any requests whether written or oral for charity, business or patronage.

You argued to the Court that the solicitation ordinance should be enjoined at least to the extent it prohibits the distribution of handbills or other documents which ask for or solicit funds at a future date or location. The Court declined that request. In fact, it awarded the defendants summary judgment on that question. It is unfortunate that your client chooses to ignore the Court's ruling. While I understand that both you and your client are disappointed with the Court's ruling that the Mall is a non-public forum, the appropriate response for the plaintiffs is to appeal, not ignore the Court's ruling.

Furthermore, the suggestion to the media by Mr. Peck that the Mall is now open for supposed vending of merchandise is irresponsible. First, I note that the plaintiffs represented to the Court that they do not "sell" merchandise. Instead, the plaintiffs claim that they merely give away merchandise in exchange for "donations." The Court's order clearly addresses that issue, noting that it constitutes solicitation and is prohibited by the solicitation ordinance. I assume that the plaintiffs did not make

SCHRECK MORRIS
ATTORNEYS AT LAW

Allen Lichtenstein
May 1, 1998
Page 2

a misrepresentation when they informed the Court that they are not engaged in the "sale" of any merchandise.

As you know, I have been engaged in representing several clients against the various t-shirt vendors that sought to inundate the strip in 1996. Like your clients, those vendors claimed that they were not "selling" any merchandise. They insisted that they were exempt from the state and local regulations applicable to those that "sell" merchandise (i.e. sales tax, business licenses, etc.) because they were engaged in charitable solicitation. This form of "solicitation" was furthermore a basis for maintaining a "charitable" tax-exempt status with the Internal Revenue Service. Your client's activities cannot be a "sale" for purposes of one law but yet constitute a "donation" for purposes of all others.

I hope that your clients will conform their activity to the Court's order and not necessitate further legal action.

Best regards.

Sincerely,

SCHRECK MORRIS

Todd L. Bice

TLB/mw
Enclosure

# *Las Vegas*

# *Food not Bombs*

Because **FOOD** is a **RIGHT** not a *privilege!*
Because there is enough food for everyone to eat!
Because SCARCITY is a LIE!

Because Food — Grows on Trees

**POVERTY** is — *capitalism make*
a form of — *food a source*
VIOLENCE — of profit not *a*
not necessary — source of *nutrition*
or natural! — Because we need
— COMMUNITY
Because we need HOMES — not CONTROL!
not JAILS!

## FREE FOOD !!!

Pearson Park ( Washington & D St )
EVERY Sunday 2- 4 pm  Info 260-8378

www.shundahai.org/fnb



## WHY    FOOD NOT BOMBS?

Tables to provide info about food, peace, and promote non-violence

Recent studies have indicated that 5 million children go hungry every night in the United States. Enough food is wasted each day to feed those children, and all the adults that go hungry in this country. Hunger is not an agricultural problem, it is a problem of distribution.

In 1980 Food Not Bombs was formed in Boston by a group of anti-nuclear activists to redistribute some of the food that is thrown away each day. They began by collecting edible food from warehouses and grocer stores that was either in surplus or deemed unsalable. If a produce warehouse has food that needs to be used within a day or two, it can no longer be sold to a retail grocer because it won't have the necessary shelf life. Grocers also have produce that needs to be used immediately, is partially damaged or is just physically unappealing and thus won't sell. This food would then be taken to local soup kitchens where it was prepared and served to hungry people the same day.

Nutrition is also an important aspect of fighting hunger. While there is no shortage of food, there is a predominance of unhealthy food and unhealthy diets-especially among poor people. This condition is reinforced by social agencies which serve people primarily meat based diets with mostly canned and processed fruits and vegetables. Food Not Bombs serves and distributes only vegetarian food. It would be very difficult to guarantee the safety of outdated or marginal meat products. Grains, beans, and fresh vegetables have a lower fat content than meat, and they also can provide high amounts of protein. Food Not Bombs also makes great efforts to provide organically grown foods. Many of the chemical fertilizers and pesticides leave residues or become ingrained within produce and are clear but insufficiently measured threats to one's health. the manufacture and use of these chemicals is also destroying our environment through toxic air emissions and runoff.

After developing this basic operation and solidifying their contact with suppliers, Food Not Bombs began preparing their own meals for political rallies and for serving to people on the streets. In this way they worked to feed hungry people where they were, in a non-institutional setting and to publicly demonstrate that hunger exists and that our country should be using its resources to feed people and not to create weapons of war.

WE NEED HELP! ANYTHING - Food - DONATIONS - PEPOLE - CARS - LOVE - KITCHEN SUPPLIES



# ALLEN LICHTENSTEIN
### ATTORNEY AT LAW

3315  RUSSELL RD., #H222
LAS VEGAS, NV 89120
PHONE (702) 433-2666
FAX (702)-433-9591

March 3, 2000

Todd Bice
Schreck Morris
300 South Fourth Street, #1200
Las Vegas, NV 89101

Dear Mr. Bice:

An incident occurring on or about February 3, 2000 has come to my attention. Individuals attempting to distribute the attached flyer were prevented from doing so by Fremont Street Experience security personnel on the grounds that the material contained unlawful solicitation. As you can see, no appeal for money, goods or other material is included in the flyer's message. The security personnel determined that the phrase "join us" along with a phone number violated LVMC Chapter 10.44. Clearly, our position is that nothing in the handout in question comes anywhere close to fitting into the definition of "solicitation" contained within LVMC 10.44.010(A).

In the past, you have requested that we inform you of these incidents to help avoid unnecessary court proceedings. In that spirit I am writing this letter, along with the request that you inform me as to whether the actions of Fremont Street Experience security personnel and their interpretation of LVMC 10.44.010(A) conforms with your understanding of the scope of the term "solicitation" in the ordinance. As you are well aware the question of the breadth of that definition is the subject of an upcoming motion by the Plaintiffs. If the "join us" language is a matter of contention, that fact needs to be reflected in the argument of both sides. If it is not, and the security personnel exceeded their authority, then the matter is more one of training.

I appreciate your timely response to this letter so that we can clarify the scope of the areas of disagreement to allow both sides in the litigation to address to substantive issues.

Very truly yours,

Allen Lichtenstein
AL/ll

# NUCLEAR TEST TODAY
## OBOE 3

YOUR
TAX
$$$$
AT
WORK

END
THE
NUCLEAR
THREAT



RADIATION
WILL
KILL

YOU

YOUR
GOVERNMENT
DOESN'T
WANT YOU
TO KNOW
Join Us
702-647-3095
www.shundahai.org

YOUR
HEALTH
AT
RISK

# NUCLEAR TEST TODAY
## OBOE 3

YOUR
TAX
$$$$
AT
WORK

END
THE
NUCLEAR
THREAT

RADIATION
WILL
KILL

YOU

YOUR
GOVERNMENT
DOESN'T
WANT YOU
TO KNOW
Join Us
702-647-3095
www.shundahai.org

YOUR
HEALTH
AT
RISK

# NUCLEAR TEST TODAY
## OBOE 3

YOUR
TAX
$$$$
AT
WORK

END
THE
NUCLEAR
THREAT

RADIATION
WILL
KILL

YOU

YOUR
GOVERNMENT
DOESN'T
WANT YOU
TO KNOW
Join Us
702-647-3095
www.shundahai.org

YOUR
HEALTH
AT
RISK

# NUCLEAR TEST TODAY
## OBOE 3

YOUR
TAX
$$$$
AT
WORK

END
THE
NUCLEAR
THREAT

RADIATION
WILL
KILL

YOU

YOUR
GOVERNMENT
DOESN'T
WANT YOU
TO KNOW
Join Us
702-647-3095
www.shundahai.org

YOUR
HEALTH
AT
RISK

# FREE

YOURSELF FROM RADIATION DAMNATION

THE WESTERN SHOSHONE NATION
IS THE MOST BOMBED NATION IN THE WORLD!!

THE NEVADA TEST SITE
*(60 MILES NORTH OF VEGAS)*
HAS BECOME THE
PERMANENT LOW- LEVEL WASTE DUMP
OF THE NATION.

OBOE 3 IS ONE OF **10,000 NUCLEAR TESTS!!**
FOR EVERY TEST, THERE IS A **DIRECT THREAT**
TO YOUR HEALTH.
AND TO THE SURVIVAL OF **ALL LIFE** TO COME.
**DON'T WAIT**
FOR THE GOVERNMENT TO TELL YOU WHY YOU'RE SICK.
HELP STOP THE MADNESS.
**END THE NUCLEAR THREAT!**

Join Us
702-647-3095
www.shundahai.org

# FREE

YOURSELF FROM RADIATION DAMNATION

THE WESTERN SHOSHONE NATION
IS THE MOST BOMBED NATION IN THE WORLD!!

THE NEVADA TEST SITE
*(60 MILES NORTH OF VEGAS)*
HAS BECOME THE
PERMANENT LOW- LEVEL WASTE DUMP
OF THE NATION.

OBOE 3 IS ONE OF **10,000 NUCLEAR TESTS!!**
FOR EVERY TEST, THERE IS A **DIRECT THREAT**
TO YOUR HEALTH.
AND TO THE SURVIVAL OF **ALL LIFE** TO COME
**DON'T WAIT**
FOR THE GOVERNMENT TO TELL YOU WHY YOU'RE SICK
HELP STOP THE MADNESS.
**END THE NUCLEAR THREAT!**

Join Us
702-647-3095
www.shundahai.org

# FREE

YOURSELF FROM RADIATION DAMNATION

THE WESTERN SHOSHONE NATION
IS THE MOST BOMBED NATION IN THE WORLD!!

THE NEVADA TEST SITE
*(60 MILES NORTH OF VEGAS)*
HAS BECOME THE
PERMANENT LOW- LEVEL WASTE DUMP
OF THE NATION.

OBOE 3 IS ONE OF **10,000 NUCLEAR TESTS!!**
FOR EVERY TEST, THERE IS A **DIRECT THREAT**
TO YOUR HEALTH.
AND TO THE SURVIVAL OF **ALL LIFE** TO COME.
**DON'T WAIT**
FOR THE GOVERNMENT TO TELL YOU WHY YOU'RE SICK.
HELP STOP THE MADNESS.
**END THE NUCLEAR THREAT!**

Join Us
702-647-3095
www.shundahai.org

# FREE

YOURSELF FROM RADIATION DAMNATION

THE WESTERN SHOSHONE NATION
IS THE MOST BOMBED NATION IN THE WORLD!!

THE NEVADA TEST SITE
*(60 MILES NORTH OF VEGAS)*
HAS BECOME THE
PERMANENT LOW- LEVEL WASTE DUMP
OF THE NATION.

OBOE 3 IS ONE OF **10,000 NUCLEAR TESTS!!**
FOR EVERY TEST, THERE IS A **DIRECT THREAT**
TO YOUR HEALTH.
AND TO THE SURVIVAL OF **ALL LIFE** TO COME.
**DON'T WAIT**
FOR THE GOVERNMENT TO TELL YOU WHY YOU'RE SICK
HELP STOP THE MADNESS.
**END THE NUCLEAR THREAT!**

Join Us
702-647-3095
www.shundahai.org